# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

2311 RACING LLC, d/b/a 23XI Racing; FRONT ROW MOTORSPORTS, INC.,
*Plaintiffs-Appellees*,

v.

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC;
and JAMES FRANCE,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of North Carolina
No. 3:24-cv-00886-KDB-SCR (Hon. Kenneth D. Bell)

## OPENING BRIEF OF APPELLANTS NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC AND JAMES FRANCE

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com

Tricia Wilson Magee
SHUMAKER, LOOP &
  KENDRICK, LLP
101 S. Tryon Street, Suite 2200
Charlotte, NC 28280
(704) 945-2961
tmagee@shumaker.com

February 12, 2025

Gregory G. Garre
Anna M. Rathbun
Christopher J. Brown
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
lawrence.buterman@lw.com

*Counsel for Defendants-Appellants*
*National Association for Stock Car Auto Racing, LLC and James France*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION ........................................................1

ISSUES PRESENTED ...........................................................................1

INTRODUCTION ..................................................................................2

STATEMENT OF THE CASE ..............................................................6

    A.    Factual Background................................................................6

        1.    NASCAR's Mission To Grow Stock-Car Racing .....................6

        2.    Other Motorsports Leagues And Sports In The U.S..................8

        3.    Racing Team Owners Jointly Negotiated For The Charter System ...............................................................10

        4.    Lengthy Negotiations Over The 2025 Charters ........................13

    B.    Procedural Background .........................................................17

        1.    This Lawsuit.............................................................17

        2.    The District Court's Mandatory Preliminary Injunctions.........20

SUMMARY OF THE ARGUMENT ....................................................25

STANDARD OF REVIEW ..................................................................27

ARGUMENT .......................................................................................28

    A.    The District Court's Injunctions Upset The Status Quo And Thus Triggered The Heightened Standard For Mandatory Injunctions.......28

    B.    Plaintiffs Have Not Established That They Are Likely, Much Less Clearly Likely, To Succeed On The Merits Of Their Sherman Act Claim ...........................................................33

1. Plaintiffs Have Not Shown That NASCAR Wields Monopsony Power In A Valid, Relevant Market ..................... 33

2. In Any Event, Even Assuming A Relevant Market, Plaintiffs Did Not Demonstrate The Release Is Anticompetitive ......................................................................... 40

C. The District Court's Injunctions Contradict Plaintiffs' Complaint And Their Attempt To Hold The Charters Unlawful .......................... 53

D. The District Court's Errors Mandate Reversal Of Both Of Its Injunction Orders ................................................................................ 56

CONCLUSION ..................................................................................................... 57

STATEMENT REGARDING ORAL ARGUMENT ........................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abcor Corp. v. AM International, Inc.*,
  916 F.2d 924 (4th Cir. 1990) ...................................................................41, 46

*Advanced Health-Care Services, Inc. v. Radford Community Hospital*,
  910 F.2d 139 (4th Cir. 1990) ...............................................................33

*Alexander v. Gardner-Denver Co.*,
  415 U.S. 36 (1974)...............................................................................51

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)..............................................................................45

*Belmora LLC v. Bayer Consumer Care AG*,
  987 F.3d 284 (4th Cir. 2021) ...............................................................34

*In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*,
  85 F.4th 1070 (11th Cir. 2023), *cert. denied*,
  144 S. Ct. 2686 (2024)........................................................................42

*Brookins v. International Motor Contest Association*,
  219 F.3d 849 (8th Cir. 2000) ...............................................................37

*Campfield v. State Farm Mutual Automobile Insurance Co.*,
  532 F.3d 1111 (10th Cir. 2008) .............................................34, 35, 40

*Cedeno v. Sasson*,
  100 F.4th 386 (2d Cir. 2024) ...............................................................50

*Chicago Professional Sports L.P. v. National Basketball Association*,
  961 F.2d 667 (7th Cir. 1992) ...............................................................51

*Consul, Ltd. v. Transco Energy Co.*,
  805 F.2d 490 (4th Cir. 1986) .......................................................33, 40

*Continental Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) .......................................................51, 52

*Duffy Theatres, Inc. v. Griffith Consolidated Theatres, Inc.*,
    208 F.2d 316 (10th Cir. 1953) ...........................................42

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ...........................................46

*Dyer v. Conoco, Inc.*,
    49 F.3d 727, 1995 WL 103233 (5th Cir. 1995) .................34

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .............................................45

*Host International, Inc. v. MarketPlace, PHL, LLC*,
    32 F.4th 242 (3d Cir. 2022) .......................................46, 53

*Ingram Corp. v. J. Ray McDermott & Co.*,
    698 F.2d 1295 (5th Cir. 1983) ...........................................42

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) .......................................34, 41

*Kentucky Speedway, LLC v. National Association
of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) .............................................36

*Kim v. Hanlon*,
    99 F.4th 140 (3d Cir. 2024) ...............................................29

*Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) ...............................26, 41, 42

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .............................................29

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ................................46, 47

*Madison Square Garden, L.P. v. National Hockey League*,
    No. 07-cv-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ..................47, 49

*Madison Square Garden v. National Hockey League*,
    No. 07-cv-8455, 2007 WL 3254421 (S.D.N.Y. Nov. 2, 2007) ..........................48

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)..............................................................28

*MetroNet Services Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ...........................................46

*In re Microsoft Corp. Antitrust Litigation*,
    333 F.3d 517 (4th Cir. 2003) ........................................54, 55

*Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..............................................................50

*Mozart Co. v. Mercedes-Benz of North America, Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ......................................35, 38

*North American Soccer League, LLC v.*
    *United States Soccer Federation, Inc.*,
    883 F.3d 32 (2d Cir. 2018) .................................................30

*North Carolina State Conference of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ........................................27, 40

*OJ Commerce, LLC v. KidKraft, Inc.*,
    34 F.4th 1232 (11th Cir. 2022) ...........................................46

*Omega World Travel, Inc. v. Trans World Airlines*,
    111 F.3d 14 (4th Cir. 1997) .......................5, 27, 30, 54, 55, 56

*Oskey Gasoline & Oil Co. v. Continental Oil Co.*,
    534 F.2d 1281 (8th Cir. 1976) .............................................42

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009).......................................................27, 44

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ....................................26, 37, 39

*Redel's Inc. v. General Electric Co.*,
    498 F.2d 95 (5th Cir. 1974) .................................................50

*Richard's Lumber & Supply Co. v. United States Gypsum Co.*,
    545 F.2d 18 (7th Cir. 1976) .................................................42

*Salt Lake Tribune Publishing Co. v. AT&T Corp.*,
  320 F.3d 1081 (10th Cir. 2003) ..........................................................30

*Samica Enterprises, LLC v. Mail Boxes*,
  No. 06-cv-2800, 2008 WL 11342744 (C.D. Cal. Apr. 10, 2008)......................55

*Schott Enterprises, Inc. v. Pepsico, Inc.*,
  520 F.2d 1298 (6th Cir. 1975) ............................................................42

*In re Search Warrant Issued June 13, 2019*,
  942 F.3d 159 (4th Cir. 2019) ........................................................28, 44

*Saint Luke's Hospital v. ProMedica Health Systems, Inc.*,
  8 F.4th 479 (6th Cir. 2021) ..............................................................45

*Stanley v. University of Southern California*,
  13 F.3d 1313 (9th Cir. 1994) ..............................................................30

*Suckow Borax Consolidated, Inc. v. Borax Consolidated, Ltd.*,
  185 F.2d 196 (9th Cir. 1950) ..............................................................42

*Taylor v. Freeman*,
  34 F.3d 266 (4th Cir. 1994) ................................................................29

*Three Rivers Motors Co. v. Ford Motor Co.*,
  522 F.2d 885 (3d Cir.1975) ............................................................42, 43

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ..................................................................29

*Tominaga v. Shepherd*,
  682 F. Supp. 1489 (C.D. Cal. 1988) ....................................................38

*UHSpro, LLC v. Secure Documents, Inc.*,
  No. 17-cv-00411, 2017 WL 2729082 (D. Utah June 23, 2017)......................30

*United Farmers Agents Association v. Farmers Insurance Exchange*,
  89 F.3d 233 (5th Cir. 1996) ................................................................38

*United States v. Aluminum Co. of America*,
  148 F.2d 416 (2d Cir. 1945) ..............................................................41

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)......................................................45

*United States v. Purdue Pharma L.P.*,
  600 F.3d 319 (4th Cir. 2010) ........................................51

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).................................................41, 45

*Virginia Impression Products Co. v. SCM Corp.*,
  448 F.2d 262 (4th Cir. 1971) .......................................42

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
  108 F. Supp. 2d 549 (W.D. Va. 2000)..........................39

*VKK Corp. v. National Football League*,
  244 F.3d 114 (2d Cir. 2001) ...................................42, 47

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007)......................................................34

*White Mule Co. v. ATC Leasing Co.*,
  540 F. Supp. 2d 869 (N.D. Ohio 2008) .......................52

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008).....................................................29, 56

## STATUTES

28 U.S.C. § 1292(a)(1).......................................................1

28 U.S.C. § 1331.................................................................1

28 U.S.C. § 1337.................................................................1

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2024)........................................46

Robert H. Bork, *The Antitrust Paradox* (1978) .......................................................45

Federal Rule of Appellate Procedure 4(a)(1)(A) .......................................................1

Benjamin Klein & Lester F. Saft, *The Law and Economics of Franchise Tying Contracts*, 28 J. Law & Econ. 345 (1985) .............................38

Al Pearce, *How A Meeting At The Streamline Hotel in 1947 Led to the Birth Of NASCAR*, Autoweek (Dec. 7, 2022), https://www.autoweek.com/racing/nascar/a42095993/ how-meeting-streamline-hotel-1947-birth-nascar/ .............................................6

Alan H. Silberman, *The Myths of Franchise "Market Power,"* 65 Antitrust L.J. 181 (1996)...............................................................................35

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. The district court's first preliminary injunction was entered on December 18, 2024, JA167-186, and modified by a subsequent order on December 23, 2024, JA192-204. The district court then entered a separate preliminary injunction on December 26, 2024. JA209-210. NASCAR timely filed an amended notice of appeal of both preliminary-injunction orders on December 27, 2024. JA212; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Whether the district court erred, as a matter of law, in holding that its injunctions did not trigger the heightened standard for mandatory injunctions.

