No. 24-2245

# United States Court of Appeals for the Fourth Circuit

2311 RACING LLC d/b/a 23XI RACING
and FRONT ROW MOTORSPORTS, INC.,

*Plaintiffs-Appellees*,

*v.*

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC;
and JAMES FRANCE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of North Carolina
No. 3:24-CV-886-KDR-SCR
Hon. Kenneth D. Bell

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

Danielle T. Williams
WINSTON & STRAWN LLP
300 S. Tryon St. 16th Floor
Charlotte, NC 28202
(704) 350-7700
dwilliams@winston.com

Jeanifer Parsigian
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000
jparsigian@winston.com

Jeffrey L. Kessler
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700
jkessler@winston.com

Scott P. Glauberman
Kelly Mannion Ellis
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
(312) 558-5600
sglauber@winston.com
kmannion@winston.com

*Counsel for Plaintiffs-Appellees*
*2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc.*

# TABLE OF CONTENTS

Introduction ................................................................................ 1

Statement of the Issues ............................................................. 8

Counterstatement of the Case .................................................. 8

    I.   The parties ...................................................................... 8

    II.   The charter system ...................................................... 10

    III.   The 2025 charter agreement and the Release .......... 13

    IV.   This lawsuit .................................................................. 16

    V.   The first preliminary injunction motion .................... 19

    VI.   The renewed preliminary injunction motion ............ 20

    VII.   The preliminary injunction ........................................ 23

        A.   Likely success on the merits ................................... 23

        B.   Other preliminary injunction factors .................... 25

        C.   The injunction's terms and standard for granting it .............. 27

        D.   The stay motion ...................................................... 27

    VIII.   The 2025 Daytona 500 ............................................... 29

Summary of Argument ............................................................. 30

Standard of Review ................................................................... 32

Argument .................................................................................. 34

    I.   The district court found that plaintiffs carried their burden no matter what standard applies to the preliminary injunction ............ 34

    II.   The district court did not abuse its discretion in finding that plaintiffs are likely to succeed on the merits. .................................... 39

        A.   Plaintiffs showed a likelihood of proving that defendants have monopoly power in a relevant market. ............................................. 39

        B.   Plaintiffs showed a likelihood of proving that defendants unlawfully maintained their monopsony through exclusionary acts. ................................................................................................ 47

            1.   The anticompetitive Release ............................... 48

            2.   Other exclusionary conduct .............................. 53

C.    Plaintiffs showed a likelihood of proving antitrust injury. .....58

III.  The injunction is consistent with the complaint and narrowly drawn—for defendants' benefit. ....................................................61

Conclusion ...................................................................................... 65

Oral Argument Statement ................................................................ 67

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aggarao v. MOL Ship Mgmt.*,
   675 F.3d 355 (4th Cir. 2012) ...................................................... 37, 38

*Aspen Skiing v. Aspen Highlands Skiing*,
   472 U.S. 585 (1985) ...................................................................... 55

*Bell v. Brockett*,
   922 F.3d 502 (4th Cir. 2019) ............................................................ 38

*Brookins v. International Motor Contest Association*,
   219 F.3d 849 (8th Cir. 2000) ............................................................ 41

*Centro Tepeyac v. Montgomery Cnty.*,
   722 F.3d 184 (4th Cir. 2013) ...................................................... 33, 37

*Chicago Pro. Sports v. NBA*,
   961 F.2d 667 (7th Cir. 1992) ...................................................... 58, 59

*Cont'l Airlines* v. *United Airlines*,
   277 F.3d 499 (4th Cir. 2002) ............................................................ 59

*CSX Transp. v. Norfolk S. Ry.*,
   648 F. Supp. 3d 679 (E.D. Va. 2023), *aff'd*, 114 F.4th 280
   (4th Cir. 2024) ............................................................................ 57

*Duke Energy Carolinas v. NTE Carolinas II*,
   111 F.4th 337 (4th Cir.), *reh'g en banc denied*, 122 F.4th
   120 (4th Cir. 2024) .................................................................. *passim*

*Hispanic Nat'l Law Enf't Assn. NCR v. Prince George's Cnty.*,
   535 F. Supp. 3d 393 (D. Md. 2021) .................................................... 63

*Host International v. MarketPlace*,
   32 F.4th 242 (3d Cir. 2022) ............................................................ 50

*Hughes Network Sys. v. InterDigital Commun.*,
  17 F.3d 691 (4th Cir. 1994) ................................................................ 64

*Int'l Boxing Club of N. Y. v. United States*,
  358 U.S. 242 (1959) ........................................................................... 40

*International Union, United Mine Workers of America v. Bagwell*,
  512 U.S. 821 (1994) ........................................................................... 34

*Ky. Speedway v. NASCAR*,
  588 F.3d 908 (6th Cir. 2009) ............................................................. 42

*L.A. Mem'l Coliseum Comm'n v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) ........................................................... 40

*Le v. Zuffa*,
  216 F. Supp. 3d 1154 (D. Nev. 2016) ........................................... 40. 56

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ...................................................... 35, 37

*Loren Data v. GXS*,
  501 F. App'x 275 (4th Cir. 2012) ....................................................... 50

*Lutz v. Case Farms*,
  2020 WL 5111217 (W.D.N.C.) ..................................................... 62, 63

*Madison Square Garden v. NHL*,
  2008 WL 4547518 (S.D.N.Y.) ............................................................. 50

*Madsen v. Women's Health Ctr.*,
  512 U.S. 753 (1994) ........................................................................... 64

*Mandeville Island Farms v. Am. Crystal Sugar*,
  334 U.S. 219 (1948) ........................................................................... 58

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ............................................................. 34

*Mozart v. Mercedes-Benz of North America*,
  833 F.2d 1342 (9th Cir. 1987) ........................................................... 46

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005)............................................................. 65

*NCAA v. Alston*,
594 U.S. 69 (2021)...................................................... *passim*

*Omega World Travel, Inc. v. Trans World Airlines*,
111 F.3d 14 (4th Cir. 1997)......................................... *passim*

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013)................................... 39, 47, 53

*Philadelphia World Hockey Club v. Philadelphia Hockey Club*,
351 F. Supp. 462 (E.D. Pa. 1972)......................................... 56

*Pierce v. N.C. State Bd. of Elections*,
97 F.4th 194 (4th Cir. 2024) ................................... 37, 39, 44

*Queen City Pizza v. Domino's Pizza*,
124 F.3d 430 (3d Cir. 1997) ................................... 44, 45, 46

*Radovich v. NFL*,
352 U.S. 445 (1957)............................................................. 56

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020)............................................... 64

*Shields v. World Aquatics*,
2024 WL 4211477 (9th Cir.) ............................................... 55

*Toledo Mack Sales & Serv. v. Mack Trucks*,
530 F.3d 204 (3d Cir. 2008) ............................................... 57

*Total Vision v. Vision Serv. Plan*,
717 F. Supp. 3d 922 (C.D. Cal. 2024) ............................... 48

*UHSpro v. Secure Documents*,
2017 WL 2729082 (D. Utah)............................................... 38

*United Farmers Agents Association v. Farmers Insurance Exchange*,
89 F.3d 233 (5th Cir. 1996)............................................... 46

iii

*United States v. Microsoft,*
  253 F.3d 34 (D.C. Cir. 2001) ....................................................... 55

*Virginia Impression Prods. v. SCM,*
  448 F.2d 262 (4th Cir. 1971) ....................................................... 49

*VKK v. NFL,*
  244 F.3d 114 (2d Cir. 2001) .................................................. 49, 50

*White Mule v. ATC Leasing,*
  540 F. Supp. 2d 869 (N.D. Ohio 2008) ...................................... 59

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) ................................................................... 23, 35

## Statutes

15 U.S.C. § 1 ................................................................................. 16, 17

15 U.S.C. § 2 ................................................................................. *passim*

Sherman Act ................................................................................ 61, 62

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp,
  Antitrust Law: An Analysis of Antitrust Principles
  and Their Application (5th ed. 2022) ...................................... 57

## INTRODUCTION

This appeal is brought by a monopolist—NASCAR—that unlawfully maintains its monopsony power over premier stock car racing. NASCAR's anticompetitive conduct includes, among other things, refusing to allow premier stock car racing teams like plaintiffs to compete unless the teams agree to release all antitrust claims against NASCAR.

The district court granted a narrow preliminary injunction that preserves the status quo through trial. The injunction allows plaintiffs to continue to participate in NASCAR's premier Cup Series as chartered teams—which, the court found, is the only way for them to compete without suffering irreparable harm—while maintaining their rights to pursue antitrust claims.

The preliminary injunction will be in effect for the 2025 NASCAR season only, which ends on November 2. The trial on plaintiffs' claims will begin on December 1.

The Cup Series is well underway. When this Court hears oral argument, roughly one-third of the races will be finished. Less than six months later, the checkered flag will come down at the Championship

1

Race. The injunction maintains the status quo for the 2025 season, with minimum disruption to both sides, for just enough time to allow a jury to decide the antitrust claims. It was well within the district court's discretion, so this Court should affirm.

In this appeal, defendants do *not* dispute that plaintiffs carried their burden to show three of the four factors for a preliminary injunction. They do *not* dispute that plaintiffs would suffer imminent irreparable harm if unable to race as chartered teams or if forced to release their antitrust rights. They do *not* dispute that the balance of equities favors plaintiffs. (Indeed, as the district court found, the injunction is unlikely to harm defendants at all.) And they do *not* dispute that the public interest favors the injunction. Fans want to cheer for their favorite teams and drivers to be Cup Series champion.

Defendants challenge only the district court's finding that plaintiffs are likely to succeed on the merits of their claim under Section 2 of the Sherman Act, 15 U.S.C. § 2. Section 2 forbids monopolizing any part of interstate trade or commerce through exclusionary acts.

Plaintiffs 23XI and Front Row Motorsports are premier stock car racing teams. There is only one premier stock car racing circuit in the United States: NASCAR's Cup Series. NASCAR is a monopsony—a monopolist in a buyer's market. Its share of the market for the services of premier stock car racing teams is 100 percent.