2. Whether the district court erred, as a matter of law, in holding that Plaintiffs made a clear showing that they are likely to succeed on the merits of their Sherman Act Section 2 challenge regarding NASCAR's inclusion of a reciprocal release-of-claims provision in a commercial contractual offer.

3. Whether the district court erred, as a matter of law, in granting injunctions that contradict Plaintiffs' complaint and their attempt to hold the Charters unlawful.

**INTRODUCTION**

This appeal challenges the district court's entry of two preliminary injunctions that force NASCAR into contractual relationships with two motorsports organizations actively suing it, on their preferred terms. The district court's injunction orders flout federal antitrust law; misapply the established rules governing the use of preliminary injunctions; ignore unrebutted, legally significant evidence; and have sweeping implications for NASCAR's 2025 Cup Series season. Any one of the district court's many errors warrants reversal.

The events leading up to this appeal began in 2014, when eighteen NASCAR team owners banded together to demand guaranteed starting positions in NASCAR races and more money from NASCAR. Their collective negotiations paid off, transforming what was once a performance-based system governing access to the NASCAR Cup Series into a "Charter" system that guaranteed Charter-holding teams starting positions in Cup Series races and non-performance-based payments through December 2024. Plaintiffs 23XI Racing (23XI) and Front Row Motorsports (Front Row) were among the team owners who signed or acquired Charters from 2016 to 2021, enjoying all their benefits—including the Charters' reciprocal release-of-claims provisions that protect both NASCAR and team owners from litigation over claims arising prior to the execution of the Charters.

Fast forward to 2024, and team owners secured even better terms from NASCAR in a new Charter following more than two years of negotiations. But 23XI and Front Row wanted even more. While every other team owner that was offered a new Charter with these better terms accepted it, these two held out—raising concerns about several provisions but not the mutual releases. NASCAR eventually withdrew its offers to Plaintiffs and moved forward with planning its 2025 Cup Series season without them as chartered teams. So 23XI and Front Row turned to the courts, attempting to transform the Charter's standard release provision into a trump card to belatedly secure, outside of negotiations, the Charters they regretted rejecting—even though neither team owner ever raised that provision as an issue in two years of Charter negotiations. With neither the facts nor the law on their side, 23XI and Front Row argue it violates the Sherman Act for sports enterprises to include such standard releases in their agreements.

The district court took the bait. In two different decisions, it entered injunctions compelling NASCAR to enter into rewritten Charters with the parties actively suing it, despite the absence of any meeting of the minds on key contractual terms. These injunctions misuse the judicial power to force NASCAR to treat its litigation adversaries as its business partners and confidants, undermining the mutual trust that has fueled NASCAR's growth and success. Worse, the district court conjured from thin air a categorical ban on sports leagues including releases broad

enough to encompass antitrust claims in their agreements—eliminating the need to prove anticompetitive conduct, a crucial element of the Sherman Act Section 2 claim Plaintiffs are pursuing. No court of appeals has ever ruled that standard release provisions violate the antitrust laws. The district court's misguided approach threatens countless commercial agreements, and demands correction.

The district court's decisions were riddled with errors, each warranting reversal of its injunctions. *First*, the district court mistakenly held that Plaintiffs' requested injunctions maintain the status quo, bypassing the heightened standard for securing "mandatory injunctions." But the injunctions here disrupt the status quo by forcing NASCAR to provide Plaintiffs with the benefits of a contract they *rejected* and NASCAR subsequently withdrew. The mandatory-injunction standard clearly applies, and Plaintiffs have not met it.

*Second*, even if the heightened standard did not apply, the district court erred by concluding that Plaintiffs are likely to succeed on the merits of their Sherman Act Section 2 claim. Plaintiffs have not established the most basic element of their Section 2 challenge—a valid market. But even if Plaintiffs had established a valid market, the district court erred in concluding that the Charter's release violates the antitrust laws. The district court failed to assess whether releasing claims against NASCAR is anticompetitive—a fundamental requirement for any Sherman Act claim purportedly supporting these injunctions. Instead, it concocted a new legal

standard focused on whether the release was a "condition of market participation," without citing any precedent backing such a rule. The district court then misapplied cases about the *enforceability* of prospective releases, ignoring that the issue here is whether the release constitutes an *antitrust violation*, and the release is retrospective. And it erroneously found that Plaintiffs suffered an "antitrust injury" just from being *offered* the release—without considering whether that injury was linked to a reduction in market competition. Any one of these errors requires reversal.

*Finally*, the district court erred under this Court's precedent by compelling NASCAR to do business with its litigation adversaries under terms they are actively *contesting* as anticompetitive in this litigation. Plaintiffs' complaint purports to challenge several Charter provisions beyond the release, including restrictions on teams competing in other leagues and NASCAR's use of Charter teams' intellectual-property rights. Yet Plaintiffs have sought and now received preliminary injunctive relief *binding Plaintiffs* to those very provisions. This Court's decision in *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997), squarely forecloses granting Plaintiffs such contradictory relief.

This Court should reverse.

# STATEMENT OF THE CASE

## A.     Factual Background

### 1.     NASCAR's Mission To Grow Stock-Car Racing

Founded in 1948, NASCAR is one of the top motorsports series in the world. JA428 (¶¶5-7).  NASCAR's roots trace back to the mid-1930s when William "Bill" France, Sr., a mechanic and auto-repair shop owner, moved to Daytona Beach and began promoting stock-car races—events featuring everyday cars with minimal modifications for speed and endurance.  JA428 (¶¶5-7).  Inspired by the popularity of these races and determined to end the unscrupulous practice of sponsors skipping out on paying their drivers, France gathered three-dozen like-minded individuals from the local stock-car community in December 1947 to discuss his vision for a corruption-free sanctioning body for stock-car racing.  JA428 (¶¶5-7).[1]  That day, NASCAR was conceived.

It started small—the first official NASCAR race took place on a beach, with free admission and drivers racing the very cars they drove home.  JA428 (¶¶5-7). Since then, NASCAR has evolved into a motorsports institution that spans generations and, today, is one of the country's most popular sports.  JA428-430 (¶¶7-8).  The company is still privately owned by the France family; since 2018, Bill's

---

[1]  *See also* A. Pearce, *How A Meeting At The Streamline Hotel in 1947 Led to the Birth of NASCAR*, Autoweek (Dec. 7, 2022), https://www.autoweek.com/racing/nascar/a42095993/how-meeting-streamline-hotel-1947-birth-nascar/.

son, James "Jim" France, has served as NASCAR's CEO and chairman. JA33 (¶¶48-49).

Now, NASCAR "sanctions"—or organizes and stages—three national racing series: the Cup Series, the Xfinity Series, and the Craftsman Truck Series. JA430 (¶10). The Cup Series, with its iconic races like the Daytona 500, is what put NASCAR on the map in 1949. JA430 (¶11). The cars used in the Cup Series outwardly resemble standard commercial sedan vehicles, but are developed and engineered for safety and competition. JA428 (¶6). The Xfinity Series was created thirty years after the Cup, and tends to feature shorter races with larger and heavier cars. JA430 (¶12). And the Craftsman Truck Series is comprised of modified pickup trucks. JA430 (¶13).

From its inception, the hallmark of NASCAR has been its "open team" format. JA407 (¶4); JA431 (¶14). Unlike most other major sports, where team participation is restricted by agreements among owners, NASCAR has welcomed any qualifying team to compete in one of its starting positions, including in its flagship race, the Daytona 500. JA407 (¶4). In addition, until 2016, the compensation teams received was purely tied to on-track performance. JA407 (¶5). Historically, NASCAR distributed a quarter of the revenues it received from its media rights deals to team owners, keeping just 10% for itself and allocating the remaining amount to

racetracks. JA407 (¶5). Team owners also generated revenue from sponsors and other sources, without any obligation to share that income with NASCAR.

### 2. Other Motorsports Leagues And Sports In The U.S.

While stock-car racing is one of the best known motorsports, it is just one of many different types of motorsports in the United States. JA431-432 (¶15). Formula 1 and the IndyCar Series, for example, are two prominent "open-wheel" racing leagues featuring cars with open-air cockpits and wheels outside the car's main body. JA431-432 (¶15). The IMSA SportsCar Championship is a form of "sports-car racing" that showcases high-performance vehicles, often with two seats and closed cockpits. JA431-432 (¶15). There are numerous drag racing leagues— one of the oldest forms of motor racing—focused on straight-line speed. JA431-432 (¶15). And the "Formula Drift" championship series—launched in 2004— challenges drivers to "drift" their cars through marked courses, judged on style and precision. JA431-432 (¶15).

Over the last few years, new racing leagues have continued to emerge— including a new stock-car racing league. From 2021 to 2023, the Superstar Racing Experience (SRX) series hosted eighteen short-track stock-car races, including at prominent racetracks such as the Knoxville Raceway and Lucas Oil Speedway. JA371-373 (¶¶35-36); JA436 (¶35). SRX attracted a distinguished lineup of drivers from various leagues, including famous NASCAR drivers and IndyCar competitors.

JA372 (¶35). Denny Hamlin, co-owner of Plaintiff 23XI, himself raced to an SRX victory in 2023. JA372 (¶35).

NASCAR has consistently faced competition from these other circuits for fan attention, talent, and sponsors. For instance, many NASCAR drivers have raced in other motorsports leagues, such as IndyCar, Formula 1, IMSA, the Championship Auto Racing Series (CARS) Tour, the United States Auto Club (USAC), and the International Motor Contest Association (IMCA)—among others. *See, e.g.*, JA372 (¶35); JA414 (¶34). NASCAR also competes with other sports—like Major League Soccer (MLS), Major League Baseball (MLB), the National Basketball Association (NBA), and the National Collegiate Athletic Association (NCAA)—for fan attention, sponsors, and broadcast coverage. JA376 (¶43); JA432-433 (¶¶19-22). And NASCAR competes with other sports and entertainment options for partnerships and investment dollars. For instance, Michael Jordan, co-owner of Plaintiff 23XI, has held ownership stakes in MLB, NBA, and NASCAR teams, a motorcycle racing team, restaurants, and car dealerships. JA366 (¶26).