Since 2016, the only economically viable way for teams to compete in the Cup Series has been through NASCAR charter agreements. Each agreement guarantees its holder a spot for one car in each Cup Series race, along with a portion of NASCAR broadcast revenues. Still, the charters provide the teams with much less revenue and less favorable terms than would prevail in a market unrestrained by NASCAR's unlawful monopsony. Teams do not have a fair opportunity to earn a return on their investments—tens of millions of dollars each year. As a result, most of the original 2016 charter owners exited the market.

NASCAR has been able to impose below-market prices and unfavorable charter terms because of its monopsony, which it has maintained for years through anticompetitive acts. Those acts include:

(1) acquiring premier racetracks and refusing to grant any other stock car races access to this necessary resource;

3

(2) contractually forbidding Cup Series racetracks that NASCAR does not own from hosting other stock car races;

(3) acquiring its closest rival to prevent it from growing into a competitor to the Cup Series;

(4) forbidding chartered teams from competing in other stock car races or owning a share of any competitor to the Cup Series;

(5) requiring chartered teams to use and pay for expensive "Next Gen" cars that cannot be used in competing stock car races; and

(6) as a condition of competing in Cup Series events, imposing a release that defendants assert would bar plaintiffs from pursuing their antitrust claims against NASCAR. JA0836-0837 (§10.3) (the "Release").

On September 6, 2024, NASCAR presented all chartered teams with an ultimatum for 2025 charter agreements, which will last for seven years. NASCAR threatened to end the charter system—again, the only economically viable way to compete in Cup Series events—unless teams accepted its offer in just hours. These take-it-or-leave-it charter agreements included the mandatory Release. In other words, waiving antitrust claims was part of the monopsony price for being able to compete.

Plaintiffs refused to surrender. They did not sign the 2025 charter agreement and instead sued NASCAR and its CEO owner, James France, for antitrust violations.

Plaintiffs obtained a preliminary injunction allowing them to continue to compete in the Cup Series as chartered teams until the December trial. The injunction also prevented NASCAR from following through on its threat to withhold approval of plaintiffs' purchases of charters from Stewart-Haas Racing LLC unless plaintiffs gave up their antitrust claims.

In their opening brief, defendants use overblown rhetoric and hyperbole to attack the district court's reasoning. They assert that the judge did not understand antitrust law and abused his discretion. But the "errors" defendants identify are not errors at all. The district court applied well-established precedent to the extensive fact and expert record, properly exercising its discretion to grant a narrowly tailored preliminary injunction that protects the rights of all parties and the public until trial. Each of defendants' arguments against this narrow injunction is meritless.

First, defendants argue that the district court mistakenly treated its mandatory injunction as prohibitory, leading it to lighten plaintiffs' burden. But they fail to mention that the court held that plaintiffs carried their burden under *either* standard.

Second, defendants argue that the district court should not have found that plaintiffs are likely to succeed on the merits of their Section 2 claim. On each merits point, however, they can muster only a disagreement with the district court, not any legal error or abuse of discretion.

For example, the district court found that plaintiffs' expert and fact evidence established a relevant input market for premier stock car racing teams. Disagreeing, defendants argue for a very different market: sports investors. The district court correctly rejected defendants' market, recognizing that plaintiffs are stock car racing teams, not financial investors. The district court also properly considered the expert testimony of Dr. Daniel Rascher, which defendants ignore, to conclude that NASCAR has monopsony power in the relevant input market. The district court made its relevant market determination by applying established precedent to the evidence before it. That is not an abuse of discretion.

Similarly, defendants are wrong to argue the district court abused its discretion by finding that NASCAR's Release will likely be found an exclusionary act used to maintain its monopsony power. This finding is

6

strongly supported by the evidence. It also accords with this Court's decision in *Duke Energy Carolinas v. NTE Carolinas II*, 111 F.4th 337, 354 (4th Cir. 2024), *reh'g en banc denied*, 122 F.4th 120 (4th Cir. 2024), holding that "alleged anticompetitive conduct must be considered as a whole," not piecemeal, in determining its exclusionary effect in a Section 2 case. Together with the Release, plaintiffs presented evidence of a series of anticompetitive acts by NASCAR.

Nor is there any basis for defendants' claim that the district court abused its discretion by finding that plaintiffs will likely be able to prove antitrust injury without showing that NASCAR charged higher prices to *consumers*. Defendants are confusing the input market in which plaintiffs compete with the output market in which NASCAR sells its product. Plaintiffs needed to—and did—show only that they will likely be able to prove that *they* are suffering antitrust injury by receiving below-competitive market prices for selling *their* services in a monopsony market.

Finally, there is no merit to defendants' argument that the injunction and complaint are inconsistent. The complaint does not seek to invalidate the entire charter agreement, so this Court's *Omega*

7

decision does not apply. The complaint alleges that just two provisions of the charter agreement—the Release of antitrust claims and the covenant not to compete—are exclusionary acts that NASCAR used to maintain its monopsony. The district court enjoined the Release. It could have *also* enjoined the non-compete provision, but it exercised its discretion not to—thus *minimizing* any disruption to defendants before trial while still preventing irreparable harm to plaintiffs. The injunction was narrowly tailored and fair. This Court should affirm.

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion in finding, based on an evidentiary record developed by both sides, that plaintiffs are likely to succeed on the merits of their Section 2 claim.

2.      Whether the district court abused its discretion in narrowly tailoring its preliminary injunction to be both consistent with the complaint's allegations and minimally intrusive to defendants.

## COUNTERSTATEMENT OF THE CASE

### I.    The parties

Plaintiff Front Row Motorsports, Inc. was founded in 2004 with one goal: "to try to be the best stock car racing team it can be." JA0031 (¶37); JA1149 (¶22). Dedicated to the sport for over two decades, it

8

employs around 80 people—from drivers to mechanics to technical personnel—to make that dream come true. JA1061 (¶8), JA1064-1065 (¶22).

Plaintiff 2311 Racing LLC, which does business as 23XI Racing, shares the ambition "to compete at the highest level of stock car racing, striving to become the best team it can be." JA1153 (¶6). Its co-founders—NBA legend Michael Jordan, NASCAR legend Denny Hamlin, and their business partner Curtis Polk—started 23XI in 2020 to create a Cup Series team for driver Bubba Wallace, a breakout star and the only full-time, Black driver. After building multi-million-dollar facilities; contracting with Wallace; acquiring charters; and purchasing stock cars, equipment, and other business necessities, 23XI had around 100 full-time employees and expected to add around 30 more. JA1077-1078 (¶¶10-15).

There is only one premier stock car racing circuit in the United States in which these teams can achieve their goals. It is run by a monopolist: NASCAR.

NASCAR's business model is different from other professional sports, such as the NBA and NFL, in which the teams are joint venture

partners who form a league. JA0021 (¶3). Instead, NASCAR asks

independent stock car racing teams to invest their own time and money

and then sell their services to compete in a premier stock car racing

circuit at tracks largely owned by NASCAR's ruling family, the Frances,

whose scion James is NASCAR's Chair, CEO, and co-defendant.

JA0020-0021 (¶¶2-3); JA0949-0950 (¶¶7-9). Although the teams make

the investments, employ the drivers, and engage in the races that

attract fans, broadcasters, and sponsors, NASCAR reaps almost all the

economic benefits. JA0949-0950 (¶9). Thus, the teams and NASCAR are

*not,* to use defendants' term, "partners." Br. 3, 30, 51.

## II.    The charter system

For most of its history, NASCAR operated its premier circuit, the

Cup Series, using year-to-year contracts that did not ensure the

financial viability of racing teams. JA0021-0022 (¶¶3-4). That worked

well for NASCAR, with the France family handsomely profiting.

JA0021-0022 (¶¶4-6). But it was a different story for the teams. They

suffered from constant financial turmoil and depended on individual

team sponsors to make ends meet. Some sat out races to conserve costs,

many went defunct, and all lacked a fair chance to earn a profit, with no guarantee of prize money. JA0021-0022 (¶¶4-6).

Finally, in 2014, the teams formed the Race Team Alliance to advocate for a fairer economic deal from what France himself has referred to as his "benign" "dictatorship." JA0036 (¶62), JA0038 (¶71). This ultimately resulted in the charter system that, although still imposing monopolistic terms in NASCAR's favor, provided certainty that the teams would be able to compete in every race. JA0023 (¶8); JA1023-1025 (¶¶18-21); JA1078 (¶16). Under this system, NASCAR granted charters for 36 cars, guaranteeing each one a spot in every Cup Series race as well as a share of pooled broadcast revenue. JA1062 (¶10). Charters provided the minimum for teams to have a chance to survive. Without one, they could not attract sponsors and quality drivers to stay afloat, much less turn a profit. JA1068-1071 (¶¶38-46).

The alternative to a charter—racing as an "open" team, with no guaranteed entry into races and no share of broadcast revenue—is not an economically sustainable alternative. JA1068-1071 (¶¶38-46). Drivers and sponsors require teams to have the certainty of a charter. As the district court found, plaintiffs would "likely suffer significant

11

harm if they are consigned to only racing as an 'open' team, losing the opportunity to race their most competitive team as well as putting at risk several important sponsorships." JA0184. Racing as an open team is so difficult that "the consistent participation of 'open' cars by a non-chartered team is effectively non-existent." JA0171; JA0982-0984 (¶¶81-86); JA1049-1052 (¶¶82-91).

Even under the charter system, its below-competitive market terms still caused teams to struggle. JA1061 (¶7); JA1063-1064 (¶18); JA0038-0040 (¶¶71-76). Over half—11 of the 19 original 2016 charter holders—left the sport. JA0039 (¶73).

Plaintiffs have done their best to overcome these economic challenges and compete. In 2016, Front Row signed two charter agreements running through the end of 2024. JA1061-1063 (¶¶5, 10, 18). In May 2024, it agreed to buy a third charter from Stewart-Haas Racing. It was Front Row's (misguided) hope that NASCAR would soon agree to fairer terms in the upcoming charter renewal. JA1062 (¶9).