Even after forming Cup Series teams, motorsports organizations like Plaintiffs can and do offer their services and assets to other leagues if NASCAR's terms are not competitive. For instance, Team Penske—a professional auto racing organization founded by former Cup Series driver Roger Penske—routinely supplies racing teams not only to NASCAR, but also to other racing circuits like IndyCar.

JA364 (¶20); JA429 (¶8).  And Chip Ganassi Racing has supplied teams to several racing circuits, including NASCAR, IndyCar, and other sports car circuits over the past twenty years.  JA364 (¶20); *see* JA958 (¶29).

### 3. Racing Team Owners Jointly Negotiated For The Charter System

In 2014, amid declining sponsorships, ratings, and attendance for Cup Series races, eighteen of the largest motorsports organizations competing in the Cup Series banded together to form the Race Team Alliance (RTA) and challenge NASCAR's performance-based "model."  JA407-408 (¶¶7-9); *see* JA38 (¶72).  Represented by the international law firm Covington & Burling, the RTA demanded that NASCAR adopt a new competition format that would guarantee RTA members spots in all regular season Cup Series races, irrespective of merit—allowing those members to boost their sponsorship earnings while reducing qualifying opportunities for team owners outside their alliance.  JA407-408 (¶¶7-9).  The RTA also demanded more consistent revenue from NASCAR.  JA407-408 (¶¶7-9).

The team owners' collective efforts worked.  In 2016, NASCAR agreed to create a "Charter" system, which Plaintiffs have likened to a "franchising" model.  JA324;  JA332;  JA408 (¶¶9-11);  JA973 (¶58);  JA1062 (¶11).  This system guaranteed 36 "Charter" cars entry into all Cup Series races, as well as non-performance-based payments of NASCAR's broadcast revenues.  JA408-410 (¶¶11-

18).  NASCAR provided these Charters to motorsports organizations *for free*, giving them a valuable asset that can be sold for a profit.  JA408 (¶11).

NASCAR made significant concessions in the 2016 Charter:  It committed not only to overhauling its business model, but also to limiting the number of Charters available, providing for a distribution of funds not solely tied to teams' on-track performances, and creating a "Team Owner Council" comprised of Charter and qualifying open teams that could provide formal input on NASCAR's policies.  JA686-696; JA38 (¶72).  In exchange for these commitments, NASCAR received only a handful of benefits—one being a commitment from Charter holders not to compete in other stock-car racing leagues during the Charter's term.  JA706-707 (2016 Charter § 6.6).  This non-compete provision (called the "Protection of Goodwill" clause) is found in Section 6.6 of the Charter.[2]  NASCAR understood that assuring television broadcasters Charter teams would not race in other stock-car leagues would enhance its media rights deals and, in turn, the payments team owners receive.  JA410 (¶17).

---

[2]    The 2016 Charter expressly notes that its non-compete clause "applies only to professional stock[-]car racing series in the [United States, Canada, and Mexico], and not to any other motorsports or non-stock[-]car series (such as V8 Supercars, Indy Car, IMSA or Global Rally Cross), nor to any amateur/semi-pro series." JA706-707 (2016 Charter § 6.6).

Aware of the potential antitrust risks from banding together as horizontal competitors to negotiate *against* NASCAR, the team owners also sought and secured a release from NASCAR for potential claims related to their joint negotiations, captured in Section 10.4 of the Charter. JA411 (¶21); *see* JA723-724 (2016 Charter § 10.4). In return, NASCAR obtained a reciprocal release of claims from the owners, outlined in Section 10.3. JA411 (¶21). Section 10.3 is retrospective, or backward-looking, in nature. It released NASCAR from claims "arising out of or relating to the criteria used by [NASCAR] to determine whether or not to enter into, or to offer to enter into, a [2016] Charter" with an owner. JA723 (2016 Charter § 10.3).

To expand opportunities to compete in races and preserve a semblance of the old system's performance-based competition model, NASCAR kept a pathway for teams without Charters to compete in Cup Series races. At least four spots in each Cup Series race are reserved for "open teams"—those without Charters—allowing them to compete and receive compensation based on their finishing positions. JA407 (¶6); JA503. Open teams can and do secure lucrative sponsorship deals, and for the current 2025 season, are not bound by any release-of-claims or noncompete provision. JA409 (¶140); JA515; JA551-557.

By the end of 2016, NASCAR had awarded 36 Charters to organizations that had demonstrated longstanding commitments to NASCAR, including Plaintiff Front

Row, one of the participants in the 2016 Charter negotiations.  JA347; JA408 (¶11).

Plaintiff 23XI was not among the original 36 Charter holders, but instead chose to

buy into the system *after* the 2016 Charters were executed.  Co-owned by NBA

legend Michael Jordan, racing driver Denny Hamlin, and their business partner

Curtis Polk, 23XI was founded in 2020 for the sole purpose of funding a racing team.

JA30 (¶¶26, 28); JA284.  23XI purchased its first Charter from another racing

organization in 2020 and a second in 2021 for millions of dollars each.  JA30 (¶¶29-

33); JA411 (¶20).  As Denny Hamlin explained in 2021, "[I]t's an attractive time to

come into the sport.  This was a big factor in our decisions, [and] will be a big factor

in our decisions [going forward]."  JA378 (¶45).

Since 23XI's entry, the value of Charters has skyrocketed—with recent

Charter sales exceeding $20 million, and one reaching as high as $40 million.  JA375

(¶41); JA287; JA325.

### 4.    Lengthy Negotiations Over The 2025 Charters

By its terms, the 2016 Charter ended on December 31, 2024.  JA685 (2016

Charter § 2.3).  But Section 2.3 of the 2016 Charter granted each Charter holder the

exclusive right to negotiate a new Charter with NASCAR from January 1, 2023 to

March 1, 2023.  JA685 (2016 Charter § 2.3).  At the request of Charter holders,

NASCAR began negotiations over the new Charter early, in June 2022.  JA72;

JA503.

Once again, the team owners negotiated collectively, this time through a committee of the RTA called the Teams Negotiating Committee, again represented by Covington & Burling. JA26 (¶16); JA411 (¶23). NASCAR again made significant concessions, including substantially increasing Charter owners' share of NASCAR's media revenue attributable to the Cup Series from 37% to nearly 50%. JA407 (¶5); JA413-414 (¶32). And, to create further stability for team owners, NASCAR offered a Charter term of seven years with a possibility for extension, which aligned with NASCAR's new broadcast agreements. JA798 (2025 Charter § 2.1); JA418 (¶45); JA432 (¶18). Throughout these negotiations, no team owner— including Plaintiffs—ever once voiced concerns about the Section 10.3 release-of-claims provision. JA440 (¶50).

After two-and-a-half years of negotiations—extending well past the March 2023 exclusive-negotiations deadline—NASCAR needed to finalize its plans for the upcoming 2025 Cup Series season. So, on August 30, 2024, NASCAR circulated a final version of the 2025 Charter to the team owners, requesting their signatures by September 6, 2024. JA439 (¶¶46-49). This final Charter introduced several significant *enhancements* for owners, including increased financial benefits, an extended Charter term, and the elimination of a provision allowing NASCAR to revoke Charters if a team performed poorly three years in a row. *See, e.g.*, JA416 (¶39). In exchange, the Charter maintained the Section 6.6 non-compete provision,

deemed a "material part of the consideration for [NASCAR]." JA821 (2025 Charter § 6.6).[3]

By the September 6, 2024 deadline, thirteen team owners (representing 32 of the 36 Charters) had signed the 2025 Charter. JA417 (¶42). 23XI and Front Row were the only previous Charter holders that chose not to sign—despite having existing agreements with drivers *requiring* them to hold Charters. JA417 (¶42); JA440 (¶51); JA591-601.

On September 6, 2024, 23XI's co-owners Michael Jordan and Denny Hamlin wrote to NASCAR President Steve Phelps, expressing their view that the 2025 Charter was "an inferior contract to the existing Charters," and listing eight conditions they needed met before they would sign. JA67-68. None of these demands concerned the release in Section 10.3 or the seven-year non-compete in Section 6.6. JA68. NASCAR responded on September 11, 2024, offering to meet with Jordan and Hamlin. JA71-72. Jordan and Hamlin declined. JA77-78.

Meanwhile, Front Row requested more time to review the Charter, which NASCAR extended to September 17, 2024. JA419 (¶51); JA440 (¶¶53-54). On that

---

[3]   Though the new Section 6.6 prohibits Charter teams from racing or holding equity in "any automobile or truck motorsports racing series" in the United States, Canada, and Mexico, that prohibition has numerous exceptions, including for private events, all open-wheel series—like the IndyCar Series and Formula 1—and multiple other existing series like the CARS Tour. JA821 (2025 Charter § 6.6).

day, Front Row sent a letter to NASCAR explaining that its "issues with the current Agreement are similar in nature to the most part with those brought up by 23XI." JA83; JA440 (¶55).

In an attempt to resolve these outstanding concerns, NASCAR sent another letter to 23XI on September 18, 2024, requiring that 23XI execute the Charter by September 20, 2024 or NASCAR would withdraw its offer. JA80-81.

When neither 23XI nor Front Row signed by their extended deadlines, NASCAR deemed its offers rejected and withdrew them. JA420 (¶52). NASCAR then began working to fulfill its contractual obligations to 2025 Charter holders, including re-allocating purse money for the 2025 season based on 32 Charters instead of 36. JA424-425 (¶¶75-76).

Many team owners have since praised the 2025 Charter. For instance, Rick Hendrick, co-owner of Hendrick Motorsports, has called the 2025 Charter "a fair deal," stating he was "happy with where we were" because "we protected the [C]harters … got the (revenue) increase," and "a lot of things we didn't like we got taken out." JA321; JA421 (¶56). The owner of Trackhouse Racing highlighted that there are "things in the agreement that I really like, that are going to be very, very helpful to us" and affirmed that "[a]t the end of the day, the [2025 Charter] is one that I can build a business around." JA317; JA420-421 (¶55). And RFK Racing co-owner Brad Keselowski dismissed the notion that owners were "forced" to sign the

2025 Charter, emphasizing that everyone agreed it was "important to get these things settled." JA325; JA421 (¶57).

Despite declining NASCAR's Charter offers, both Front Row and 23XI later paid millions of dollars to purchase one 2025 Charter apiece from Stewart-Haas Racing, LLC (SHR)—one of the 13 team owners that signed the 2025 Charter—under the very terms they previously rejected. JA31-32, JA47 (¶¶35, 41, 105); JA67. NASCAR later objected to these assignments of Charters, deeming them inconsistent with the terms of its agreements with SHR. JA1163-1164.