23XI purchased two charters—one in 2020, one in 2021—from teams leaving the Cup Series. JA1077 (¶¶9-10). And, in August 2024, it also agreed to buy a third from Stewart-Haas. JA1078 (¶14). Each time,

23XI believed that the 2016 charters were one-sided in favor of NASCAR. JA1076-1077 (¶7). But, as co-founder Curtis Polk explained, "We knew that the current NASCAR charters would expire at the end of 2024, and our naive hope was that NASCAR would negotiate in good faith to agree upon a fairer economic division with the racing teams at that time." JA1077 (¶8).

## III.  The 2025 charter agreement and the Release

Plaintiffs' hopes went unfulfilled. In 2022, the Race Team Alliance's members created a Team Negotiating Committee of four team owners to take the lead in advocating for fairer terms in the renewed charter agreements to be offered to the individual teams. JA1065 (¶25); JA1080-1082 (¶¶20-28). The group met with defendants a total of fourteen times to explain why changes needed to be made "to provide a fairer economic system for the teams." JA1080 (¶22). But France rejected their proposals for permanent charters and other terms that would have allowed the value of the teams to rise, revenue splits to increase, and shared governance to be implemented (among other needed improvements). The terms NASCAR proposed, viewed as a whole, got worse. JA1065-1067 (¶¶26-30); JA0046-0048 (¶¶103-08).

NASCAR then announced that it was ending the discussions with the Team Negotiating Committee and would negotiate with each chartered team individually. JA1081 (¶24).

By late August 2024, most of the teams "began to crack under NASCAR's pressure, as there was no alternative to competing at Cup Series events and teams feared the loss of their charters." JA1067 (¶31). On September 6, NASCAR sent what it declared to be a "final" version of the 2025 charter agreement and gave teams just hours to sign, without changes, or risk losing their charters. JA0048-0049 (¶¶109-11); JA1082 (¶29). These 2025 charters continued to impose below-competitive market terms that did not provide the teams with a fair chance to earn a reasonable return on their investments. JA0048-0049 (¶¶110, 114); JA0968-0975 (¶¶48-65); JA1067-1068 (¶¶31-36); JA1082-1083 (¶¶29-32).

In addition, the "final" agreement, like its 2016 predecessor, included mandatory Release language that defendants contend shields NASCAR from any antitrust liability:

> Team Owner … hereby releases and forever discharges [NASCAR] … from all [claims] … arising out of or relating to the criteria used by [NASCAR] to determine whether or not

> to enter into, or to offer to enter into, a Charter Member
> Agreement with the Team Owner or any other Person ....

JA0836-0837 (§10.3). Contractually protecting NASCAR's unlawful monopsony from an antitrust challenge by the racing teams is an exclusionary act.

The Release appeared in similar terms in NASCAR's required agreements for "open" cars until November 15, 2024—when NASCAR *removed* it in response to plaintiffs' efforts to obtain a preliminary injunction. JA0172. NASCAR also insisted that plaintiffs accept the Release as a condition for NASCAR fulfilling its promise to approve plaintiffs' purchases of two charters from Stewart-Haas. JA1145 (¶¶11-12).

As the district court stated, the Release is "hardly a model of clarity, but Defendants' view that the Release bars Plaintiffs' antitrust claims *in this action* is crystal clear." JA0194 (emphasis in original); *see also* JA0180 n.10 ("inscrutable would be a fairer description" of the Release, but "Defendants clearly contend that the Release has th[e] effect" of releasing antitrust claims). The Release was part of the package of exclusionary acts that defendants used to maintain NASCAR's monopsony. JA0049 (¶113); JA1047-1048 (¶¶78-79).

It may be, as defendants assert, that a few racing teams "have since praised the 2025 Charter" in public. Br. 16. But *private* discussions tell a different story. One team described its signing as "coerced," another as "under duress," and a third as NASCAR "put[ting] a gun to our head," so it "had to sign." JA0027 (¶20); JA0050 (¶115); JA1068 (¶35). Still another described NASCAR's tactics as befitting a "communist regime." JA0027 (¶20); JA0050 (¶115). But with their livelihoods on the line, every other team—except for plaintiffs— surrendered to NASCAR's take-it-or-leave-it demand that they sign the 2025 charter agreement in order to continue competing with charter rights in the Cup Series. JA1068 (¶¶35-36); JA1083 (¶¶31-32).

## IV. This lawsuit

Plaintiffs sued on October 2, 2024, to assert their "antitrust rights to end NASCAR's anticompetitive monopolization of premier stock car racing in the United States." JA1068 (¶36); JA1083 (¶31). Count 1 of the complaint asserts unlawful monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Count 2 alleges unlawful conspiracy in restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1. JA0054-0060 (¶¶135-58).

The complaint seeks an order granting such relief "as is necessary to restore competition in the relevant market." JA0060 (¶E). It also seeks a declaration that the Release "is invalid as a matter of law to the extent it might apply to Plaintiffs' antitrust claims in this action." JA0060 (¶E). Plaintiffs "seek damages for their past four years of antitrust injury" plus "all damages that they will continue to suffer in the future until Defendants' Section 2 violations are enjoined." JA0057 (¶149).

To support their Section 2 claim, plaintiffs showed that NASCAR used an interrelated series of exclusionary acts to maintain its monopoly position. JA0040-0050 (¶¶78-116); JA0963-0975 (¶¶37-65). These acts included requiring and enforcing non-compete provisions in the charter agreements, thus "denying a competitive circuit access to the limited supply of top stock car racing teams and ownership capital that would be available." JA0039-0045 (¶¶74-77, 94-96); JA0963-0975 (¶¶37-65). The exclusionary acts also included a "Next Gen" policy, which required Cup Series teams to use NASCAR-specified "Next Gen" cars and to buy parts from NASCAR's handpicked suppliers—with each Next Gen car remaining the property of NASCAR and teams *barred*

17

from using it to compete elsewhere. JA0045-0046 (¶¶97-102); JA0971-0973 (¶¶53-59).

NASCAR's exclusionary conduct also included acquiring the Automobile Racing Club of America, its closest competitor. JA0024 (¶12); JA0043-0044 (¶¶90-93); JA1043-1044 (¶¶67-68). And in 2019, the France family acquired International Speedway Corporation, cementing NASCAR's control over a large number of the racetracks that are capable of hosting premier stock car races. JA0033 (¶51); JA0040-0043 (¶¶79-89); JA1062-1063 (¶12). To deprive competitors of access to the racetracks they need to compete, NASCAR both refused to provide access to the tracks it acquired and also required exclusivity agreements from the Cup Series racetracks that it did not own. JA0041 (¶81); JA0965-0968 (¶¶40-47); JA1033 (¶44), JA1039-1044 (¶¶59-68).

In short, "[b]y continuously employing anticompetitive restrictions on racetrack access, restrictions on teams competing in other events, and other anticompetitive acts, NASCAR has unlawfully maintained its monopoly position for offering a top-tier stock car racing series in the United States." JA0026 (¶15).

## V.    The first preliminary injunction motion

On October 9, 2024, plaintiffs sought a preliminary injunction allowing them to participate in the Cup Series under the 2025 charter terms—except barring the Release as a defense to their antitrust claims. JA0006 (Dkt. 20). They needed that temporary relief to protect them from the one charter provision that might defeat their antitrust claims before a trial on the merits, without forcing them to face an irreparable business collapse from being deprived of the only viable option to continue competing: charter rights.

In support, plaintiffs introduced declarations from fact witnesses demonstrating the irreparable harm they would suffer if forced to compete as "open" teams or if forced to release their rights to pursue their antitrust claims. *E.g.*, JA1059-1073; JA1074-1086.

Plaintiffs also introduced evidence from Dr. Daniel Rascher. The Court might not recognize his name because defendants *never mentioned his declarations* in their opening brief. He is one of the leading sports economists in the country. *See* JA0947 (¶¶1-2). Dr. Rascher presented an expert analysis showing that NASCAR used anticompetitive acts to maintain monopoly power in a relevant input

market for premier stock car racing services, harming both competition and plaintiffs. JA0947-0985; JA1016-1053.

In response, defendants argued, among other things, that the Release in the 2016 charters precluded this lawsuit, so plaintiffs cannot succeed on the merits of their claims. JA0252. Unlike in their opening appeal brief, defendants then did not distinguish between the Release being prospective or retrospective. JA0252. Nor did they (or could they) deny that they required the Release as a condition for participating in the Cup Series, either as an open team or a charter team.

On November 8, the district court denied the motion without prejudice. Its decision addressed only irreparable harm. JA0502-0509. With the 2025 racing season (at that point) months away, and without any drivers or sponsors yet threatening to abandon plaintiffs, the court concluded that the threat of irreparable harm was speculative. JA0506-0507. But the court invited plaintiffs to move again if "circumstances change." JA0508.

## VI.   The renewed preliminary injunction motion

Circumstances changed. Drivers and sponsors soon threatened to cut ties if plaintiffs could not guarantee race spots with charter rights.

20

Driver Tyler Reddick gave notice under his agreement that 23XI had 30 days (until December 18) to assure him that he would drive a chartered car in 2025. JA0588-0589. Driver Bubba Wallace said he needed to know "immediately" how 23XI intended to compete so he could explore opportunities with other teams. JA0672-0673. Driver Corey Heim did the same, telling 23XI he needed answers "right away" so that he could "speak with other Cup race teams to see if any other opportunities would exist." JA0675.

A major 23XI sponsor revoked one promotion and rescinded an opportunity for a multi-year deal because it was "scared that both [23XI cars] could miss the Daytona 500 … [and] that Reddick will leave the team" at the end of 2024. JA0632; JA0677-0678. And a key sponsor informed Front Row that it was "evaluating options to reduce, eliminate or redirect [its] financial commitments" given the uncertainty over charter status. JA0635-0636 ("If you don't qualify or are not allowed to race in the Daytona 500, it will be a breach of our agreement. The Daytona 500 is not a race you can remedy us [if you miss it].").