## B. Procedural Background

### 1. This Lawsuit

On October 2, 2024, 23XI and Front Row filed this lawsuit against NASCAR and Jim France, accusing them of violating Sections 1 and 2 of the Sherman Act by wielding NASCAR's "monopsony power" over "premier stock-car racing team services" to commit numerous allegedly anticompetitive acts over the past decade. JA20-61. Among other allegations, Plaintiffs targeted two Charter provisions as violating the antitrust laws. First, Plaintiffs challenged the Section 10.3 release— despite having been offered a reciprocal release in Section 10.4, never raising Section 10.3 during two years of negotiations, and willingly accepting an identical release as recently as early 2024. JA55-56 (¶142). Second, Plaintiffs claimed the noncompete in Section 6.6 is anticompetitive for barring teams from participating in

"any" events outside NASCAR races—ignoring Section 6.6's numerous exceptions for participation in Formula 1, IndyCar, and other motorsports leagues. JA49-50 (¶114). To remedy these purported antitrust violations, Plaintiffs requested, among other things, that the 2016 and 2025 Charters be "adjudged to be unreasonable restraints of trade." JA60.

Days later, Plaintiffs sought a mandatory preliminary injunction, asking the district court to force NASCAR to *grant* Plaintiffs two 2025 Charters apiece, but without Section 10.3. JA220-221. This request came despite NASCAR's best and final Charter offer—which *included* that release—having expired weeks earlier, and even though granting this relief would bind Plaintiffs to Section 6.6, which they were simultaneously *contesting* as anticompetitive.

Plaintiffs relied solely on their Section 2 unlawful monopolization claim to seek this injunction, contending this claim was likely to succeed because NASCAR held a 100% market share in "the input market for premier stock[-]car racing teams in the United States." JA226-228. According to Plaintiffs, NASCAR faces zero competition from other motorsports leagues for Plaintiffs' assets and services because "[p]remier stock[-]car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes." JA227. Plaintiffs then cited a grab-bag of NASCAR acts as exclusionary or anticompetitive—including NASCAR's

2018 acquisition of the Automobile Racing Club of America (ARCA), its 2019 adoption of "Next Gen" car requirements for competitors, and Sections 6.6 and 10.3 of the Charters. JA228.

In their opposition, Defendants argued, among other points, that Plaintiffs were unlikely to succeed on the merits because most of the allegedly exclusionary conduct occurred more than four years ago and was barred by both the statute of limitations and prior releases. JA252-258. Defendants also submitted expert evidence establishing that NASCAR competes with other motorsports (and non-motorsports) leagues for teams and investors. JA358-379. And Defendants reiterated that Plaintiffs had confirmed in filings and to the press that they did not need Charters to race and would compete as open teams in the 2025 Cup Series season without an injunction. JA250.

During oral argument on their motion, Plaintiffs' counsel confirmed that Section 10.3 "doesn't apply to future events" and released claims "only . . . in the past." JA99. Plaintiffs' counsel also conceded that Plaintiffs had repeatedly agreed to this same release provision—including as recently as 2024—and never once objected to it during two years of negotiations on the 2025 Charter. JA99, JA126; *see* JA111.

On November 8, 2024, Judge Whitney denied Plaintiffs' motion for a preliminary injunction without prejudice. JA502-509. The court concluded that

Plaintiffs had not sufficiently demonstrated "present, immediate, urgent irreparable harm" to warrant the extraordinary remedy of a preliminary injunction, but rather only "speculative, possible harm." JA506. The court emphasized that Plaintiffs "could sign open contracts today and continue racing in 2025" even without Charters. JA507. Because the court found that Plaintiffs had not established irreparable harm, it did not address the other preliminary-injunction factors.

### 2. The District Court's Mandatory Preliminary Injunctions

On November 26, 2024, Plaintiffs filed a renewed motion for a preliminary injunction, once again asking the court to alter the status quo by forcing NASCAR to let Plaintiffs race under the terms of the 2025 Charter they did not sign, but without Section 10.3. JA515-516. In support, Plaintiffs speculated that a handful of drivers might leave Plaintiffs' teams due to Charter clauses in their contracts—a risk Plaintiffs could have foreseen when rejecting NASCAR's offers *after* entering into those driver contracts. JA516-517. Plaintiffs also argued that two sponsors had shared concerns about the "numerous uncertainties" connected to their lawsuit. JA517-518. In their opposition, Defendants reiterated that Plaintiffs were unlikely to succeed on the merits because, among other reasons, "[m]ost of Plaintiffs' claims are time-barred," Plaintiffs "signed multiple agreements releasing pre-2024 conduct," Section 10.3 does not "harm[] competition," and a "'[f]ailure to secure preferred contractual terms is not an antitrust injury.'" JA1102-1103.

On December 11, the case was reassigned from Judge Whitney to Judge Bell. JA11. The next day, Plaintiffs filed a "Notice" titled a "Proposed Preliminary Injunction." JA154-156. In that document, Plaintiffs purported to "clarify the preliminary relief they seek from this Court," requesting, for the first time, that the Court "requir[e] Defendants to approve the transfer" of SHR's Charter to Front Row and enjoin NASCAR from enforcing "any additional release that Defendants now claim to be required as part of" that transfer. JA154-156. A few days earlier, NASCAR had exercised its right under its Charter agreement with SHR to object to SHR's transfer of a Charter to Front Row. JA827-830 (2025 Charter §§ 8.1.1-8.1.3, 8.1.8). NASCAR deemed this objection necessary because Front Row refused to accept all Charter terms, as evidenced by this lawsuit, and also was a "Prohibited Person" as defined by the Charter given numerous inflammatory statements by Front Row's counsel to the press, including statements comparing NASCAR to an abusive spouse. JA1163-1164.

Less than a week later—without holding a hearing or allowing Defendants an opportunity to respond to the new request about a SHR Charter—Judge Bell granted Plaintiffs' preliminary injunction. JA167-186. The court's order included both the newly requested relief as well as additional relief *never even requested by Plaintiffs*: that NASCAR approve *23XI's* purchase of a Charter from SHR. JA168-169, JA186.

The district court stated that the relief granted for the SHR Charter transfers "rises and falls on the same grounds as" the other requested relief. JA169 n.2.

The district court justified its "limited preliminary injunction" as necessary to "maintain the status quo of Plaintiffs participating in NASCAR Cup Series races as chartered teams while being permitted to pursue their legal claims in this action." JA168-169. It dismissed Defendants' argument that this was a mandatory injunction subject to a higher burden, asserting that the "status quo" is "most fairly seen as Plaintiffs being two of the NASCAR Cup Series racing teams expected to race in 2025 (and beyond) who were offered the opportunity to sign 2025 Charter[s]." JA176-177.

The district court then found that Plaintiffs were likely to succeed on their Section 2 claim, focusing exclusively on the allegedly unlawful nature of Section 10.3 and "emphasiz[ing] that it d[id] not reach and express[ed] no opinion as to Plaintiffs' likelihood of success on their other Sherman Act claims." JA177. The court accepted Plaintiffs' proposed market because "premier stock[-]car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes." JA178. And it deemed Section 10.3 anticompetitive "to the extent that [it] bars Plaintiffs' antitrust claims," reasoning, "[c]an a monopolist require that a

party agree to release the monopolist from all claims that it is violating the antitrust laws as a condition of doing business? The answer is no." JA180.

To support this, the district court cited cases on the *enforceability* of prospective releases of claims. JA180-181. It reasoned that a "specific release of past conduct may be enforceable" only if it does not involve "a monopolist condition[ing] entry into a market—here the NASCAR Cup Series—on the prospective entrant's agreement not to challenge the monopolist's conduct." JA181. The court never addressed NASCAR's open-team agreements (which lack such releases), NASCAR's reciprocal release of claims against teams in Section 10.4, or Plaintiffs' acknowledgement that Section 10.3 is backward-looking. Nor did it assess whether Section 10.3 is anticompetitive—a vital element of all Section 2 claims. In a single-sentence footnote, the district court concluded that Plaintiffs suffered "antitrust injury" due to their "inability to pursue antitrust claims in good faith." JA181 n.11.

The district court also found that Plaintiffs had established irreparable harm because they would be in breach of their agreements with a handful of drivers without Charters. JA181-184. And it concluded that the balance of equities and public interest favored an injunction because "the important public interest in supporting freedom of contract is not significantly undermined by preserving the

status quo … until the lawfulness of Defendants' conduct is promptly resolved." JA184-185.

The following day, on December 19, 2024, Defendants filed a notice of appeal and asked the district court for a stay of its injunction. JA13; JA187. On December 23, 2024, the district court denied Defendants' stay motion, doubling down on its stance that NASCAR's "release to race" requirement was unlawful. JA195. In the same order, however, the court revised its injunction to eliminate the mandate that NASCAR approve 23XI's purchase of a SHR Charter, acknowledging that no party had requested such relief while also stating 23XI could pursue a separate injunction for that transaction. JA200.

On December 24, 2024, in order to position the case for an appeal, the parties requested the district court enter a stipulated injunction regarding 23XI's Charter purchase in light of the court's reasoning in its previous orders, while expressly reserving Defendants' right to appeal the new injunction. JA205-206. On December 26, 2024, the court granted that additional injunction. JA209-210.

Defendants then filed an amended notice of appeal on December 27, 2024, appealing both the injunction entered on December 18, 2024, as modified by the district court's December 23, 2024 order, and the additional injunction entered on

December 26, 2024.[4]  JA212.  On January 17, 2025, this Court granted Defendants'

motion to expedite oral argument.  ECF 20.

## SUMMARY OF THE ARGUMENT

The district court's decision to impose the extraordinary remedy of

preliminary injunctions—forcing NASCAR to extend the benefits of Charters to its

litigation adversaries—was fraught with errors, both legally and factually.

A.  At the outset, the district court mistakenly held that Plaintiffs' requested

injunctions did not alter the status quo, and thus did not trigger the heightened

standard for so-called "mandatory injunctions."  But the district court's injunctions

clearly change the status quo by compelling NASCAR to grant Plaintiffs all the

benefits of the Charter (which they currently lack), even though Plaintiffs did not

agree to many of the Charter's material terms and NASCAR had long withdrawn its

last contractual offer.  The district court should have applied the heightened test for

a mandatory injunction, and concluded that Plaintiffs failed to show the necessary

"indisputably clear" likelihood of success warranting an injunction.