Plaintiffs renewed their motion on November 26. JA0010 (Dkt. 51). With it, they submitted evidence that NASCAR had now

informed Front Row that it would reverse its position on approving the transfer of a Stewart-Haas charter to Front Row—unless Front Row dropped this lawsuit and agreed to the Release. JA0165 (¶¶4-5); JA1145 (¶¶10-12). This was a new example of anticompetitive conduct. The Release likewise threatened 23XI's pending purchase of a Stewart-Haas charter. JA1078 (¶14). Plaintiffs asked the court to rule that the Release in the Stewart-Haas charters was inapplicable to plaintiffs' antitrust claims or was otherwise invalid. JA0526-0527. "Such a ruling would allow Plaintiffs to close on their charters with [Stewart-Haas Racing] without risking the irreparable loss of their antitrust rights." JA0526.

In response, NASCAR again argued that the Release barred this lawsuit. It said first that "Plaintiffs signed multiple agreements releasing pre-2024 conduct." JA1102. It then went further. In opposing the request for a ruling on the Release's validity and applicability to the Stewart-Haas transfers, NASCAR argued that the Release barred "claims predicated on *continuing* pre-release conduct." JA1105. And NASCAR did not deny that it was mandating the release of all antitrust claims as a prerequisite to chartered Cup Series racing.

## VII.    The preliminary injunction

On December 18, the district court issued a 20-page opinion granting a limited preliminary injunction to "maintain the status quo of Plaintiffs participating in NASCAR Cup Series races as chartered teams while being permitted to pursue their legal claims in this action." JA0169; JA0177. After discussing the evidence, including the full range of defendants' exclusionary and anticompetitive conduct, it addressed the four preliminary injunction factors from *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). It found that plaintiffs showed (1) they are likely to succeed on the merits of their Section 2 claim, (2) they are likely to suffer irreparable harm without a preliminary injunction, (3) the balance of equities favors them over defendants, and (4) the public interest favors an injunction. JA0169.

### A.    Likely success on the merits

The district court found that plaintiffs are likely to succeed on their Section 2 claim. JA0177-0181. It found that NASCAR possesses monopsony power—that is, a buyer's monopoly power—in the relevant input market that Dr. Rascher identified: the United States market for

the services of premier stock car racing teams. JA0178 n.8; JA0954-0963 (¶¶21-36). The court found that:

> NASCAR's Cup Series is the only premier stock car racing series in the United States, and premier stock car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes. Therefore, NASCAR fully controls which teams can compete at the highest level of stock car racing—effectively, it has a 100% market share.

JA0178.

The court rejected defendants' "cursory and unpersuasive" argument that the relevant market should be different because "Plaintiffs and the public have numerous other sports in which to invest or to watch." JA0179 n.9. "The availability of multiple sports in the United States says nothing about NASCAR's control of a major one of them." JA0179 n.9. NASCAR's 100 percent market share, plus the "obvious" barriers to entry for others to enter the market (such as the unavailability of suitable racetracks and teams), led the court to conclude that NASCAR likely possesses monopoly power in a relevant market—the first element of a Section 2 claim. JA0179-0189.

Next, the district court considered whether plaintiffs showed the other Section 2 element: obtaining or maintaining that monopoly power

through anticompetitive conduct. JA0180. Without addressing the other exclusionary conduct that Dr. Rascher analyzed, the district court found that the Release itself is likely an exclusionary act for maintaining NASCAR's monopoly. "Market aspirants should not be forced to choose between participation in a market and the later assertion of their ongoing/future antitrust rights, nor should a monopolist be permitted to include in the market only those who consent to the monopolist's alleged wrongdoing." JA0181. The court therefore found that plaintiffs are likely to succeed in proving that the Release "is unlawful in this context, considering the circumstances 'as a whole.'" JA0180 (quoting *Duke Energy*, 111 F.4th at 354). "Can a monopolist require that a party agree to release the monopolist from all claims that it is violating the antitrust laws as a condition of doing business? The answer is no." JA0180.

## B.    Other preliminary injunction factors

In this appeal, defendants challenge only the district court's finding that plaintiffs are likely to succeed on the merits, not any other findings or conclusions. Plaintiffs will therefore discuss the rest of the district court's decision only briefly.

First, the court found irreparable harm to plaintiffs from the likely "loss of their contractual rights with their drivers coupled with the uncertainty over racing as an 'open' team." JA0182. The loss of star drivers could not "fully be rectified by the final judgment after trial" because "success on the track" is "incalculable," and "[s]ports are played in the moment." JA0182-0183. Plaintiffs would also suffer irreparable harm "even if they are allowed to race as 'open' cars – which remains decidedly uncertain as it is under the control of the Defendants." JA0183.

Second, the balance of equities favored an injunction. In contrast to the irreparable harm plaintiffs would suffer without one, defendants "will not be significantly harmed (and perhaps not harmed at all) by Plaintiffs being allowed to race as chartered cars on the same terms as other chartered teams," which defendants asserted are fair and desirable. JA0184.

Third, the public interest favored an injunction. The public interest included the interests of fans in cheering for their teams and watching the best drivers, as well as the interests of litigants in

pursuing claims without being deprived of the ability to compete.

JA0185.

## C. The injunction's terms and standard for granting it

The district court found that plaintiffs met their burden of proof

on all four elements. That was true whether or not the injunction was

deemed to be "prohibitory" or "mandatory" because plaintiffs' "right to

relief is indisputably clear" with respect to "the limited injunction being

granted." JA0177. The court therefore entered a preliminary injunction

allowing:

> Plaintiffs to each enter two race cars in all NASCAR Cup
> races under the terms applicable to all charter teams, with
> the exception that the "release" language in Section 10.3 of
> the 2025 Charter Agreement shall not be enforceable to the
> extent that it would release or bar Plaintiffs' claims in this
> action. Further, NASCAR will be preliminarily enjoined from
> refusing to approve Plaintiffs' purchases of two Stewart-Haas
> Racing, LLC ("SHR") charters, which Plaintiffs will be
> entitled to use to race in all 2025 NASCAR Cup races on the
> same terms as other charter teams, again with the exception
> of the application of the release language to Plaintiffs' claims
> in this action.

JA0168-0169; JA0186.

## D. The stay motion

The next day, defendants moved to stay the injunction pending

appeal. They sought a stay to the extent the injunction required them to

27

do anything other than guarantee each plaintiff entry of two cars per race until trial. Dkt. 76. Defendants did not want to approve the Stewart-Haas charter sales, despite previously promising to do so. Dkt. 76. And they did not want to grant plaintiffs any benefits from the 2025 charters. Dkt. 76.

The 13-page stay ruling explained that the court did not order the injunction "lightly." It applied "well-established legal standards to fast-moving and time sensitive events" and "carefully considered" the evidence. JA0192. The court then walked through defendants' arguments for a stay, rejecting each one. JA0193-0200. It also reaffirmed its irreparable harm findings as to plaintiffs and found, as to defendants:

> [A]pplying the charter terms to Plaintiffs' race cars will not harm NASCAR at all. NASCAR has the same terms with 30 other cars and has repeatedly represented to the Court that those terms reflect a fair and *beneficial* deal for all concerned. So, the Court's injunction requiring NASCAR to permit Plaintiffs to race chartered cars cannot constitute "irreparable harm" to NASCAR.

JA0200.

The court denied the stay motion but modified the injunction to confirm that NASCAR was "not enjoined from declining to approve

23XI's purchase of a [Stewart-Haas] charter" because that issue (unlike the issue of Front Row's purchase) was not yet ripe. JA0204. The parties then stipulated to an order allowing 23XI to complete its purchase while defendants reserved all rights on appeal. JA0205-0206. The district court entered the stipulated order, and this appeal followed. JA0187; JA0209-0210; JA0212.

## VIII.    The 2025 Daytona 500

The biggest race of the Cup Series, the Daytona 500, was run for the 67th time on February 16. That was after the district court issued the preliminary injunction and after defendants initiated this appeal, but the results of the race are in the public record.

With the benefit of the preliminary injunction, three cars each from Front Row and 23XI raced from guaranteed spots in a field that included eight former Daytona 500 winners. (Four "open" cars from other teams did not qualify to race.) After the second of the race's three stages, Todd Gilliland of Front Row was fifth, and Bubba Wallace of 23XI was ninth. At the checkered flag, after racing 502.5 miles for nearly four hours, Tyler Reddick of 23XI finished second—a heartbreaking *113 thousandths of a second* away from a win. There is

29

no evidence that the preliminary injunction caused any harm to

NASCAR, which hailed the race as a great success.

## SUMMARY OF ARGUMENT

Shorn of defendants' overblown rhetoric, this appeal boils down to

one issue: did the district court abuse its discretion in finding the

evidence showed that plaintiffs are likely to succeed on the merits of

their Section 2 claim? It did not.

The evidence, including the Dr. Rascher declarations that

defendants do not mention, showed that NASCAR is the sole buyer in a

relevant input market for the services of premier stock car racing teams

like plaintiffs. The record also showed that NASCAR unlawfully

maintained its monopsony power over these teams through a series of

anticompetitive acts, including by forcing them to choose between

giving up their antitrust rights or their ability to compete in the only

premier stock car racing circuit.

NASCAR's other anticompetitive acts are classic examples of

exclusionary conduct. They include contract provisions that denied, to

actual or potential premier racing circuits, access to the racetracks and

racing teams needed to compete. They also include acquisitions of

NASCAR's closest competitor and a company controlling many of the top-tier racetracks in the United States.

NASCAR used this combination of exclusionary conduct to maintain its monopsony, resulting in plaintiffs receiving sub-competitive market rates for their services, year after year—a clear antitrust injury. The district court thus did not abuse its discretion in finding that plaintiffs' Section 2 claim is likely to succeed.

Nor does it matter whether the district court should have viewed the injunction as prohibitory or mandatory. Defendants *never mention* that the court held that plaintiffs met their burden as to *either* type of injunction.