---

[4]  On January 10, 2025, Judge Bell denied Defendants' motion to dismiss
Plaintiffs' complaint, reasoning that "Plaintiffs have sufficiently alleged one or more
plausible antitrust claims against Defendants within the applicable period of
limitations."  Dkt. 104 at 2; *see* JA16.  The court offered no explanation for how
plausibly pleading *one* claim could keep an *entire* complaint afloat, even though
Defendants had moved to dismiss the complaint in full.

B.  Even if the heightened standard did not apply, the district court erred in concluding that Plaintiffs are likely to succeed on the merits of their Sherman Act Section 2 claim.  As a threshold matter, Plaintiffs failed to establish the most basic element of a Sherman Act violation—market definition.  The evidence is undisputed that NASCAR competes with other motorsports leagues and non-motorsports sports for fans, teams, and investment dollars.  The district court erred by ignoring that evidence and defining the market in a way that considers only whether *these* "particular [P]laintiff[s]" were "locked in" to NASCAR—an issue that says nothing about NASCAR's monopsony power in any relevant market.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438-39 (3d Cir. 1997).

But even accepting Plaintiffs' market definition, Plaintiffs' claim still fails because they have not shown that the release provision—the only NASCAR act the district court identified as unlawful—constitutes an antitrust violation.  In finding that Section 10.3 violated Section 2, the district court ignored the crucial Section 2 requirement that the release constitute "anticompetitive conduct"—conduct that "foreclose[d] competition," provided NASCAR with an unfair "competitive advantage," or was used to "destroy a competitor."  *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (citation omitted).  The district court misapplied cases on the *enforceability* of prospective releases, despite the focus here being on the retrospective release's *antitrust* implications.  And the

district court flouted Supreme Court precedent affirming businesses' fundamental freedom "to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). On top of that, it wrongly found that Plaintiffs are suffering an "antitrust injury," even though Plaintiffs never demonstrated their personal harms stem from a reduction in competition in any market.

C. The district court further erred by entering relief that contradicts Plaintiffs' complaint and their underlying attempt to hold the Charters unlawful by enjoining Defendants to effectively enter into a contractual relationship with Plaintiffs under the very terms that they claim violate the antitrust laws. This Court's decision in *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997), which reversed an injunction in similar circumstances, forecloses this kind of paradoxical relief. That "*Omega* error" separately requires reversal here.

This Court should reverse.

## STANDARD OF REVIEW

This Court reviews a district court's issuance of a preliminary injunction for abuse of discretion. *North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020). But the "legal conclusions" underlying the injunction are reviewed "de novo," and a district court abuses its discretion if it bases its ruling on a "'misapprehen[sion] [of] the law.'" *Id.* (citation omitted). A district court also

abuses its discretion if it "'rest[s] its decision on a clearly erroneous finding of a material fact'" or "ignores 'unrebutted, legally significant evidence.'" *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019) (alteration in original) (citations omitted).

## ARGUMENT

The district court abused its discretion in awarding mandatory preliminary injunctions in this case by committing several legal errors. First, it erred as a matter of law in holding that the injunctions did not trigger the heightened standard established for "mandatory injunctions." Second, it erred as a matter of law in concluding that Plaintiffs are likely to succeed on the merits of their Sherman Act Section 2 challenge based on a standard release provision. And, third, it erred as a matter of law in issuing relief that contradicts the allegations in Plaintiffs' complaint. Each of these errors independently requires reversal.

### A. The District Court's Injunctions Upset The Status Quo And Thus Triggered The Heightened Standard For Mandatory Injunctions

The Supreme Court has underscored that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on all four *Winter* factors: likelihood of success, irreparable harm, favorable balance of the equities, and alignment with the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

(per curiam) (citation omitted); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (clarifying standard for securing injunctive relief).

An even more rigorous standard applies when the plaintiffs seek a "mandatory injunction"—an injunction that would alter, rather than maintain, the status quo "by commanding some positive act." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Such injunctions are "disfavored" in "any circumstance," *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (citation omitted), and "warranted only in the most extraordinary circumstances," *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). In such cases, the plaintiff must show a greater likelihood of success than normal—one that is "substantial" and "indisputably clear." *Kim v. Hanlon*, 99 F.4th 140, 155 (3d Cir. 2024) (citation omitted); *see Taylor*, 34 F.3d at 270 n.2.

The district court's injunction orders here alter the status quo and thus trigger the demanding mandatory-injunction standard. Before the district court's intervention, the status quo was clear: Plaintiffs were free to race as "open teams" in the 2025 Cup Series season because NASCAR had withdrawn its 2025 Charter offers after Plaintiffs refused to accept them. As a result, Plaintiffs never held guaranteed spots in 2025 Cup Series races or increased revenue payments from NASCAR beyond December 2024, when their 2016 Charters expired. JA411, JA420 (¶¶22, 52). But the injunctions grant Plaintiffs all that—rendering them

"mandatory": they force NASCAR to extend (and, in fact, augment) "benefits" that always had a defined shelf life. *North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018); *see Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1099 (10th Cir. 2003) (injunction extending contractual right beyond contract's expiration was mandatory).

But the mandatory nature of the injunctions here is even more clear in a different respect. As numerous courts have acknowledged, "forced marriage[s] between litigation opponents" are particularly disfavored and "undoubtedly" mandatory, as they often necessitate "ongoing [judicial] supervision" to ensure compliance with court-imposed terms. *UHSpro, LLC v. Secure Documents, Inc.*, No. 17-cv-00411, 2017 WL 2729082, at *4 (D. Utah June 23, 2017); *see, e.g.*, *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 15 n.1 (4th Cir. 1997) ("order[ing] the parties to continue in a relationship" otherwise terminable "under the contract" was disfavored mandatory injunction); *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320, 1325-26 (9th Cir. 1994) (injunction forcing university into contract with former coach suing it was mandatory).

These orders are no exception. By mandating that NASCAR allow Plaintiffs to race "under the terms" of the 2025 Charter, the district court has effectively forced NASCAR into contractual relationships with its litigation opponents—requiring NASCAR to treat its adversaries as its *business partners*. The detailed Charter

provisions Plaintiffs now enjoy, and NASCAR must honor, dictate every facet of this relationship. Yet, these court-mandated contracts lack a release for NASCAR, even though *every* previous agreement between the parties contained one and even though the court-mandated contracts still contain a release of NASCAR's claims against team owners. *See, e.g.*, JA411, JA420, JA423-424 (¶¶21, 53, 69).[5]

In finding that the injunctions were prohibitory rather than mandatory, the district court mischaracterized the status quo as "Plaintiffs being two of the NASCAR Cup Series racing teams expected to race in 2025 (and beyond) who were offered the opportunity to sign 2025 Charter Agreements." JA176. That framing overlooks two critical points: first, Plaintiffs *declined* to sign the 2025 Charter before NASCAR withdrew its offers, resulting in no meeting of the minds and, under basic contract law, no contract; and, second, the benefits of the 2016 Charter always had a set expiration date in 2024. The true status quo before this dispute arose was Plaintiffs competing as open teams in 2025—without any outstanding Charter offer available to accept. At the very least, the status quo was Plaintiffs competing as

---

[5]     For the same reasons, the district court's orders on SHR's Charter transfers are mandatory by forcing NASCAR to approve transfers of Charters to new owners and enter contracts with Plaintiffs, ignoring both NASCAR's stated objections and the Charter's agreed-upon arbitration process for transfer-related disputes. JA830, JA838 (2025 Charter §§ 8.1.8, 12).

Charter teams *with mutual releases*, as both the 2016 and 2025 Charter offers always contained such provisions.

The fact that Plaintiffs can now obtain Charters months after NASCAR withdrew its best-and-final offers—and on different terms that Plaintiffs prefer—is significant for NASCAR and NASCAR competitors. After Plaintiffs declined to sign the Charters, NASCAR recalculated race purses, reassessed the number of available race positions, and communicated these updated details to 2025 Cup Series participants. JA424-425 (¶¶75-76). By securing Charters, Plaintiffs have hit the jackpot—more races and more prize money—even though they deliberately declined NASCAR's now-withdrawn final offers and other teams had already begun strategizing for a 32-Charter 2025 Cup Series season. At this point, NASCAR would prefer to extend the perks of the 2025 Charter to owners committed to enhancing NASCAR's competitiveness with other sports for fans, sponsors, and media dollars—rather than owners that undermine NASCAR's brand and seek advantages over other owners in Charter terms.

The district court erred as a legal matter in viewing its injunctions as prohibitory. But in any event, as explained below, whether viewed under the "particularly exacting" standard for mandatory injunctions or the already "exacting" standard for prohibitory injunctions, the district court's injunctions cannot stand

because the district court erred as a matter of law in finding that Plaintiffs have established a clear likelihood of success on their Sherman Act Section 2 claim.

**B.      Plaintiffs Have Not Established That They Are Likely, Much Less Clearly Likely, To Succeed On The Merits Of Their Sherman Act Claim**

Section 2 of the Sherman Act requires proof of three elements: "possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). Plaintiffs have not established any of these requirements.

The district court's analysis primarily hinged on its conclusion that Section 10.3 was unlawful and caused Plaintiffs antitrust injury. *See* JA180-181. Those conclusions were flatly incorrect, for reasons discussed below. But the court's analysis was flawed for a threshold reason, too: It rested on the false premise that Plaintiffs had established NASCAR holds monopsony power in a valid, relevant market. Each of these errors independently justifies reversal.

**1.      Plaintiffs Have Not Shown That NASCAR Wields Monopsony Power In A Valid, Relevant Market**

One of the "incontrovertible" threshold requirements of any Section 2 claim is that Plaintiffs define and prove the relevant market. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986). Plaintiffs "bear[] the burden of

proof" on this critical market-definition element. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) (citation omitted).