In any event, the district court properly viewed the injunction as prohibitory because it forbade defendants from altering the last uncontested status quo: (a) the completion of the sale of the Stewart-Haas charters to plaintiffs, which NASCAR had stated it would approve, and (b) the renewal of plaintiffs' rights under the "final" charter terms that NASCAR demanded, except for the anticompetitive requirement that plaintiffs release their antitrust rights as a condition of competing.

Finally, the court did not abuse its discretion by crafting a narrow injunction that is tailored to the needs and equities of the situation. The *Omega* decision does not forbid the injunction because the complaint only challenges two provisions of the 2025 charter agreement as exclusionary acts of a monopolist—without contending that the charter agreement itself is unlawful or invalid. The district court properly did the minimum necessary to prevent irreparable harm to plaintiffs by enjoining one of the two charter provisions that plaintiffs challenged as an exclusionary act—the Release—while otherwise requiring both sides to abide by the 2025 charter terms that defendants demanded. The court carefully crafted the injunction and designed it to maintain the status quo and balance the interests of the parties just until the December 1 trial. This Court should affirm.

## STANDARD OF REVIEW

A preliminary injunction "will not be disturbed on appeal unless the record shows an abuse of [judicial] discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188

(4th Cir. 2013). This Court reviews "factual findings for clear error and … legal conclusions *de novo*." *Id.*

In their 57-page brief, defendants refer to the district court's discretion in just four sentences. Br. 27-28. Rather than discuss that controlling issue, the brief struggles to qualify for *de novo* review by mislabeling factual issues as legal disputes.

As one example, defendants describe the following as a "key legal question: whether the assets, skills, and services of motorsports organizations like Plaintiffs are truly exclusive to the Cup Series or could be marketed to other leagues." Br. 40. That is not a legal question. No statute or precedential opinion answers it. The district court had discretion to decide—and answered "No," based on extensive factual and expert evidence.

This appeal, like the one in *Centro*, 722 F.3d at 188, "search[es] in vain for a legal error to call an abuse of discretion." This Court should reject defendants' invitation to substitute their discretion for the district court's.

## ARGUMENT

### I. The district court found that plaintiffs carried their burden no matter what standard applies to the preliminary injunction.

Defendants argue the district court "erred as a matter of law in holding that the injunctions did not trigger the heightened standard established for 'mandatory injunctions." Br. 28. The court's "bypassing [of] the heightened standard," they assert, "independently requires reversal." *Id.* at 4, 28.

But the district court did no such thing. The court did *not* merely hold that plaintiffs met the standard for a prohibitory injunction. Instead, the court held that it ***does not matter*** if the injunction is mandatory because plaintiffs met that standard, too. After explaining why it viewed this injunction as prohibitory (and why it viewed the mandatory versus prohibitory distinction as dubious, as did the Supreme Court in *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 835 (1994)), the court held:

> [M]andatory injunctive relief is available where the moving party's 'right to relief is indisputably clear,' *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019), ***which the Court finds that it is*** with respect to the limited injunction being granted by the Court.

JA0177 (emphasis added).

The district court thus did not "bypass" the heightened standard. The court *applied* the standard for a mandatory injunction and found that plaintiffs met it by showing a clear entitlement to relief. This finding is only bolstered by defendants' brief, which does not contest three of the four *Winter* factors and, as discussed below, offers only feeble opposition to the court's finding on the remaining factor, likelihood of success.

Defendants' argument is also wrong because the injunction is prohibitory. As the district court explained, "'mandatory injunctions alter the status quo, whereas prohibitory injunctions aim to maintain the status quo.'" JA0176 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014)). The status quo is "'the last uncontested status between the parties which preceded the controversy.'" *Id.* (quoting *League*, 769 F.3d at 236).

The court found that the status quo is plaintiffs' continuing ability to race with the rights of chartered teams because that was the last uncontested status that NASCAR offered to plaintiffs before the controversy:

> Here, elevating substance over form, the 'status quo' is most fairly seen as Plaintiffs being two of the NASCAR Cup Series

> racing teams expected to race in 2025 (and beyond) who were
> offered the opportunity to sign 2025 Charter Agreements.
> Therefore, an injunction that allows Plaintiffs to race in 2025
> with chartered cars on the same terms as other chartered cars
> … puts Plaintiffs in relatively the same position they would
> have been in … while preserving their ability to pursue their
> legal claims.

JA0176-0177.

The injunction also maintained the status quo by preventing

NASCAR from blocking plaintiffs' purchases of the Stewart-Haas

charters. The district court found that NASCAR "was willing to

approve" those purchases "on the merits but has now refused approval

solely on the grounds of Plaintiffs' lawsuit." JA0169 n.2; *see also*

JA0199. Only after plaintiffs sued did NASCAR assert that it would not

approve the transfers unless plaintiffs dropped this lawsuit and agreed

to the Release. JA1145 (¶¶10-11).

Defendants contend that the injunction disturbed the status quo

because it required them to "recalculate[] race purses" and "reassess[]

the number of available race positions." Br. 32. But the district court

found that defendants could "readily" accomplish those small

adjustments to restore the status quo. JA0185. As this Court has

explained, "it is sometimes necessary to require a party who has

recently disturbed the status quo to reverse its actions," but "[s]uch an injunction restores, rather than disturbs, the status quo ante." *Aggarao v. MOL Ship Mgmt.*, 675 F.3d 355, 378 (4th Cir. 2012). That is the situation here.

Although defendants may disagree with the district court's factual findings about what constituted the status quo, "mere disagreement with the district court does not make its findings clearly erroneous." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024). Here, the court's factual finding that the status quo was plaintiffs having the opportunity to continue to compete with charter rights was clearly "plausible in light of the record viewed in its entirety, [so] the court of appeals may not reverse it." *Id.*; *see also Centro*, 722 F.3d at 188 (this Court will not reverse simply because it "would, in the first instance, have decided the matter differently").

Nor is there any relevance to defendants' argument that "the status quo was Plaintiffs competing as Charter teams *with mutual releases*." Br. 31-32. Even if this were true, it would be proper for the district court to issue this prohibitory injunction to both "maintain the status quo and prevent irreparable harm while a lawsuit plays itself out

37

in the courts." *League*, 769 F.3d at 236. The court found—and *defendants do not contest*—that plaintiffs would have suffered irreparable harm without the injunction by being forced to make the Hobson's choice between preserving their antitrust rights or losing their livelihoods. JA0181-0184.

It also does not matter that defendants would now "prefer to extend the perks of the 2025 Charter" to other racing teams. Br. 32. That has nothing to do with the status quo, which is the last situation that existed *before* the controversy, not well into it. *Aggarao*, 675 F.3d at 378.[1]

Finally, even if this Court overturned the district court's factual findings as an abuse of discretion (an unsupported result) and found the injunction to be mandatory, that still would not support reversal.

---

[1] Defendants also argue the injunction is mandatory because it requires a "forced marriage between litigation opponents." Br. 30. They did not argue this point in the district court, so they waived it. *E.g.*, *Bell v. Brockett*, 922 F.3d 502, 513 (4th Cir. 2019). In any event, the argument has no force here because defendants were more than willing to provide plaintiffs with charter rights before this litigation was filed, and they have not said that they will refuse to comply with the injunction. *Contra UHSpro v. Secure Documents*, 2017 WL 2729082, at *3-*4 (D. Utah) (cited in Br. 30) (court was concerned about having "to provide ongoing supervision to assure the nonmovant is abiding by the injunction").

Instead, the Court would then conduct an "even more searching" review to determine whether the district court further abused its discretion in holding that plaintiffs satisfied the heightened standard applicable to mandatory injunctions. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). No such abuse of discretion occurred.

## II. The district court did not abuse its discretion in finding that plaintiffs are likely to succeed on the merits.

Whether the injunction is viewed as prohibitory or mandatory, the following rule is clear: although "plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits," they "need not show a certainty of success." *Pashby*, 709 F.3d at 321 (prohibitory); *see also Pierce*, 97 F.4th at 209 (mandatory). Thus, this Court's task is to assess whether the district court abused its discretion in finding that plaintiffs showed a likelihood of success on each element of their Section 2 monopolization claim.

### A. Plaintiffs showed a likelihood of proving that defendants have monopoly power in a relevant market.

The district court properly exercised its discretion to find that plaintiffs established a likelihood of success in showing a relevant market. That market is the input market for the services of premier

39

stock car racing teams in the United States. JA0178. As Dr. Rascher

explained, NASCAR is the sole buyer of those services, has a

100 percent share of the market, and therefore possesses monopsony

power. JA0954-0963 (¶¶21-36). These factual findings are firmly

grounded in the expert evidence, and the court did not abuse its

discretion in adopting them. JA0178-0179; JA0954-0963 (¶¶21-36).

Indeed, the relevant market here parallels the one that the

Supreme Court recognized in *NCAA v. Alston,* 594 U.S. 69 (2021).

There, the relevant market was the input market for the services of

Division I college football and basketball athletes. As the Supreme

Court observed, there are "no viable substitutes, as the NCAA's

Division I essentially *is* the relevant market for elite college football and

basketball." *Id.* at 81-82 (cleaned up). That input market gave the

NCAA and its members the "power to restrain student-athlete

compensation in any way and at any time they wish, without any

meaningful risk of diminishing their market dominance." *Id.*[2]

---

[2] *Alston* is not alone. Numerous cases recognize a relevant input market
for a single sport's premier competitions. *E.g.*, *Int'l Boxing Club of N. Y.
v. United States*, 358 U.S. 242, 249-52 (1959) (championship boxing);

40

The district court found similar facts here to support the existence of a relevant input market. The "Cup Series is the only premier stock car racing series in the United States, and premier stock car racing is a distinct form of automobile racing with unique cars and highly specialized racing teams for which other types of motorsports like Formula 1 and IndyCar are not substitutes."[3] JA0178; JA1027-1028 (¶29). These findings were well within the court's discretion.

Defendants' challenge to these findings confuses the *input* market in which plaintiffs sell their services as racing teams with the *output* market in which NASCAR sells its racing circuit product to fans,

---

*L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1394 (9th Cir. 1984) (professional football); *Le v. Zuffa*, 216 F. Supp. 3d 1154, 1159–60 (D. Nev. 2016) ("Elite Professional MMA Fighter services").