Typically, antitrust claims involve buyers of a product or service complaining that a seller is using their market power to reduce supply. But in the far less common "monopsony" situation, *sellers* complain about oppression from a dominant *buyer*. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007). In a valid monopsony case, those sellers face a Hobson's choice of either "sell[ing] into the rigged market and tak[ing] [a] depressed price, or [] *refus*[ing] *to sell at all*." *Dyer v. Conoco, Inc.*, 49 F.3d 727, 1995 WL 103233, at *5 (5th Cir. 1995) (emphasis added). Since sellers can usually shift their efforts to alternative buyers or repurpose their resources when faced with unfavorable offers, a valid monopsony claim arises only in "exceptional" situations. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) (citation omitted).

To establish a valid market in a monopsony case, a plaintiff must account for *all* the buyers to which similar sellers may cater "similar services." *Id.* If a plaintiff fails to include "reasonably good substitute[]" buyers in their proposed market, they have not established a Section 2 claim. *Id.* at 1118 (citation omitted); *see It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (rejecting attempt to "gerrymander … an antitrust victory without due regard for market realities").

Plaintiffs have failed to establish a valid market here. In an attempt to shoehorn their case into the unusual monopsony category, Plaintiffs structured their lawsuit to argue that they are "sellers" of "premier stock[-]car teams' racing services," and "NASCAR is the sole buyer." JA954 (¶19); *see* JA950 (¶9). But there are no "exceptional" circumstances justifying this single-buyer market. *Campfield*, 532 F.3d at 1119. Plaintiffs' proposed market conveniently excludes as potential buyers the *hundreds* of motorsports series run by other sanctioning bodies, as well as all non-motorsports sports—many of which compete with NASCAR for fans, sponsors, and investment dollars from firms like Plaintiffs. *See supra* at 9-10.

As Defendants' expert, Dr. Hubbard, explained—and Plaintiffs did not dispute below—team owners like Plaintiffs can invest in other motorsports leagues or even non-motorsports sports if NASCAR's terms are not competitive. JA361-367. While *consumers* might perceive these sporting leagues as unique, investors like Plaintiffs would not see them that way—any league offering a comparable "return on … capital" is a viable substitute for the Cup Series. Alan H. Silberman, *The Myths of Franchise "Market Power,"* 65 Antitrust L.J. 181, 209 (1996); *see Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1346 (9th Cir. 1987) (distinguishing between the perspective of investors and consumers when defining a market of alternate buyers). Indeed, Michael Jordan—23XI's co-owner— previously held an ownership interest in an NBA team. *Supra* at 9.

Moreover, even *after* deciding to invest in the Cup Series, motorsports organizations like Plaintiffs can sell many of their services and assets to motorsports leagues and companies beyond just NASCAR. *See* JA364 (¶20). Team Penske, for example, supplies teams and other services to NASCAR, IndyCar, and sports car circuits. JA364 (¶20). And Roush Racing has not only supplied teams to NASCAR and sports car circuits, but also, through Roush Yates Engines, provides engines and other motorsports components to companies that then supply teams to NASCAR. JA364 (¶20).

Given these market dynamics, courts have repeatedly held that a single motorsports league cannot constitute a relevant "market"—including in the context of antitrust claims against NASCAR. Take a prior monopsony case brought by Kentucky Speedway. There, the Sixth Circuit rejected a nearly identical proposed market definition of "premium-stock-car" hosting markets, likewise gerrymandered to give NASCAR a 100% market share. *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 912, 916 (6th Cir. 2009). The Sixth Circuit underscored that NASCAR "competes with various forms of entertainment[,] including other stock-car and open-wheel racing, other professional sports leagues, and recreational sports" for corporate sponsors, broadcasters, and other necessary elements of the sport. *Id.* at 917.

Likewise, in a monopsony claim against the IMCA (another racing sanctioning body), the Eighth Circuit held that "no reasonable jury could find that races governed by [one particular sanctioning organization] are a separate relevant market for antitrust purposes" given the "many other classes of auto racing, and many other auto racing sanctioning bodies." *Brookins v. International Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000). The Eighth Circuit emphasized that if one sanctioning body's terms are unfair, drivers and teams would compete in "other classes of racing" managed by one of the "many competing auto racing sanctioning bodies, such as NASCAR" or "USAC." *Id.* at 852, 854.

Plaintiffs offered no evidence contradicting any of this. Instead, they fixated on the notion that certain assets, like cars, which motorsports organizations invest in *after* choosing to partner with NASCAR, cannot be used to race in other leagues. JA955-958, JA980 (¶¶23-28, 75). Plaintiffs argued their investments in such assets "lock them in" to NASCAR, which is why NASCAR is the only possible buyer for their services. But the market analysis for investors focuses on the existence of competition at the *pre-investment* stage, not the present circumstances of any "particular plaintiff." *Queen City Pizza*, 124 F.3d at 438 (rejecting single-buyer market definition). So this "lock in" theory is legally irrelevant.

That is particularly true given the franchise context of this case. Plaintiffs and their expert characterize motorsports organizations like theirs as "franchisees," with

NASCAR as the "franchisor." JA973 (¶58); JA1062 (¶11); *see* JA22 (¶4 & n.3); JA325; JA332; JA346. Yet, courts have consistently rejected attempts to define the market from a franchisee's perspective *after* investments are made and contracts formed, insisting that market analysis must include all the options "potential franchisees" had at the "'pre-contract' stage." *Tominaga v. Shepherd*, 682 F. Supp. 1489, 1494-95 (C.D. Cal. 1988) (citation omitted).

The reasoning is straightforward: "[C]ompetition among franchisors … to sign up franchisees [is what] prevents [a single franchisor] from exercising any economic power in setting [unfair] contract terms." Benjamin Klein & Lester F. Saft, *The Law and Economics of Franchise Tying Contracts*, 28 J. Law & Econ. 345, 356 (1985). While a franchisor might leverage its "post-contract" power to "'hold up' franchisee[s] that ha[ve] [already] made a specific investment," *id.*, that "lock-in" power is inherent to the "franchise method of doing business" and "has nothing to do with market power, ultimate consumers' welfare, or antitrust," *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) (citation omitted); *see Mozart*, 833 F.2d at 1345-46 (lock-in costs are not indicative of "market power").

Here, any limitations on Plaintiffs' ability to switch between leagues stem from contractual relationships they willingly entered into as investors—"eyes wide open, fully able to 'assess the potential costs and economic risks at the time'"—and

not from NASCAR's alleged monopsony power. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 584 (W.D. Va. 2000) (citation omitted); *id.* (refusing to adopt single-franchise market definition). Consider Michael Jordan, who chose to purchase two Charters years *after* the system's introduction. *Supra* at 13. No one forced him to invest in the NASCAR Cup Series over a Formula 1 team or another NBA team. If the Charter's terms were genuinely anticompetitive, Jordan would have either invested less or not at all in NASCAR—instead of acquiring an *additional* Charter for millions of dollars just last year. *Supra* at 17. His alleged "lock in" results from his own voluntary choices, not from NASCAR's monopsony power. *See Queen City*, 124 F.3d at 441.

Without citing a single piece of record evidence, the district court simply echoed Plaintiffs' allegation that "premier stock[-]car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes." JA178. This was a legal misstep in two significant ways.

*First*, the district court wrongly defined the market from the perspective of team owners who had already committed to doing business with NASCAR and created "unique cars" and "highly specialized racing teams." JA178. As discussed above, Plaintiffs misapplied the law by focusing on the specific cars and assets they invested in *after* deciding to do business with NASCAR, ignoring the broader

economic realities from the time of their initial investments. *Supra* at 37-39. The district court compounded this error by uncritically adopting Plaintiffs' market analysis. That oversight constitutes reversible legal error. *See Raymond*, 981 F.3d at 308.

*Second*, even if adopting an *ex post* perspective were correct, the district court nowhere addressed the key legal question: whether the assets, skills, and services of motorsports organizations like Plaintiffs are truly exclusive to the Cup Series or could be marketed to other leagues. *See Campfield*, 532 F.3d at 1119. It failed to assess whether these organizations can deploy their services and assets in series beyond just NASCAR—an ability that would refute the claim that NASCAR is the only available buyer. The district court's failure even to *address* the relevant market-definition question is reversible legal error too. *See Raymond*, 981 F.3d at 308.

Because there is no Section 2 claim without Plaintiffs establishing a valid market in the first place, the injunctions cannot stand. *See Consul*, 805 F.2d at 495.

### 2. In Any Event, Even Assuming A Relevant Market, Plaintiffs Did Not Demonstrate The Release Is Anticompetitive

Regardless, even if NASCAR possesses monopsony power in a valid market, Plaintiffs failed to show a likelihood of success in proving that NASCAR willfully maintained that power through "anticompetitive conduct"—a necessary element for all Sherman Act Section 2 claims.

As the district court stressed, it found a likelihood of success only as to Plaintiffs' claim that Section 10.3—one of two mutual release provisions—was unlawful. JA177. But that release could be deemed unlawful only if it constituted "anticompetitive conduct"—conduct that "foreclose[d] competition," provided NASCAR with an unfair "competitive advantage," or was used to "destroy a competitor." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (citation omitted). Section 10.3 does none of these things. The district court overlooked this anticompetitive-conduct requirement *altogether*, while also committing several other legal errors in the process.

### a. Plaintiffs Did Not Establish Section 10.3 Is Anticompetitive

As court after court has made clear, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). "[S]ize does not determine guilt"; instead, "there must be some 'exclusion' of competitors" or other conduct that unfairly limits competition. *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429 (2d Cir. 1945); *see It's My Party Live*, 811 F.3d at 690 ("[B]ig is not invariably bad."). In every Section 2 claim, the burden falls squarely on the plaintiff to demonstrate such anticompetitive conduct. *See Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 928 (4th Cir. 1990)

Plaintiffs failed to meet that burden for Section 10.3—the sole "anticompetitive" act the district court identified.[6] No court of appeals *ever* has concluded that a release provision constitutes anticompetitive conduct under the antitrust laws. In fact, this Court has squarely held that there is "no prohibition in the . . . antitrust laws that prohibits the disclaimer of [existing] antitrust claims by a general release." *Virginia Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262, 266 (4th Cir. 1971). Every single court of appeals to consider the issue has agreed.[7]

Plaintiffs have not provided any evidence demonstrating how Section 10.3 "foreclose[s] competition," grants NASCAR an unfair "competitive advantage," or "destroy[s] a competitor." *E.I. DuPont*, 748 F.3d at 175 (citation omitted). Nor could they. Section 10.3 is only one half of the equation—with Section 10.4 completing it by shielding *team owners* from legal challenges *by NASCAR* over their

---

[6] The district court rightly did not invoke the various other "anticompetitive" acts Plaintiffs alleged, nearly all of which are time-barred by the Sherman Act's four-year statute of limitations. *Infra* at 49.