[3] These factual findings distinguish this case from *Brookins v. International Motor Contest Association*, 219 F.3d 849 (8th Cir. 2000), on which defendants rely. Br. 37. There, the plaintiffs asserted that a particular type of racing was a relevant *output* market. *Id.* at 854. The Eighth Circuit disagreed because they presented no "proof there is no cross-elasticity of demand" by consumers between it and other types of races. *Id.* In other words, the plaintiffs had no evidence to support their relevant market definition. Here, by contrast, Dr. Rascher showed that there is a relevant *input* market for premier stock car racing teams because there is no other circuit in which these teams can sell their services and compete at the highest level of stock car racing. JA0954-0963 (¶¶19-36); JA1021-1032 (¶¶13-40).

sponsors, and broadcasters. Although NASCAR might to some small degree compete for fans, sponsors, or broadcasters with other types of motorsport racing or even other sports leagues like the NFL or NBA, plaintiffs can offer their services as premier stock car racing teams only to a premier stock car racing circuit. JA0957-0958 (¶¶27-30).

Defendants' reliance on *Kentucky Speedway*, Br. 36, misses this distinction. That case involved the definition of the *output* market in which NASCAR competes for fans, sponsors, and broadcasters. *Ky. Speedway v. NASCAR*, 588 F.3d 908, 917 (6th Cir. 2009). The Sixth Circuit held that the plaintiff's expert should have considered the full range of potential output market competitors, including other professional sports leagues. *Id*. But because the market at issue here is the *input* market for stock car racing services, the Sixth Circuit's analysis of the *output* market does not apply.

That is why the district court rejected defendants' argument as "cursory and unpersuasive." It explained:

> The availability of multiple sports in the United States says nothing about NASCAR's control of a major one of them in the same way that the availability of professional basketball and football did not lead to a finding that the NCAA was not a monopolist with respect to the highest levels of college basketball and football in *Alston*.

JA0179 n.9. Here, as in *Alston*, the relevant market is an input market, and plaintiffs cannot offer their services as premier stock car racing teams to the NFL, NBA, or even other motorsports leagues.

Defendants next suggest that the district court erred by "uncritically adopting" plaintiffs' position on market definition. But the district court made clear that it "fully and carefully considered" the parties' filings for *both* preliminary injunction motions, "along with the entire record" submitted. JA0167. And those filings contained ample fact and expert evidence to support the court's relevant market finding. *E.g.*, JA0954-0963 (¶¶19-36); JA1072 (¶¶49-51).

Dr. Rascher's expert declaration—which defendants do not even mention—explained in detail three reasons why premier stock car racing teams compete in a unique input market. First, the lack of substitution across the different tiers of stock car racing isolates "premier stock car racing" as a relevant market. JA0954-0957 (¶¶21-26).

Second, other racing circuits like Formula 1 and the IndyCar Series are not substitute purchasers. They produce races of open-wheeled cars, which require substantially different capital investments

43

and team expertise than closed-wheel stock cars. JA0957-0959 (¶¶27-30); JA1025-1028 (¶¶22-30). As the district court noted, NASCAR itself sought to justify its non-compete restriction as "necessary to protect its unique racing offering." JA0179 n.9.

Third, there is no other premier stock car circuit outside of NASCAR that would offer a "significant economically substitutable source of revenue for stock car teams." JA0960 (¶32); *accord* JA0959-0963 (¶¶31-36); JA1027-1028 (¶29).

Defendants disagree with Dr. Rascher's analysis. Br. 35-36, 40 (citing their own expert's report (JA0364 (¶20)). But when there are "two permissible views of the evidence, the district court's choice between them cannot be clearly erroneous." *Pierce*, 97 F.4th at 210 (cleaned up).

Defendants also make the irrelevant assertion that "no one forced [23XI co-owner Michael Jordan] to invest in the NASCAR Cup Series over a Formula 1 team or another NBA team." Br. 39. They argue that the district court should have conducted a "market analysis for investors [that] focuses on the existence of competition at the *pre-investment* stage." Br. 37 (citing *Queen City Pizza v. Domino's Pizza*,

124 F.3d 430, 438-39 (3d Cir. 1997)). But neither Mr. Jordan nor any other investor in a stock car racing team is the plaintiff in this case. Plaintiffs here are the stock car racing teams. Their antitrust claims are based on NASCAR monopolizing the input market in which they sell their services, not any market for financial investments in sports.

The decision on which defendants rely for their misguided investment-market argument, *Queen City*, hurts rather than helps them. The plaintiffs there were Domino's Pizza franchisees. They proposed a market of "sales of supplies to Domino's franchisees"—that is, to themselves. *Queen City*, 124 F.3d at 438-39. Their franchise contracts required them to buy supplies only from Domino's, so they contended that Domino's had a monopoly on the market for selling them those supplies. *Id*. at 434-35. The Third Circuit rejected that monopoly theory. As it explained, the plaintiffs had to "purchase products from Domino's Pizza not because of Domino's market power over a unique product, but because they are bound by contract to do so." *Id.* at 441.

Here, by contrast, plaintiffs *do not* sell their services to NASCAR because of a contractual obligation. They sell to NASCAR because, as the district court found, NASCAR is the sole buyer for those services.

45

Unlike Domino's Pizza, NASCAR has monopsony power over a "unique" product. JA0178. NASCAR operates the only premier stock car racing circuit and that circuit is "not interchangeable" with any other racing circuit and thus provides the only opportunity for plaintiffs to compete. *Compare* JA0178 (making this finding), *with Queen City*, 124 F.3d at 439.[4]

Finally, there is no merit to defendants' argument that "'competition among franchisors'" like NASCAR prevents any one of them from "'exercising economic power in setting [unfair] contract terms.'" Br. 38 (quoting a 40-year-old franchise law review article—the sole support for this assertion.) The problem for defendants—yet again—is that the district court found, as a factual matter, that NASCAR *has no competitors* as a buyer: "NASCAR fully controls which

---

[4] Defendants' other cases (Br. 38) are like *Queen City*. In *United Farmers Agents Association v. Farmers Insurance Exchange*, 89 F.3d 233, 236-37 (5th Cir. 1996), the relevant market was the broad "market for insurance sales" because the defendant did not offer a "unique insurance product." In *Mozart v. Mercedes-Benz of North America*, 833 F.2d 1342, 1346-47 (9th Cir. 1987), the relevant market was not limited to Mercedes dealerships but rather was "the market for [automobile] dealership franchises" generally because Mercedes cars were not unique.

46

race teams can compete at the highest level of stock car racing—effectively, it has a 100% market share." JA0178. That factual finding and the other findings on market definition and market power were well within the court's discretion.

### B. Plaintiffs showed a likelihood of proving that defendants unlawfully maintained their monopsony through exclusionary acts.

The district court also correctly found that plaintiffs demonstrated a likelihood of proving that NASCAR used exclusionary acts "to foreclose competition [or] to gain a competitive advantage"—the second element of a Section 2 claim. JA0180.

For purposes of the narrow preliminary injunction that it granted, the court "focused its attention only on the anti-competitive effect of the Release." JA0180. This Court should affirm on that same basis, but it may also affirm "based on any ground that appears in the record." *Pashby*, 709 F.3d at 330. The record contains extensive evidence of NASCAR using exclusionary conduct to maintain its monopsony. *All* those exclusionary acts, "considered as a whole," *Duke Energy*, 111 F.4th at 354, show that plaintiffs are likely to succeed on the merits of their Section 2 claim.

47

### 1.  The anticompetitive Release

The district court found that if the Release "is interpreted as a bar to or a release of Plaintiffs' asserted antitrust claims, Plaintiffs have a likelihood of success." JA0177. That is because a monopolist mandating a release of antitrust claims "in this context, considering the circumstances 'as a whole'" (JA0180 (quoting *Duke Energy*, 111 F.4th at 354))—that is, using a release to protect its monopoly by forcing suppliers to choose between their antitrust rights and their livelihoods—is itself an exclusionary act aimed at maintaining monopoly power. *E.g.*, *Total Vision v. Vision Serv. Plan*, 717 F. Supp. 3d 922, 933 (C.D. Cal. 2024) (plaintiff "plausibly pled that the Release is invalid because it was 'part and parcel' of [defendant's] antitrust conspiracy").

The district court stated the issue plainly: "Can a monopolist require that a party agree to release the monopolist from all claims that it is violating the antitrust laws as a condition of doing business?" Based on the record here, the district court found "[t]he answer is no." JA0180.

48

The district court did *not*, as defendants proclaim, "ignore unrebutted, legally significant evidence," "concoct[] a new legal standard," "categorical[ly] ban" releases in sports contracts, adopt a "*per se* rule that releases are unlawful,*"* or hold that "standard release provisions violate the antitrust laws." Br. 1, 3-5, 48. The court instead carefully reviewed the factual record and properly exercised its discretion to make a case-specific finding that this Release on this record violated Section 2.

Defendants do not respond to the court's factual finding. Instead, they cite inapposite cases enforcing private settlements that release antitrust claims. *E.g.*, Br. 42 (citing *Virginia Impression Prods. v. SCM*, 448 F.2d 262, 266 (4th Cir. 1971)). But as the district court found, the Release here is *not* a "general release executed in the context of settling an ongoing legal dispute." JA0181. Nor does it involve a "specific release of past conduct." JA0181. Instead, it involves "green-lighting the ability of a monopolist to condition [market] entry … on the prospective entrant's agreement not to challenge the monopolist's conduct." JA0181.

The sports league cases that defendants cite are similarly off point. Br. 47-48. In one of these cases, the court found, as a factual

matter, that the release was not void for being part and parcel of an alleged antitrust conspiracy by the NFL. That was because the plaintiff (an owner of a joint venture member of the NFL) knowingly entered into the release after the claimed conspiracy—to prevent the plaintiff from moving his NFL team to another market—was complete. *VKK v. NFL*, 244 F.3d 114, 125-27 (2d Cir. 2001). Here, by contrast, plaintiffs are independent contractors who are *not* joint venture members of NASCAR. And they refused to agree to the Release, which was being used to maintain defendants' unlawful monopoly, making it an exclusionary act that violates Section 2. *VKK* did not address this Section 2 issue.