[7] *See VKK Corp. v. National Football League*, 244 F.3d 114, 126 (2d Cir. 2001); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 & n.27 (3d Cir. 1975); *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1316 (5th Cir. 1983); *Schott Enters., Inc. v. Pepsico, Inc.*, 520 F.2d 1298, 1300 (6th Cir. 1975); *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976); *Oskey Gasoline & Oil Co. v. Continental Oil Co.*, 534 F.2d 1281, 1288 (8th Cir. 1976); *Suckow Borax Consolidated, Inc. v. Borax Consol., Ltd.*, 185 F.2d 196 (9th Cir. 1950); *Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc.*, 208 F.2d 316, 324 (10th Cir. 1953); *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1088-89 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 2686 (2024).

collective negotiations.  Rather than serving as a tool to "foreclose" competition or "destroy" rivals, these reciprocal releases fostered collaboration between the parties.  And owners who disagree with this arrangement (or wish to preserve their litigation rights) can compete in the 2025 Cup Series as open teams without signing a release—as several owners currently do.  JA1115-1116 (¶¶20, 24).

Nor does Section 10.3 insulate NASCAR from suit under the Sherman Act.  Consumers, competitors, potential competitors, open teams, and of course, the government retain the right to bring claims under the Sherman Act, including for any future antitrust violations by NASCAR.  As the Third Circuit explained, "[s]ince release of [a] private cause of action in no way dilutes the government's remedies against the [alleged] antitrust violator, federal policy would not seem to require the condemnation of" such a release.  *Three Rivers*, 522 F.2d at 892.

> **b.  The District Court's Contrary Conclusion Is Tainted By Both Legal And Factual Errors**

The district court's contrary conclusion was shot through with errors.  The district court failed to assess whether Section 10.3 is anticompetitive.  It asserted the release was a condition of market participation, despite undisputed evidence to the contrary.  It misapplied cases on prospective releases to a clearly retrospective provision.  And it overlooked that antitrust injury requires market-wide effects, not just harm to one competitor.  Each of these errors requires reversal.

1.  Most problematic, the district court committed a legal error by failing even to *address* whether the release was anticompetitive—a necessary element for all Sherman Act claims, including under Section 2.  While the district court initially paid lip service to the correct standard, *see* JA180, it never applied it.  Instead, the district court devised a novel and unsupported test: that releases automatically violate the Sherman Act *whenever* they are a "condition" for market participation. JA180.  This approach is flawed on multiple levels.

As a threshold matter, the facts of this case do not even meet the district court's test.  It is undisputed that team owners currently are *not* required to release claims against NASCAR to compete in the Cup Series:  they can race as "open teams." *Supra* at 12, 19.  Indeed, Plaintiffs' own motion confirmed that NASCAR's agreements with "open teams" lack releases.  JA515.  The district court's disregard for this "unrebutted evidence" is reversible error.  *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019).

In any event, the district court cited nothing to support the notion that monopolists cannot include release-of-claims provisions as business "conditions." And that is not surprising—because the caselaw says the exact opposite.  The Supreme Court has repeatedly affirmed that, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555

U.S. 438, 448 (2009). This "presumption of freedom" has deep roots. Robert H. Bork, *The Antitrust Paradox* 344 (1978). Even the earliest Section 2 cases note that the Sherman Act "does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal" and on what terms. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

There is only "one, limited exception to this general rule that there is no antitrust duty to deal," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020)— the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). There, the Supreme Court held that a company engages in anticompetitive conduct when (1) it "unilateral[ly] terminat[es] … a voluntary" and "profitable" "course of dealing" with a competitor; (2) the only conceivable rationale is to sacrifice "short-run benefits" in order to obtain higher profits in the long run by excluding competition, *Trinko*, 540 U.S. at 409 (describing the *Aspen Skiing* test); and (3) the parties did not have "a preexisting agreement that permitted the [defendant] to end" its contract with the plaintiff, *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 487, 490 (6th Cir. 2021) (same). The Supreme Court has since characterized the *Aspen Skiing* exception as "at or near the outer boundary of [Section] 2 liability." *Trinko,* 540 U.S. at 409.

The district court did not find the *Aspen Skiing* criteria met here, and for good reason. Plaintiffs are not NASCAR's competitors, which disqualifies them from the *Aspen Skiing* framework altogether. *See OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1246 (11th Cir. 2022). More fundamentally, NASCAR has not refused to deal with Plaintiffs. Instead, NASCAR "proposed terms for a commercial relationship"—terms *Plaintiffs* rejected. *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012); *see also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 365 (4th Cir. 2024) (*Aspen Skiing* met only because defendant "unilateral[ly] terminat[ed]" ongoing relationship). And Plaintiffs can still race as "open teams." Since the Cup Series was not made completely unavailable and Plaintiffs could have, in fact, competed in it "on the same terms" as other Chartered or open teams, they lack "an actionable antitrust claim under the Supreme Court's existing refusal to deal precedents." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133-34 (9th Cir. 2004); *see Abcor*, 916 F.2d at 930 (considering whether defendant "completely severed business relations with the plaintiff").

None of this is groundbreaking. Time and again, courts have held that a plaintiff's preference for different "term[s] in a commercial agreement" does not create an "antitrust violation." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 (3d Cir. 2022); *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:*

*An Analysis of Antitrust Principles and Their Application* § 774e (2024) ("[C]ourts are loathe to interfere when the claim is that the defendant is actually dealing, but only on disadvantageous or onerous terms."). As in *Loren Data*, "simply because [NASCAR] does not offer [Plaintiffs] the terms and conditions [they] desire[] does not mean that [NASCAR] has violated the antitrust laws"—especially because "[t]here is no suggestion … that [NASCAR's] offer of a new commercial agreement was some sort of sham or that [NASCAR] would renege on its proposal; rather, [Plaintiffs were] not satisfied with its terms." 501 F. App'x at 283.

The district court fixated on the fact that Section 10.3 originated in the sports context and was imposed by a purported "monopolist." JA180-181; JA195. But it cited no authority for why either of these factors matters. Courts routinely uphold releases implemented by sports leagues, even those considered "monopolists." For instance, the Second Circuit has applied a release between a former owner of the New England Patriots and the NFL to bar antitrust challenges brought by the owner against the league, despite the owner's argument that the NFL had monopoly power. *VKK*, 244 F.3d at 121-27. Likewise, the Southern District of New York found no issue with the NHL requiring team owners to execute releases whenever they joined the league and whenever there was a change in ownership. *Madison Square Garden, L.P. v. National Hockey League*, No. 07-cv-8455, 2008 WL 4547518, at *7-9 (S.D.N.Y. Oct. 10, 2008). This was so even though Plaintiffs claimed the NHL was

an "illegal cartel." *Madison Square Garden v. National Hockey League*, No. 07-cv-8455, 2007 WL 3254421, at *5 (S.D.N.Y. Nov. 2, 2007).

Ultimately, the district court's focus on the "monopolist" label erased the distinct anticompetitive-conduct element, effectively creating what amounts to a *per se* rule that releases are unlawful *whenever* a plaintiff claims that a sports league has market power. This approach has no support and should be rejected.

2. The district court further erred both in asserting that Section 10.3 functions as a "prospective" waiver of rights, and by concluding that this purportedly prospective nature is why Section 10.3 violated the *antitrust laws*, rather than just making it unenforceable as a *contractual* matter. JA180-181; JA194.

As a threshold matter, Section 10.3 is unmistakably retrospective. It employs past-tense language—releasing NASCAR from claims "arising out of or relating to the criteria *used* by [NASCAR] to determine whether or not to enter into, or to offer to enter into, a Charter[]"—and does not purport to release any claims accruing in the future. JA836-837 (2025 Charter § 10.3) (emphasis added).

The district court's contrary conclusion was not based on any analysis of the text of Section 10.3. Rather, it was based on a misunderstanding of arguments in NASCAR's earlier filings. *See* JA194. For instance, the district court referenced a line from NASCAR's opposition to Plaintiffs' first preliminary-injunction motion—explaining that Section 10.3 "release[s] … antitrust rights"—as proving Section 10.3

releases future conduct. JA194. But the court ignored NASCAR's opposition to Plaintiffs' latest motion, which made perfectly clear its view that Section 10.3—signed by Plaintiffs as recently as 2024—released *only* "pre-2024 conduct," not claims accruing in the future. JA1102. Nor did the district court address the fact that Plaintiffs' counsel agreed that Section 10.3 is backward-looking in nature. JA99; JA526-527. In any event, the district court should have grounded its interpretation of Section 10.3 in that provision's plain language, not on a crabbed reading of one party's purported interpretation.

The district court also oversimplified things by assuming that NASCAR's assertion that releases barred the vast majority of Plaintiffs' claims meant NASCAR viewed the releases as forward-looking. NASCAR's briefing explained why most of Plaintiffs' claims in this action are *retrospective*—and barred by the statute of limitations—as they relate to policies or actions NASCAR initiated *more than four years ago*, such as its 2018 acquisition of ARCA or 2019 adoption of Next Gen car requirements. JA252-253; JA1102; *see* JA122-123. As NASCAR explained, even if these actions have spill-over effects going forward, any antitrust claim based on that conduct accrued years ago. JA122. So, the releases Plaintiffs signed in 2024 can lawfully cover all of that retrospective conduct. *See, e.g.*, *Madison Square Garden*, 2008 WL 4547518, at *6-7.

In any event, none of the cases the district court cited holds that even a *prospective* release violates the antitrust laws, without more. In *Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*, the Supreme Court speculated in dicta that an arbitration agreement might be unenforceable if it operated "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations." 473 U.S. 614, 637 n.19 (1985). But, the Supreme Court has never applied that rule to invalidate a release. *See Cedeno v. Sasson*, 100 F.4th 386, 411 (2d Cir. 2024) (Menashi, J., dissenting) ("While the Supreme Court has acknowledged the theoretical possibility of an effective vindication exception to the FAA, it has always declined to apply the exception whenever litigants have asked it to do so."); *id.* (citing cases). And the lower courts that have applied the rule have done so only in the context of refusing to block an ongoing antitrust dispute despite a release—not to rule that a release *itself* constitutes an antitrust violation. *See, e.g.*, *id.* at 396 (majority op.).