In the second sports league case relied on by defendants, the district court *distinguished* an enforceable antitrust release signed by members of a "legitimate joint venture" from a release imposed by a monopolist, which the court found would raise "public policy concerns." *Madison Square Garden v. NHL,* 2008 WL 4547518, at *1, *8 (S.D.N.Y.). That is the situation here. Plaintiffs are not members of a legitimate joint venture, and NASCAR is using the Release to protect its monopsony power over independent racing teams.

*None* of defendants' cases allow a monopolist to "include in the market only those who consent to the monopolist's alleged wrongdoing." JA0181.[5] As the district court put it: "Could the NCAA just say to all prospective 'student-athletes' that they can't play unless they agree to release the NCAA from antitrust liability? Of course not." JA0195. The district court correctly ruled that the same conclusion applies to NASCAR's efforts to use the Release here.

Contrary to defendants' repeated suggestion (Br. 5, 26, 43, 48-49), the court's finding that the Release likely violates Section 2 does not turn on whether its language is prospective or retrospective. Defendants themselves assert that the Release bars all of plaintiffs' antitrust claims here. JA0180 n.10, JA0194-0195. The district court did not abuse its discretion in finding the Release to be exclusionary as invoked by defendants, whether or not its terms are retrospective.

Equally specious is defendants' argument that because the charter agreements contain a "reciprocal" release by NASCAR of claims against

---

[5] *Loren Data v. GXS*, 501 F. App'x 275 (4th Cir. 2012), and *Host International v. MarketPlace,* 32 F.4th 242 (3d Cir. 2022), cited at Br. 46-47, say nothing on this point. They are cases about parties disagreeing on contract terms.

51

the teams, the Release cannot be anticompetitive. Br. 23, 43. As

Dr. Rascher explained, there is an "obvious asymmetry": a "monopsonist

with market power has the most to gain in trading antitrust releases

with small suppliers who do not have market power." JA1048 (¶79).

Thus, although the releases are "bilateral and linguistically symmetric,"

they have anticompetitive effects only on the racing teams. For the

teams, the Release is "an exclusionary act that protects monopsony

power." JA1048 (¶79). Defendants do not address this distinction (or

anything else from Dr. Rascher).

In their final attempt to discredit the district court's likelihood-of-

success finding, defendants argue that the Release cannot be

anticompetitive because "team owners currently are *not* required to

release claims against NASCAR to compete in the Cup Series: they can

race as 'open teams.'" Br. 44 (emphasis in original); *see also* Br. 12, 19,

43, 52. This argument is disingenuous. Defendants do not mention that

NASCAR *did* insist on the Release in its "open" agreements until

November 15, 2024—when they suddenly *removed* it after plaintiffs

52

sought a preliminary injunction. JA0172, JA0175.[6] That litigation tactic has no bearing on the merits of plaintiffs' Section 2 claim, especially because (as the district court found) open racing is "under the control of the Defendants," who can reinsert the Release into the open agreements just as easily as they removed it. JA0183.

Defendants' argument also ignores the district court's—now uncontested—findings that racing as open teams would inflict irreparable injury on plaintiffs because it would lead to the loss of key drivers and sponsors. JA0181-0184; JA0200-0202. The option to race "open" is no option at all. The district court did not abuse its discretion by looking past defendants' litigation gamesmanship to find that plaintiffs established a likelihood of success in showing that NASCAR's use of the Release is an exclusionary act.

## 2. Other exclusionary conduct

In a Section 2 case, "[i]t is foundational that alleged anticompetitive conduct must be considered as a whole." *Duke Energy*,

---

[6] Defendants also do not mention that they sought to impose the Release as a condition for approving the transfer of the Stewart-Haas charters to plaintiffs—yet another anticompetitive use of the Release. JA1145 (¶¶9-11); JA0175.

111 F.4th at 354. That is because Section 2 does *not* apply just to "court-made subcategories of that conduct." *Id.* In cases like this one, where plaintiffs allege interrelated acts as "part of a singular, coordinated anticompetitive effort," the allegations "must be … considered as part of a single campaign to foreclose competition." *Id.* at 356.

Defendants ignore those instructions from *Duke Energy*. They also ignore the instructions in *Pashby*, 709 F.3d at 330-31, and many other cases, affirming district court conclusions on any ground the record supports.

Plaintiffs provided extensive evidence to show that NASCAR used a series of exclusionary acts to maintain its monopoly power. *E.g.*, JA1030-1048 (¶¶35-79); JA1062-1068 (¶¶10-36); JA1078-1083 (¶¶16-32). In addition to the Release, those acts included:

(1) acquiring premier racetracks and refusing to grant access to this needed resource to any other stock car races;

(2) contractually forbidding other Cup Series racetracks, which NASCAR does not own, from hosting any other stock car races;

(3) acquiring its closest rival to prevent the rival from growing into a competitor to the Cup Series;

(4) forbidding chartered teams from competing in other stock car races or owning part of a competitor to the Cup Series; and

      (5) requiring chartered teams to use and pay for expensive "Next Gen" cars that cannot be used in stock car races competing with the Cup Series.

JA1030-1048 (¶¶38-79); JA1062-1068 (¶¶10-36); JA1078-1083 (¶¶16-32); *see also* JA0177-0181; JA0197-0199. This inter-connected series of exclusionary acts, with the Release—rather than any "superior product, business acumen, or historic accident," *Duke Energy*, 111 F.4th at 353— maintained NASCAR's monopsony.

      Consider NASCAR's ongoing restrictions and exclusionary acts to prohibit racetrack owners from hosting other top-tier stock car races, even when there is no NASCAR race at the track. These restrictions are nakedly anti-competitive, with no plausible procompetitive purpose. JA0965-0968 (¶¶40-47); JA1062-1063 (¶¶11-17). Such conduct, when used by NASCAR to help maintain its monopoly, violates Section 2. *E.g., Aspen Skiing v. Aspen Highlands Skiing*, 472 U.S. 585, 605 (1985) (unlawful to maintain monopoly by refusing to allow a competitor access to essential resources); *United States v. Microsoft*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("a monopolist's use of exclusive contracts … may give rise to a [section] 2 violation").

As another example, take NASCAR's ongoing restrictions to prohibit chartered teams from competing in other stock car races. JA0821 (§6.6). There is no plausible procompetitive rationale for locking these independent contractors into an exclusive arrangement. JA1032 (¶43). Section 2 does not allow a sports league or association to maintain its monopoly by preventing independent suppliers of essential inputs from making their services available to a new entrant seeking to compete. *E.g.*, *Shields v. World Aquatics*, 2024 WL 4211477, at *1 (9th Cir.) ("preventing [independent] member federations and swimmers" from competing in a rival swimming league may be a "per se unlawful group boycott"); *Philadelphia World Hockey Club v. Philadelphia Hockey Club*, 351 F. Supp. 462, 508 (E.D. Pa. 1972) (restraining NHL players from moving to a rival league was "unreasonable, and in violation of Section 2"); *Radovich v. NFL*, 352 U.S. 445, 448-49, 454 (1957) (similar); *Le*, 216 F. Supp. 3d at 1167-68 (similar).

Defendants' main response is to argue that this exclusionary conduct "relate[s] to policies or actions NASCAR initiated" outside the four-year limitations period. Br. 49; *see also* Br. 42 n.6. That is not

correct. NASCAR engaged in many exclusionary acts, including the

Release, during the limitations period:

- The non-compete covenants appear in both the 2016 and 2025 charter agreements and were in force every year since 2020. JA0706-0707; JA0821.

- The same is true of NASCAR's ongoing refusal to host competing events at the tracks it owns and refusal to allow other Cup Series tracks to host competing races. JA0965-0968 (¶¶40-47); JA1033 (¶44), JA1039-1044 (¶¶59-68).

- The Next Gen car restrictions started in 2022. JA1064-1065 (¶¶19-23); JA1079 (¶¶17-19); JA1081 (¶23)).

- NASCAR's refusal to approve the Stewart-Haas transfers did not take place until after plaintiffs sued. JA1145 (¶¶9-12).

- Plaintiff 23XI did not acquire its first chartered team, and become subject to NASCAR restrictions, until October 2020. JA1077 (¶9).

This record speaks for itself.

Even as to exclusionary conduct that occurred more than four

years ago (such as NASCAR acquiring its closest competitor), a

Section 2 plaintiff "may 'rely on pre-limitation conduct in order to

establish the exclusionary practices portion of a monopolization claim.'"

*CSX Transp. v. Norfolk S. Ry.*, 648 F. Supp. 3d 679, 702 (E.D. Va. 2023),

*aff'd,* 114 F.4th 280 (4th Cir. 2024) (quoting Phillip E. Areeda &

Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST

PRINCIPLES AND THEIR APPLICATION ¶320c4 (5th ed. 2022)); *cf. Toledo Mack Sales & Serv. v. Mack Trucks*, 530 F.3d 204, 218 (3d Cir. 2008) (plaintiff is "not required to prove an illegal conspiracy with evidence restricted to the limitations period").

In sum, the record contains extensive evidence of NASCAR's exclusionary conduct to unlawfully maintain its monopoly. That evidence, analyzed as a whole with the Release, as *Duke Energy* requires, demonstrates that the district court did not abuse its discretion in finding that plaintiffs are likely to succeed on the exclusionary conduct element of their Section 2 claim.

## C. Plaintiffs showed a likelihood of proving antitrust injury.

Defendants assert that plaintiffs failed to show a likelihood of an "antitrust injury" in the form of "'loss[es] com[ing] from acts that reduce output or raise prices to consumers.'" Br. 51 (quoting *Chicago Pro. Sports v. NBA*, 961 F.2d 667, 670 (7th Cir. 1992)). They argue, "[s]imply being offered the release—and choosing not to accept it" did not result in fewer races or higher prices to consumers such as fans. Br. 51-52.