The district court's reliance on *Redel's Inc. v. General Electric Co.*, 498 F.2d 95 (5th Cir. 1974), was also misplaced. In that case, the district court stated in dicta that a release might violate Section 1 as part of a "contract 'in restraint of trade'" *if* it was "an integral part of a scheme to violate the antitrust laws." *Id.* at 99, 100-01. But the district court here did not find that NASCAR engaged in any "scheme to violate the antitrust laws." *Id.* Nor did Plaintiffs invoke their Section 1 claim in support of these injunctions. So, *Redel's* 50-year-old dicta is off the table.

At the end of the day, NASCAR's release is a garden-variety contract provision—akin to those found in countless commercial contracts regularly upheld by courts, and just like Section 10.4, which benefits team owners—that guards against litigation from its business partners on issues arising before the contracts were executed. Plaintiffs, however, demand something extraordinary: a unique carve-out for antitrust releases, in contrast with waivers in virtually every other area of the law. *See, e.g.*, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59-60 (1974) (upholding Title VII releases); *United States v. Purdue Pharma L.P.*, 600 F.3d 319, 333 (4th Cir. 2010) (enforcing a qui tam release). This approach not only defies legal precedent but also jeopardizes established business norms nationwide.

3. Finally, the district court independently erred in concluding that Section 10.3 inflicts "antitrust injury" on Plaintiffs. Antitrust injury "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers" in the relevant market. *Chicago Pro. Sports L.P. v. National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992); *see Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 515-16 (4th Cir. 2002) (same). Simply being offered the release—and choosing not to accept it—falls far short of this standard.

Plaintiffs have never claimed that including Section 10.3 in the 2025 Charter offers "reduced output"—meaning decreased the number of races or teams in the Cup Series. *See Continental Airlines*, 277 F.3d at 516. Nor could they have, as

Plaintiffs still planned to compete as open teams in the 2025 Cup Series season, even without Charters. *See supra* at 19. And there are no allegations that Section 10.3 impacts consumer prices or reduces Plaintiffs' compensation. On the contrary, NASCAR's undisputed evidence shows that team owners can receive approximately 50% of NASCAR's media revenues attributable to the Cup Series under the 2025 Charter—a substantial *increase* from what they received in 2016, which was *itself* an increase from prior years. JA362 (¶15); JA407, JA413 (¶¶5, 32); JA439 (¶45). This trend of increasing compensation year-over-year alone contradicts the behavior of a monopsonist. *See* JA362, JA367, JA374-375 (¶¶15, 27, 41); *see also White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869, 888-89 (N.D. Ohio 2008) ("[T]he price the monopsonist pays for the input will go down" in a valid monopsony claim.). And it underscores the absence of any anticompetitive effects—or antitrust injury—here.

In a one-sentence footnote devoid of any case citations, the district court declared that Plaintiffs' "antitrust injury" is their "inability to pursue antitrust claims" without an injunction. JA181 n.11. But this overlooks the fact that Plaintiffs were perfectly capable of pursuing such claims by declining to sign the Charter and, indeed, were still free to compete as open teams. And, more important, it bypasses the governing "antitrust injury" test, which demands evidence of impacts on "price[s]" or "output." *Continental Airlines*, 277 F.3d at 516.

At best, the only injury Plaintiffs have shown is harm to themselves, stemming from the fact they "did not like the terms [of NASCAR's offer] and, weighing [their] options, declined [it]"—a "scenario that plays out across the nation daily, in transactions big and small." *Host*, 32 F.4th at 250. But mere dissatisfaction with contractual terms is "not an antitrust injury," as "competition has not been suppressed"—Plaintiffs were neither "excluded from any market nor forced to [sell their services] to [NASCAR]." *Id.* Such negotiations reflect the market functioning *as it should*, allowing parties to negotiate freely and either strike a deal or walk away. Plaintiffs' grievances about the natural ebb and flow of competitive business dealings simply do not establish an antitrust injury.

For all these reasons, the district court erred as a matter of law in finding that Plaintiffs were likely to succeed on their Section 2 claim.

## C.    The District Court's Injunctions Contradict Plaintiffs' Complaint And Their Attempt To Hold The Charters Unlawful

The injunctions are flawed for an additional, independent reason: They contradict Plaintiffs' complaint and the relief they seek in their complaint. Under this Court's precedent and basic principles governing the proper use of preliminary injunctions, such extraordinary relief is warranted *only* when necessary "to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the

illegality alleged in the complaint." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) (citation omitted). Plaintiffs have not met this standard.

Plaintiffs' complaint attacks the Charters as unlawful for numerous reasons beyond the release. For example, the complaint purports to challenge the Charter's restriction on teams competing in other leagues, JA39, JA44-45, JA49-50 (¶¶76, 94-96, 114), as well as the Charter's "seiz[ure]" of Charter teams' intellectual-property rights, JA48 (¶110). The complaint even asks the district court to adjudge the 2025 Charter an "unreasonable restraint[] of trade in violation of Section 1 of the Sherman Act." JA60. Yet, Plaintiffs have now sought—and received—preliminary injunctive relief *binding them* to the very provisions they decry, including the noncompete and intellectual-property clauses. That paradoxical relief is not allowed.

*Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997), is squarely on point. In that case, a ticketing agency claimed Trans World Airlines' standard ticketing-agency contract violated the antitrust laws, while simultaneously seeking an injunction to *prevent* that contract's termination. *Id.* at 15-16. This Court rejected that inconsistent request, holding that a claim that a contract "violates the Sherman Act cannot, as a matter of law, support an injunction requiring [the defendant] to remain involuntarily in a contractual business relationship with [the plaintiff]." *Id.* This Court stressed that when "the injury that

the movant seeks to prevent through a preliminary injunction is not only unrelated, but directly contradictory to, the injury for which it seeks redress in the underlying complaint, then a preliminary injunction simply should not issue." *Id.* at 16.

This case is a mirror image of *Omega*. Absent the district court's injunctions, Plaintiffs would not be bound by the Charter provisions they challenge—and Charters are not necessary to compete in Cup Series races, as Plaintiffs could compete as open teams without signing a release. The complaint itself acknowledges the paradox of this requested relief, stating that Plaintiffs "will be competing under the anticompetitive and monopolistic terms of the 2025 Charter Agreement . . . *if* a preliminary injunction is granted." JA52-53 (¶127) (emphasis added). By granting Plaintiffs' requested injunctions, the district court has weakened, rather than supported, its ability to provide ultimate relief "of the same kind." *Microsoft*, 333 F.3d at 526. Indeed, Plaintiffs could potentially leverage the district court's orders to seek *additional* damages at the case's conclusion if the provisions to which they are now bound are later deemed anticompetitive. *See Samica Enters., LLC v. Mail Boxes*, No. 06-cv-2800, 2008 WL 11342744, at *3 (C.D. Cal. Apr. 10, 2008) (applying *Omega* to deny mandatory injunction that could "compound, rather than mitigate, Plaintiffs' losses"). That cannot be the law.

In response to *Omega*, the district court asserted that its orders "do[] not create any contractual relationship" but simply require that Plaintiffs race on the same

"terms" as other Charter teams.  JA196.  But under the injunctions, the parties must adhere to all terms of the Charter minus the release.  JA168, JA176-177, JA185-186; *see* JA195.  That is a contract, no matter how it comes garbed.  More important, those court-imposed obligations—contract or not—bind Plaintiffs to the very terms they are simultaneously challenging as anticompetitive, thus failing to "protect [Plaintiffs], during the pendency of the action, from being harmed or further harmed in the manner in which [they] contend[] [they] w[ere] or will be harmed through the illegality alleged in the complaint."  *Omega*, 111 F.3d at 16.

The district court's *Omega* error alone requires reversal.

### D.    The District Court's Errors Mandate Reversal Of Both Of Its Injunction Orders

All of the arguments made above necessitate reversal of *both* of the district court's injunction orders.  Both of the injunctions were predicated on Plaintiffs' Sherman Act Section 2 claim alleging that the release was unlawful.  JA168-169, JA177.  Because that claim is unlikely to succeed, the district court had no basis to grant *any* injunctive relief, including regarding the SHR Charter transfers.  *See Winter*, 555 U.S. at 22.  Moreover, since allowing Plaintiffs to race under the Charter's terms contradicts the relief sought in the complaint, the district court had no authority under *Omega* to grant such relief, including regarding the SHR Charter transfers.  111 F.3d at 15-16.

The district court has asserted the equitable power to "unwind" the SHR Charter transfers to Plaintiffs if this Court overturns its injunctions, either by ordering Plaintiffs to transfer the Charters to other motorsports organizations or by dissolving them.  JA190 n.1.  This Court should remand to the district court to enter an order implementing such appropriate relief.

## CONCLUSION

The district court's preliminary injunctions should be reversed, and the case remanded to the district court to enter an order implementing appropriate relief.

Dated: February 12, 2025

Respectfully submitted,

*/s/ Gregory G. Garre*

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com

Tricia Wilson Magee
SHUMAKER, LOOP &
  KENDRICK, LLP
101 S. Tryon Street, Suite 2200
Charlotte, NC 28280
(704) 945-2961
tmagee@shumaker.com

Gregory G. Garre
Anna M. Rathbun
Christopher J. Brown
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
lawrence.buterman@lw.com

*Counsel for Defendants-Appellants*
*National Association for Stock Car Auto Racing, LLC and James France*

**STATEMENT REGARDING ORAL ARGUMENT**

This Court has directed the Clerk to schedule oral argument in this appeal during the Court's May 6-9, 2025 argument sitting.  ECF 20.  NASCAR agrees that oral argument would aid the Court in its consideration of this case.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

Counsel for Appellants National Association for Stock Car Auto Racing, LLC and James France hereby certifies that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(b). The brief contains 12,998 words (as calculated by the Microsoft Word 365 word processing system used to prepare this brief), excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman style font.


Dated:  February 12, 2025                    *s/ Gregory G. Garre*
                                             Gregory G. Garre

                                             *Counsel for Defendants-Appellants*
                                             *National Association for Stock Car*
                                             *Auto Racing, LLC and James France*