This argument is misguided. The issue is not whether plaintiffs suffered their antitrust injury from a *single exclusionary act*, such as

58

the Release. The issue is whether defendants' *unlawful monopolization of the relevant input market* inflicted an antitrust injury on plaintiffs. It did.

As the Supreme Court has explained, the antitrust injury inflicted by a monopsonist is felt by "sellers, not customers or consumers." *Mandeville Island Farms v. Am. Crystal Sugar*, 334 U.S. 219, 235 (1948), *cited by Alston*, 549 U.S. at 87. In *Alston*, for example, it was undisputed that the "decrease [in] the compensation that student-athletes receive compared to what a competitive market would yield" was an antitrust injury. 549 U.S. at 86.[7]

This principle applies here. Plaintiffs are sellers forced to accept below-competitive market prices and other terms for their services because of NASCAR's unlawful monopsony. JA0954-0957 (¶¶21-26); JA0976-0977 (¶¶67-69). Put another way, as a case on which

---

[7] The cases that defendants cite, involving competitors, are inapposite. Plaintiffs are sellers forced to accept anticompetitive terms when selling; they are not competitors of the defendants whose antitrust injury lies in being excluded from the market. Br. 51 (citing *Chicago Pro. Sports L.P. v. Nat'l Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) (two basketball teams challenging league rules, which blocked broadcast competition with other teams), and *Cont'l Airlines* v. *United Airlines*, 277 F.3d 499 (4th Cir. 2002) (one airline suing another)).

defendants rely (Br. 52) explains, "supplier antitrust injuries" occur when a monopsonist coerces a supplier into "an all or nothing" arrangement. *White Mule v. ATC Leasing*, 540 F. Supp. 2d 869, 890 (N.D. Ohio 2008). That is what defendants did here, inflicting an antitrust injury on plaintiffs.

Defendants make the false assertion that "there are no allegations that Section 10.3 [the Release] … reduces Plaintiffs' compensation." Br. 52. Yes, there are. The complaint alleges that the Release "is, itself, an anticompetitive act" that defendants "used to further protect NASCAR's monopsony position." JA0028 (¶22). NASCAR used its monopsony power "to impose terms upon the racing teams that ensure that a majority of the revenues … will go to NASCAR and the France family, at the expense of the teams and their drivers." JA0037-0038 (¶69); *see also, e.g.,* JA0047-0049 (¶¶105-06, 110). As Dr. Rascher explained, the Release "would serve to increase NASCAR's market power" and "limit[] … the revenue teams earn." JA0975-0977 (¶¶64, 69). Once again, defendants do not even mention Dr. Rascher's

declaration.[8] As with the other elements, plaintiffs have shown a

likelihood of success in proving antitrust injury.

## III. The injunction is consistent with the complaint and narrowly drawn—for defendants' benefit.

Finally, defendants argue that the district court erred "by

compelling NASCAR to do business with its litigation adversaries under

terms they are actively *contesting* as anticompetitive in this litigation."

Br. 5 (pointing to the non-compete provision). They argue that "[t]his

Court's decision in *Omega World Travel, Inc. v. Trans World Airlines*,

111 F.3d 14 (4th Cir. 1997), squarely forecloses granting Plaintiffs such

contradictory relief." *Id.* Defendants are wrong.

*Omega* does not apply here. In that case, a ticket agent sued to

"dissolve" its agency relationship with the defendant. *Omega*, 111 F.3d

at 15-16. The defendant then "threatened to terminate" the agency

---

[8] Defendants also argue there can be no antitrust injury because team revenues will purportedly be higher under the 2025 charter agreement than the 2016 charter agreement. Br. 52. Setting aside the disputed nature of that assertion, Dr. Rascher explained that the correct measure is not "the price level over time" but whether plaintiffs would have earned more in a competitive market. The evidence here will demonstrate that the 2025 charter agreement, like the 2016 charter agreement, imposes below-competitive market terms upon plaintiffs. JA1031 (¶40).

relationship. *Id.* at 15. In reaction, the plaintiff sought and received an

injunction to *prevent* the defendant from terminating it. *Id.* This Court

reversed, finding that the plaintiff "literally [sought] through its

antitrust claim to dissolve the very contractual relationship which it

[sought] to have preserved through preliminary injunction." *Id.* at 16.

Unlike in *Omega*, plaintiffs here do *not seek to dissolve* the parties'

entire contractual relationship (the charter system) as a Sherman Act

violation. *Id.* at 16. In fact, the opposite is true. Plaintiffs want to be

part of the charter system—but on fair, market-based terms. *See*

JA0053 (¶128). Instead of a broad *Omega* attack, plaintiffs challenge

only two provisions[9] of the more than 100-page 2025 charter agreement

as unlawful exclusionary acts: the Release and the covenant not to

compete.[10] The complaint and the injunction thus are consistent, not

_____

[9] The exclusionary restriction that prevents plaintiffs from using Next Gen cars in other races is not part of the charter agreements. It is found in NASCAR's Next Gen policy, issued in 2022. JA1064-1065 (¶¶19-23); JA1079 (¶¶17-19); JA1081 (¶23).

[10] There is, of course, an important distinction between a charter term that is itself an exclusionary act *maintaining* the monopsony—the Release and the covenant not to compete—and the below-competitive terms of the charter that the monopsony *enables*. The latter terms are the source of plaintiffs' antitrust injury and damages, but they are not

"directly contradictory." *Omega*, 111 F.3d at 16. The complaint seeks to maintain the charter agreements, "but only to the extent that they do not violate the [Sherman Act]." *Lutz v. Case Farms*, 2020 WL 5111217, at *3 (W.D.N.C.) (distinguishing *Omega* on that basis). The complaint does not challenge the legality of the rest of the 2025 charter agreement apart from the two provisions that are exclusionary acts.

The injunction does the minimum necessary to protect plaintiffs from irreparable harm while preserving the status quo—including parts of the status quo that benefit defendants—until trial. *Hispanic Nat'l Law Enf't Assn. NCR v. Prince George's Cnty.*, 535 F. Supp. 3d 393, 411-12 (D. Md. 2021) (rejecting the argument that *Omega* forbade an injunction that was narrower than the scope of the complaint). That is laudable, not objectionable, and *Omega* is no obstacle to the injunction here. *Id.*; *Lutz*, 2020 WL 5111217, at *4; JA0196-0197 (citing *Lutz* and distinguishing *Omega*).

Defendants' argument on this point—that the district court *did not go far enough* because it did not enjoin the non-compete covenant—

---

themselves unlawful acts. They are the equivalent of the above-competitive market prices that a monopolist charges its customers.

is "puzzling," as the district court politely put it. JA0196. Maintaining

the non-compete covenant and other terms as part of the status quo

redounds to "*NASCAR's benefit* and reflect[s] the Court's effort to enter

the least intrusive injunction." JA0196 (emphasis in original); *see also*

JA0200 (NASCAR "repeatedly represented to the [district] Court that

those terms reflect a fair and *beneficial* deal"). The limited injunction, in

other words, embodies the district court's effort to "ensure a preliminary

injunction is 'no more burdensome to the defendant than necessary'" to

protect the plaintiffs from irreparable harm through trial. *Roe v. Dep't*

*of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (quoting *Madsen v. Women's*

*Health Ctr.*, 512 U.S. 753, 765 (1994)); s*ee also Hughes Network Sys. v.*

*InterDigital Commun.*, 17 F.3d 691, 694 (4th Cir. 1994) (similar).

Here, the injunction is fair to both sides. It protects plaintiffs from

the one exclusionary charter provision (the Release) that defendants

argue would preclude this case (and therefore plaintiffs' ability to

challenge *any* of defendants' exclusionary acts at trial), without forcing

plaintiffs' businesses to suffer irreparable injury from racing without

charter rights. For defendants, the injunction kept in place all but one

64

of the 2025 charter terms—terms that defendants demanded and "repeatedly represented" benefit them. JA0200.

The only thing "paradoxical" (Br. 27, 54) is defendants' objection that the preliminary injunction should be vacated because it is *too narrow* because it does not enjoin the covenant not to compete that the complaint alleges is an unlawful exclusionary act. If taken seriously, that is an argument for expanding, not jettisoning, the injunction. If that is what defendants want, plaintiffs do not object. This Court may direct the district court to modify the injunction to also enjoin the non-compete provision. JA0058 (¶153); JA0821 (§6.6); *e.g., Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 207 (4th Cir. 2005) (directing a district court to modify an injunction). But in no event does *Omega* support defendants' argument that this Court should vacate the district court's narrowly tailored, carefully measured injunction.

## CONCLUSION

For all these reasons, this Court should affirm so that plaintiffs can continue to compete in Cup Series events under charter terms, without being subject to the Release, for a few more months before the December 1 trial.

March 14, 2025                    Respectfully submitted,

By:   /s/ *Jeffrey L. Kessler*
      Jeffrey L. Kessler
      WINSTON & STRAWN LLP
      200 Park Avenue
      New York, NY 10166
      (212) 294-6700
      jkessler@winston.com

      Danielle T. Williams
      WINSTON & STRAWN LLP
      300 South Tryon Street
      Charlotte, NC 28202
      (704) 350-7700
      dwilliams@winston.com

      Jeanifer Parsigian
      WINSTON & STRAWN LLP
      101 California Street
      San Francisco, CA 94111
      (415) 591-1000
      jparsigian@winston.com

      Scott P. Glauberman
      Kelly Mannion Ellis
      WINSTON & STRAWN LLP
      35 W. Wacker Dr.
      Chicago, IL 60601
      (312) 558-5600
      sglauber@winston.com
      kmannion@winston.com

      *Counsel for Plaintiffs-Appellees*
      *2311 Racing LLC Racing and*
      *Front Row Motorsports, Inc.*

## ORAL ARGUMENT STATEMENT

Oral argument would help the Court resolve this appeal. The

Court has scheduled this case for argument on May 9, 2025.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,590 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook, 14-point font.

/s/ *Jeffrey L. Kessler*
JEFFREY L. KESSLER