# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

2311 RACING LLC, d/b/a 23XI Racing; FRONT ROW MOTORSPORTS, INC.,
*Plaintiffs-Appellees*,

v.

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC;
and JAMES FRANCE,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of North Carolina
No. 3:24-cv-00886-KDB-SCR (Hon. Kenneth D. Bell)

## REPLY BRIEF OF APPELLANTS NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC AND JAMES FRANCE

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com

Tricia Wilson Magee
SHUMAKER, LOOP &
  KENDRICK, LLP
101 S. Tryon Street, Suite 2200
Charlotte, NC 28280
(704) 945-2961
tmagee@shumaker.com

April 4, 2025

Gregory G. Garre
Anna M. Rathbun
Christopher J. Brown
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
lawrence.buterman@lw.com

*Counsel for Defendants-Appellants*
*National Association for Stock Car Auto Racing, LLC and James France*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................1

ARGUMENT ...................................................................................4

I.  Plaintiffs Have Not Established A Likelihood Of Success On Their Sherman Act Section 2 Claim ...................................................4

    A.  Plaintiffs Have Not Shown An Anticompetitive Act...........................4

        1.  The Release Is Not An Antitrust Violation.................................4

        2.  None Of Plaintiffs' Alternative Arguments Has Merit...............7

    B.  Plaintiffs Do Not Have Antitrust Standing .........................................13

    C.  Plaintiffs Have Not Shown That NASCAR Wields Monopsony Power In A Valid, Relevant Market....................................................18

    D.  At A Minimum, Plaintiffs Have Failed To Meet The Heightened Standard Required For Mandatory Injunctions...................................24

II.  The District Court's Injunctions Fail For The Additional Reason That They Contradict Plaintiffs' Attempt To Hold The Charter Unlawful...........26

CONCLUSION...................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*,
690 F.2d 411 (4th Cir. 1982) ...............................................................16

*American President Lines, LLC v. Matson, Inc.*,
No. 21-cv-2040, 2025 WL 870383 (D.D.C. Mar. 19, 2025).....................9

*Brookins v. International Motor Contest Association*,
219 F.3d 849 (8th Cir. 2000) ...............................................................13

*Cogent Healthcare of Arizona PC v. Blue Cross & Blue Shield of Arizona Inc.*,
No. 23-cv-02119, 2024 WL 4347772 (D. Ariz. Sept. 30, 2024).........17

*Continental Airlines, Inc. v. United Airlines, Inc.*,
277 F.3d 499 (4th Cir. 2002) ...............................................................16

*CSX Transportation, Inc. v. Norfolk Southern Railway Co.*,
114 F.4th 280 (4th Cir. 2024) ...............................................................16

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ...............................................................26

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ...............................................................12

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ...........................................................8, 9

*Federal Trade Commission v. Penn State Hershey Medical Center*,
838 F.3d 327 (3d Cir. 2016) ...............................................................19

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
711 F.3d 68 (2d Cir. 2013) ...............................................................16

*Hayes v. National Football League*,
469 F. Supp. 247 (C.D. Cal. 1979) ...................................................15

*Host International, Inc. v. MarketPlace, PHL, LLC*,
 32 F.4th 242 (3d Cir. 2022) .................................................15

*Imaging Center, Inc. v. Western Maryland Health Systems, Inc.*,
 158 F. App'x 413 (4th Cir. 2005) .........................................11

*Kartell v. Blue Shield of Massachusetts, Inc.*,
 749 F.2d 922 (1st Cir. 1984) ................................................17

*Loren Data Corp. v. GXS, Inc.*,
 501 F. App'x 275 (4th Cir. 2012) .........................................15

*Modern Perfection, LLC v. Bank of America, N.A.*,
 126 F.4th 235 (4th Cir. 2025) ..............................................12

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
 915 F.3d 197 (4th Cir. 2019) ...............................................25

*Mozart Co. v. Mercedes-Benz of North America, Inc.*,
 833 F.2d 1342 (9th Cir. 1987) .......................................22, 23

*NCAA v. Alston*,
 594 U.S. 69 (2021) ............................................................21

*Omega World Travel, Inc. v. Trans World Airlines*,
 111 F.3d 14 (4th Cir. 1997) ...........................................2, 26

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
 555 U.S. 438 (2009) .....................................................3, 5, 9

*Pashby v. Delia*,
 709 F.3d 307 (4th Cir. 2013) ...............................................25

*Phototron Corp. v. Eastman Kodak Co.*,
 842 F.2d 95 (5th Cir. 1988) ................................................17

*Pierce v. North Carolina State Board of Elections*,
 97 F.4th 194 (4th Cir. 2024) ...............................................25

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
 124 F.3d 430 (3d Cir. 1997) ...........................................21, 22

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
  199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd sub nom.*
  *R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc.*,
  67 F. App'x 810 (4th Cir. 2003) ........................................................11

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ...............................................................13

*Real Time Medical Systems, Inc. v. PointClickCare*
  *Technologies, Inc.*,
  -- F.4th --, 2025 WL 779691 (4th Cir. Mar. 12, 2025)......................12

*Roland Machinery Co. v. Dresser Industries, Inc.*,
  749 F.2d 380 (7th Cir. 1984) ............................................................10

*Spinelli v. National Football League*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) ...................................................10

*Thompson Everett, Inc. v. National Cable Advertising, L.P.*,
  57 F.3d 1317 (4th Cir. 1995) ......................................................10, 14

*Three Rivers Motors Co. v. Ford Motor Co.*,
  522 F.2d 885 (3d Cir. 1975) ................................................................7

*Total Vision, LLC v. Vision Service Plan*,
  717 F. Supp. 3d 922 (C.D. Cal. 2024) ............................................5, 6

*United States Department of Labor v. Wolf Run Mining Co.*,
  452 F.3d 275 (4th Cir. 2006) ............................................................16

*United States Football League v. National Football League*,
  634 F. Supp. 1155 (S.D.N.Y. 1986) ..................................................11

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
  108 F. Supp. 2d 549 (W.D. Va. 2000)...............................21, 22, 23, 24

*West Penn Allegheny Health System, Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ...............................................................17

*Westerfield v. Quizno's Franchise Co.*,
 527 F. Supp. 2d 840 (E.D. Wis. 2007),
 *vacated in part on other grounds*, No. 06-cv-1210,
 2008 WL 2512467 (E.D. Wis. Apr. 16, 2008) ...................................................20

*White Mule Co. v. ATC Leasing Co.*,
 540 F. Supp. 2d 869 (N.D. Ohio 2008) ............................................................15

*Winter v. Natural Resources Defense Council*,
 555 U.S. 7 (2008)..............................................................................................26

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
 388 F.3d 955 (6th Cir. 2004) ...........................................................................19

*Z Technologies Corp. v. Lubrizol Corp.*,
 753 F.3d 594 (6th Cir. 2014) ...........................................................................12

## STATUTES

15 U.S.C. § 15b..............................................................................................12

**INTRODUCTION**

The injunctions at issue in this appeal rest on a categorical rule adopted by the district court that a purported monopolist (or monopsonist) cannot include a release provision in a contract without violating the Sherman Act. As NASCAR explained in its opening brief, that *per se* rule is unsupported by a single precedent, confuses the *enforceability* of a release as a matter of contract law with whether it constitutes a federal *antitrust violation*, and threatens to upend standard business practices. The district court's injunctions therefore must be reversed and the case remanded.

Tellingly, instead of racing to defend the district court, Plaintiffs devote nearly all of their response to swerving away from the decision below. They first try to reframe the district court's categorical rule as a narrow, fact-specific holding. But there is nothing "narrow" or "fact-specific" about the district court's rule; it deems releases antitrust violations whenever they (1) are adopted by a "monopolist"; and (2) function as a "business condition." JA180. Nor would the "facts" of this case even help Plaintiffs' argument, given their own admission that they never once asked NASCAR to remove the release provision before rushing to court—likely because of the reciprocal release team owners secured from NASCAR in the same contract.

Perhaps recognizing that the district court's rule is indefensible, Plaintiffs devote the bulk of their brief to a hodgepodge of alternative arguments the district court never even addressed. But those arguments fare no better. The other

supposedly anticompetitive acts Plaintiffs now cite as justification for the injunctions—like NASCAR's exclusivity agreements with certain Cup Series racetracks, and limited non-compete clauses with other team owners—are standard business practices that fall well within the bounds of lawful competition. NASCAR submitted undisputed evidence showing multiple procompetitive justifications for each challenged act. And Plaintiffs cannot explain how any of these other acts caused them to suffer an "antitrust injury." It is no wonder that the district court did not bother to consider any of these alternative arguments.

While all of this is reason enough to reverse the injunctions, NASCAR identified other critical legal errors in the decision below, like the district court's faulty market definition, which was rooted in the wrong economic theory. Plaintiffs' main tactic is to recast these legal issues as mere fact disputes, too, dodging the hard questions and ignoring the controlling authorities. But this is pure smokescreen. Whether, for example, the district court applied the correct theory when defining the market and whether these injunctions are prohibitory or mandatory are legal questions for this Court to decide. And on these questions, Plaintiffs' defense of the district court's answers is paper-thin.

On top of all this, Plaintiffs still have no way around this Court's decision in *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997), which reversed an injunction in similar circumstances where a plaintiff sought to

enforce a contractual relationship it was simultaneously challenging as a Sherman Act violation. Plaintiffs' brief confirms what is clear from the face of their complaint: This lawsuit aims to rewrite the entire 2025 Charter because Plaintiffs believe its terms are all "below competitive" due to NASCAR's alleged monopsony. Pls.' Br. 3, 12, 14, 61 n.8. Yet, Plaintiffs have sought and now received injunctive relief binding them to this allegedly unlawful contract—the very result *Omega* forecloses.

Ultimately, Plaintiffs' pursuit of Charters through this litigation—paired with their purchase of additional Charters just last year, well into NASCAR's alleged "monopsony"—confirms that this is not a genuine monopolization case. It is a ploy by two team owners to exploit the judicial process to secure more money and better contractual terms than they could get at the bargaining table. Yet, the notion that the Sherman Act requires even a "monopsonist" to bow to whatever terms its contracting party demands has been flatly rejected by cases NASCAR cited—and Plaintiffs' brief conspicuously ignores. *See, e.g.*, *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) (A monopolist "has no duty to deal under terms and conditions that the [plaintiffs] find commercially advantageous."). The Sherman Act simply is not a tool for forcing individuals into contracts or rewriting those contracts when the parties' negotiations have failed to yield one side's desired result; but the district court's injunctions do just that.

This Court should reverse.

## ARGUMENT

## I. PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THEIR SHERMAN ACT SECTION 2 CLAIM

On Plaintiffs' likelihood of success, the district court wrongly concluded that Plaintiffs defined a relevant market; that Section 10.3 of the 2025 Charter—a standard release provision—violates the antitrust laws; and that merely offering Plaintiffs a contract with this release inflicted antitrust injury on them. Each of these errors warrants reversal. However, Plaintiffs' brief makes clear the most fundamental legal error here: the district court's holding that a standard release provision violates the Sherman Act. Plaintiffs remarkably ignore nearly all of NASCAR's arguments on the release, instead diverting attention to other allegedly exclusionary acts the district court never even addressed. And then they introduce a brand new antitrust-injury framework that is different than the one the district court applied. Plaintiffs' efforts to distance themselves from the district court's reasoning only underscore that these injunctions cannot stand. And their new arguments fall apart under any scrutiny, and cannot rescue these injunctions.

### A. Plaintiffs Have Not Shown An Anticompetitive Act

#### 1. The Release Is Not An Antitrust Violation

The district court held, as a matter of law, that it violates the Sherman Act for a monopsonist to require a seller in that market to sign a release-of-claims

provision—even if the seller never once objected to the provision or requested to have it removed. JA181. As NASCAR explained, this ruling contradicts caselaw affirming the fundamental right of parties—even monopsonists—to "choose the … terms[] and conditions" of their business agreements, *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); skips the anticompetitive-conduct requirement altogether; and confuses the *enforceability* of a release under contract law with the question of whether a release can constitute an *antitrust violation* that gives rise to treble damages. *See* NASCAR Br. 41-51.

In response, Plaintiffs bury their heads in the sand. Plaintiffs ignore the caselaw NASCAR cited holding that preference for certain contractual terms does not equate to an antitrust violation. *Id.* at 44-47. They ignore NASCAR's argument that merely offering a release does not demonstrate anticompetitive conduct, *id.* at 42-44, relying solely on *ipse dixit* to label the release "anticompetitive" without any further explanation or argument, Pls.' Br. 50, 52. And they ignore NASCAR's point that the *enforceability* of a release as a matter of public policy is distinct from whether it constitutes an *antitrust violation*. NASCAR Br. 48, 50.

Plaintiffs cite *one* district-court decision as supposedly supporting the district court's rule, but that case only underscores the district court's—and Plaintiffs'— confusion. *See* Pls.' Br. 48 (citing *Total Vision, LLC v. Vision Serv. Plan*, 717 F. Supp. 3d 922, 933 (C.D. Cal. 2024)). *Total Vision* simply held that a release can be

*unenforceable* as a contractual matter—preventing a defendant from using that release as a defense against *other* antitrust claims—when it is "part and parcel" of a conspiracy. 717 F. Supp. 3d at 933, 935. However, whether NASCAR could use Section 10.3 to defend against Plaintiffs' other antitrust claims as a matter of "public policy," Pls.' Br. 50, says nothing about whether Section 10.3 *itself* constitutes a Sherman Act violation that could support these injunctions.

Plaintiffs ultimately try to sidestep the district court's errors by seeking a more favorable standard of review, framing (at 49) the district court's conclusion on Section 10.3 as rooted in "factual findings." But Plaintiffs provide no citation to these "factual findings"—because there were none. The only factual "circumstances" that mattered to the district court regarding Section 10.3 were that (1) NASCAR was a "monopolist"; and (2) signing the release was a purported "condition" of participation in the Cup Series. JA180. From this, the district court adopted a sweeping rule that a "monopolist" cannot, consistent with the Sherman Act, impose releases "as a condition of doing business." JA180. This *per se* rule is legally untenable and demands correction.

Moreover, even if the district court had evaluated the factual circumstances of this case in connection with Section 10.3, it would not matter. As NASCAR has explained, any notion that Section 10.3 is anticompetitive collapses once that provision is analyzed under the relevant facts of this case. *See* NASCAR Br. 42-43.

Plaintiffs themselves have admitted that, over multiple years of Charter negotiations, they never once flagged Section 10.3 as problematic—likely because of the reciprocal release in Section 10.4. JA127. While Plaintiffs emphasize (at 52-53) that NASCAR removed the release from its open team agreements, this change was made only after Plaintiffs specifically requested it. JA547 (letter from Front Row). Plaintiffs never made any such request regarding the Charters' release provision before running to court.

Plaintiffs also have no answer to NASCAR's argument that Section 10.3 does not shield NASCAR from antitrust suits, as consumers, competitors, potential competitors, open teams, and the government can all still bring claims. *See* NASCAR Br. 43 (citing *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 892 (3d Cir. 1975)). Given this reality, it is no surprise that Plaintiffs cannot articulate how Section 10.3 has anticompetitive effects in any relevant market. Nor can they point to any case supporting such an argument.

For all these reasons, the district court's release holding was wrong.

### 2. None Of Plaintiffs' Alternative Arguments Has Merit

Recognizing the shaky foundation of the district court's decision, Plaintiffs pivot to a slew of alternative arguments the district court never addressed. But none of these alternative arguments can rescue these injunctions.

a. First, Plaintiffs seem to criticize (at 53-54) the district court for not assessing all of NASCAR's allegedly exclusionary conduct holistically when evaluating Section 10.3, citing this Court's decision in *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024). But *Duke Energy* is irrelevant here.

In *Duke Energy*, this Court held that in "uncommon" cases involving "a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories," courts may consider interrelated allegations collectively to assess their competitive impact. 111 F.4th at 354. But *Duke Energy* confined this approach to the "context of the allegations in th[at] case," which involved interrelated actions taken "simultaneously, and to the same effect" to drive out a competitor. *Id.* at 354, 366 (emphasis omitted). It reaffirmed that "where the alleged conduct [attempts to] fall[] within ... well-defined categories," considering allegations individually is the "proper approach." *Id.* at 354.

Here, Plaintiffs allege entirely *unrelated* conduct—such as exclusivity agreements with racetracks and years-old acquisitions—that neither occurred "during the very same time" nor "to the same effect." *Id.* at 366 (emphasis omitted). Plaintiffs have never explained how these other actions could possibly impact whether Section 10.3 had anticompetitive effects. Nor is there anything "atypical," "uncommon," or "complex" about Plaintiffs' allegations; on the contrary, Plaintiffs

have attempted to shoehorn them into established antitrust categories that "the caselaw has developed tests for analyzing," like refusal-to-deal claims. *Id.* at 354-55; *see, e.g.*, JA229-230 (Plaintiffs' district-court briefing). So, *Duke Energy*'s rule does not apply.

Regardless, even *Duke Energy* still requires that a Sherman Act claim be supported by at least one independently unlawful act. While it labeled the conduct at issue a "scheme," *Duke Energy* "nonetheless divided the scheme into two prongs and found each to be anticompetitive on its own." *American President Lines, LLC v. Matson, Inc.*, No. 21-cv-2040, 2025 WL 870383, at *10 (D.D.C. Mar. 19, 2025). Anything less would have contradicted Supreme Court precedent forbidding antitrust plaintiffs from stitching together meritless allegations to "alchemize them into a new form of antitrust liability" because "[t]wo wrong claims do not make one that is right." *linkLine*, 555 U.S. at 457. Even under *Duke Energy*, then, the district court was right to evaluate the release independently.

b. Second, Plaintiffs contend (at 53-58) that a grab-bag of NASCAR actions *other* than Section 10.3—none of which the district court addressed or made factual findings on—independently violate the Sherman Act and could justify these injunctions. But none do, whether scrutinized individually or even "holistically."

Plaintiffs focus (at 54-56) on two clauses in NASCAR's contracts that they claim are exclusionary: one preventing racetracks that host Cup Series events from

hosting other stock-car races; and the other prohibiting Charter holders from participating in other stock-car series during the Charter term. Yet, this Court's precedents make clear that such "non-price vertical restrictions ... are not per se illegal," and are valid "as long as they do not go beyond the legitimate business purposes for which they are used." *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995). Both clauses easily pass this test.

Courts repeatedly have held that exclusivity agreements like NASCAR's do not violate the Sherman Act because they enhance the product's appeal for broadcasters, fans, and sponsors by encouraging investment in the sport. *See, e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (exclusive dealing enables a firm to prevent others "from taking a free ride on [its] efforts (for example, efforts in the form of national advertising) to promote [its] brand"); *Spinelli v. National Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) (upholding NFL's exclusivity contract). Plaintiffs try to dodge this precedent by claiming (at 55-56) that NASCAR's exclusivity provisions have "no plausible procompetitive purpose." Yes, they do. NASCAR's undisputed evidence shows that these agreements have helped it control costs, maintain consistency, and safeguard its significant investments in promoting the Cup Series, Cup Series Charter teams, and Cup Series racetracks—efforts that have led to more media dollars shared with team owners. JA409-410 (¶¶13-17); JA434-435 (¶¶24, 30); *see,*

*e.g.*, *United States Football League v. National Football League*, 634 F. Supp. 1155, 1185 (S.D.N.Y. 1986) (exclusivity agreements with officials valid because they helped maintain officiating quality and protect NFL's investments in officials). Plaintiffs do not address any of that evidence.

Moreover, NASCAR's evidence demonstrated minimal, if any, impact on potential competitors from these exclusivity provisions, as neither the team owners nor the limited number of racetracks bound by exclusivity clauses are essential inputs for a competing series—as SRX's recent entry on the stock-car racing scene showed. JA368-373 (¶¶30-36); JA433-437 (¶¶23-37); *see, e.g.*, *Imaging Ctr., Inc. v. Western Md. Health Sys., Inc.*, 158 F. App'x 413, 420 (4th Cir. 2005) (upholding exclusivity contract where plaintiff failed to show opportunities for others to enter market were "significantly limited" (citation omitted)). As NASCAR's expert, Dr. Hubbard, explained, there are many traditional, oval-shaped tracks that NASCAR neither owns nor contracts with; not all races take place on traditional, oval-shaped tracks; and plenty of stock-car racing teams are not bound by the Charter's exclusivity provision—for instance, all open teams and teams that compete in NASCAR's Xfinity Series. JA368-373 (¶¶30-36). In the face of this, Plaintiffs could not offer evidence establishing that these exclusivity agreements "substantially foreclose[] competition" by blocking potential competitors. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 387 (M.D.N.C.

2002), *aff'd sub nom. R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810 (4th Cir. 2003) (dismissing similar exclusive-dealing claims); *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 209 (4th Cir. 2002) (same). That is fatal to claims based on these exclusivity clauses.

Plaintiffs' fleeting mention (at 54-55) of other allegedly exclusionary acts—in bullet-point form, without case citations or argument—is not enough to preserve any arguments about these other NASCAR actions for appeal. *See Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, -- F.4th --, 2025 WL 779691, at *12 (4th Cir. Mar. 12, 2025) ("devoting a two-sentence paragraph to [a] matter" is not enough to preserve it for this Court's review); *Modern Perfection, LLC v. Bank of Am., N.A.*, 126 F.4th 235, 240 n.1 (4th Cir. 2025) (same for a "single sentence" argument).

Regardless, none of these other NASCAR actions would establish a Sherman Act violation either. NASCAR's 2018 and 2019 acquisitions and its 2019 adoption of "Next Gen" car requirements are time-barred by the Sherman Act's four-year statute of limitations. *See* 15 U.S.C. § 15b; *see also, e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) ("continuing violations doctrine does not apply" to claims alleging price changes "following a merger or acquisition"). The cases Plaintiffs cite (at 57-58) considering acts outside the statute of limitations did so to probe evidence of intent for purposes of demonstrating a conspiracy, but these injunctions are not rooted in a conspiracy claim. *See* JA226-227.

Moreover, Plaintiffs ignore NASCAR's expert evidence demonstrating the procompetitive justifications for each of these actions—including for the Next Gen car requirements, which have *boosted* Charters' values. JA374-378 (¶¶40-45); JA433-438 (¶¶23-34), JA437-438 (¶¶38-43); JA442-444 (¶¶2-9). They also disregard the chorus of decisions affording motorsports sanctioning bodies broad leeway in rule-setting. *See Brookins v. International Motor Contest Ass'n*, 219 F.3d 849, 854-55 (8th Cir. 2000) (upholding transmissions rules); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80-82 (3d Cir. 2010) (upholding tires rules). And, remarkably, Plaintiffs fail to mention that Front Row—the only Plaintiff team owner in 2019, when the Next Gen car requirements were adopted—*voted in favor of* adopting these requirements. JA437 (¶40). In addition, the fact that 23XI decided to compete in the Cup Series *after* all of the allegedly wrongful conduct occurred belies any notion that it is anticompetitive. *See infra* at 23-24.

In short, Plaintiffs' alternate arguments—unaddressed by the district court and unsupported by this factual record—do nothing to save these injunctions.

## B. Plaintiffs Do Not Have Antitrust Standing

Plaintiffs also lack antitrust standing to challenge all of these allegedly anticompetitive actions, in any event. Faced with NASCAR's arguments on why the district court's antitrust-injury theory was wrong, Plaintiffs simply ditch the district court's reasoning and invent a brand-new antitrust-injury framework from

scratch. But Plaintiffs' new test—which would allow antitrust plaintiffs to sue over *any* act by an alleged monopolist, simply by claiming "unfair" prices—has been repeatedly rejected by this Court and others. Plaintiffs' lack of antitrust standing is a standalone reason for reversing these injunctions.

1. Plaintiffs do not even try to defend the district court's one-sentence, footnoted assertion that a "party's inability to pursue antitrust claims in good faith" constitutes "antitrust injury." JA181 n.11. As NASCAR has explained, the governing antitrust-injury test requires personal harm to be linked to the *anticompetitive effects* of the allegedly exclusionary practice at issue. *See* NASCAR Br. 51-53. Yet Plaintiffs have shown no such effects from simply being offered Section 10.3. *See supra* at 5-7.

Nor do Plaintiffs have antitrust standing to contest NASCAR's exclusivity agreements with racetracks and other team owners. Plaintiffs suffer no harm at all from these agreements with other parties, as Plaintiffs are not NASCAR's consumers, and they now disclaim (at 59 n.7) any intent to compete with NASCAR, such that they might need access to the teams or tracks bound by these exclusivity provisions. *See, e.g.*, *Thompson Everett*, 57 F.3d at 1325 (plaintiff did not have antitrust standing to challenge exclusivity contract because it was "not a would-be competitor"); *see also* Pls.' Br. 17-18 (arguing that the exclusivity provisions harm "competitors," not Plaintiffs).

14

While Plaintiffs focus (at 59-60) on NASCAR's inclusion of an exclusivity provision in *Plaintiffs'* 2025 Charter offer, they have no meaningful response to the cases NASCAR cited (at 46-47, 53) holding that "[a]n objectionable term in a commercial agreement" does not equate to "antitrust injury." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250-52 (3d Cir. 2022); *see also Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) (similar). In fact, a case Plaintiffs cite (at 60) explicitly holds that refusing to sign a noncompete provision *negates* any possible antitrust standing to challenge it. *See White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869, 890 (N.D. Ohio 2008) (no antitrust injury because plaintiff "never suffered the speculative antitrust injuries that could have resulted had it agreed to the exclusivity contract"); *see also Hayes v. National Football League*, 469 F. Supp. 247, 252 (C.D. Cal. 1979) (denying antitrust standing where the lawsuit was by player's "own failure to ask for any different terms"). So Plaintiffs' lack of antitrust injury is another reason why these alternative NASCAR actions cannot support the injunctions.

2. Yet again, Plaintiffs distance themselves from the district court's logic, introducing (at 58-62) a new antitrust-injury framework that diverges sharply from the one the district court applied. For the first time on appeal, Plaintiffs argue—without citation—that they need not link their purported injuries to specific acts by NASCAR. Instead, they assert (at 58-61) that simply showing (1) NASCAR is a

monopsonist; and (2) the prices NASCAR offered were "[un]fair" or "below[]" competitive," permits them to challenge *any* allegedly exclusionary act regardless of its impact on them.

Plaintiffs did not make this argument in the district court, so they have waived it. *See, e.g.*, *United States Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006). Regardless, this position—which would erase the antitrust-injury requirement altogether—flouts this Court's precedents. *See, e.g.*, *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002) (lost profits give rise to an antitrust injury only when they "stem from a competition-reducing aspect or effect" of a particular violation (citation omitted)).

Time and again, this Court and others have held that, to have antitrust standing, a plaintiff must pinpoint a specific anticompetitive practice, demonstrate actual injury, and then "'compar[e]' the 'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff [suffers].'" *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (first alteration in original) (citation omitted); *see, e.g.*, *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 291-92 (4th Cir. 2024) (considering antitrust injury separately for each anticompetitive action alleged). That is because the antitrust laws only protect plaintiffs whose injuries "flow[] from that which makes defendants' acts unlawful," *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*, 690 F.2d

411, 414 (4th Cir. 1982)—but neither being a monopolist nor bargaining for "uncompetitive prices" is a Sherman Act violation, without more. *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 927-930 (1st Cir. 1984); *see, e.g.*, *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) ("A firm that has … monopsony power[] is generally free to bargain aggressively when negotiating the prices it will pay for goods and services."); *Cogent Healthcare of Ariz. PC v. Blue Cross & Blue Shield of Ariz. Inc.*, No. 23-cv-02119, 2024 WL 4347772, at *4 (D. Ariz. Sept. 30, 2024) (citing cases). Plaintiffs' antitrust-injury position would require this Court to overrule decades of precedent.

Regardless, the evidence here does not establish "uncompetitive" prices—meaning Plaintiffs are doomed even under their flawed (and waived) legal framework. *See, e.g.*, *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100-02 (5th Cir. 1988) (allegations of predatory pricing without evidence prices were below-competitive could not support "extraordinary remed[y]" of a preliminary injunction). Plaintiffs' expert never explicitly stated, let alone established, that the revenue-split in the 2025 Charter is "below-competitive." That is likely because the undisputed evidence shows team owners' compensation significantly increased with the 2016 Charter, and then significantly increased again with the 2025 Charter, all due to Plaintiffs' joint negotiations. JA413 (¶¶30, 32); *see* JA367 (¶27).

Plaintiffs' assertion (at 61 n.8) that the evidence "*will*" eventually show "below-competitive market" compensation merely underscores the absence of such evidence from the current record. And Plaintiffs' suggestion (at 61 n.8) that it is "disputed" whether team owners' compensation has risen annually—tucked away in a footnote, lacking any record citation—is patently false. So for all these reasons, Plaintiffs' waived, wrong, and factually unsupported antitrust-injury theory does not work.

### C. Plaintiffs Have Not Shown That NASCAR Wields Monopsony Power In A Valid, Relevant Market

Independently, the district court's injunctions cannot stand because its market definition was based on a faulty legal standard that considered only the uniqueness of Cup Series cars and teams, not the level of competition among other leagues or franchises to attract investments from team owners like Plaintiffs.

Plaintiffs devote pages (at 40-44) to mischaracterizing NASCAR's market-definition argument as a mere factual dispute over Plaintiffs' expert's claim that NASCAR is the "sole buyer" of "services" from their Cup Series teams.[1] But for

---

[1] Plaintiffs' repeated claim (at 6, 19, 30, 43, 52, 60) that NASCAR "ignored" or did not "address" their expert's analysis is baffling. NASCAR not only cited but directly addressed the very paragraphs of Plaintiffs' expert's report they now rely on. *See* NASCAR Br. 37 (citing JA955-958, 980); *see also* NASCAR Br. 35, 38 (citing and addressing Plaintiffs' expert's market-definition claims). The only oversight here is Plaintiffs' failure to acknowledge that *the district court* never cited their expert's analysis in either of its orders.

purposes of this appeal, NASCAR is not contesting a single one of the district court's market-definition fact findings. Instead, NASCAR's brief outlined the fundamental *legal* error made by the district court, Plaintiffs, and Plaintiffs' expert in this case: using Plaintiffs' *current* perspective to identify potential uses for their cars and employees' services, rather than analyzing competition for investments from team owners at the *pre*-investment stage. *See* NASCAR Br. 37-40.[2]

Neither the district court nor Plaintiffs' expert ever analyzed the level of competition at the pre-investment stage, because they deemed it legally irrelevant. And contrary to Plaintiffs' claims (at 40-41, 44), the district court's "failure to apply the correct legal standard, i.e., the economic theory behind the relevant … market, renders [this Court's] review plenary." *Federal Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016); *see, e.g.*, *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 960 (6th Cir. 2004) ("[T]he district court's formulation of the market tests may be freely reviewed on appeal as a matter of law." (citation omitted)).

---

[2]  NASCAR also highlighted (at 40) that the district court did not even squarely apply an *ex post* version of the market-definition question, which would ask whether assets and services of fully formed teams could be marketed to other leagues. Plaintiffs' claim (at 33) that the district court "answered [that question] 'No,'" reads words into its opinion, which focused exclusively on the "uniqueness" of Cup Series races, not the potential for marketing services elsewhere. Regardless, the bottom line is that the district court's theory, however framed, was legally flawed because it dismissed the relevance of *ex ante* competition to attract team owners.

As NASCAR has explained (at 37-40), the competition for capital at the pre-investment stage—whether among other motorsports series, non-motorsports sports, or even non-sports investment opportunities—is what prevents any single league from imposing anticompetitive terms on team owners. This is especially true for a league like NASCAR, which Plaintiffs admit (at 12) experiences high team turnover and thus must continually attract new owners. *See* JA366 (¶25); JA950 (¶10). So, to accurately assess NASCAR's market power over team owners like Plaintiffs, the market definition must include "all alternatives available to the [team owner]" before investing in the equipment and personnel needed to compete in the Cup Series—not just the buyers for their post-investment cars and services. *Westerfield v. Quizno's Franchise Co.*, 527 F. Supp. 2d 840, 858 (E.D. Wis. 2007) (citation omitted), *vacated in part on other grounds*, No. 06-cv-1210, 2008 WL 2512467 (E.D. Wis. Apr. 16, 2008). The district court deemed such pre-investment evidence irrelevant—warranting reversal.

Rather than engage with these points, Plaintiffs offer three superficial distinctions. First, they argue (at 45) that the above principles do not apply because Plaintiffs are "stock car racing teams," not individual investors like Michael Jordan. This is mere semantics. Plaintiffs are entities formed by entrepreneurs, including Michael Jordan (who has owned multiple sports franchises) and Bob Jenkins (who owns hundreds of franchises, including multiple Taco Bell locations), to "fund[]"

racing teams tied to specific cars.  JA30 (¶¶28, 33).  In virtually every case NASCAR cited, the plaintiff was the company that served as the vehicle for a particular investment, not an individual investor.  *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549 (W.D. Va. 2000).

Moreover, the fact that Plaintiffs are team owners who voluntarily chose to *invest* in NASCAR sets this case apart from *NCAA v. Alston*, 594 U.S. 69 (2021), and the other cases Plaintiffs cite (at 40 n.2) involving antitrust claims by *athletes*. In those cases, athletes claimed that their unique skills left them trapped in a monopolistic environment with no alternate buyers to whom they could "sell" their athletic services.  Here, however, Plaintiffs are business entities with the freedom to choose their investments, diversify, or exit if they are dissatisfied with returns. Indeed, the rising value of Charters offers a straightforward solution for any discontented owner:  sell the Charters and turn a profit.  JA375 (¶41); JA411 (¶20). Yet, both Plaintiffs have chosen to purchase *additional* Charters as recently as last year.  JA31-32 (¶¶35, 41).

Second, Plaintiffs attempt to sidestep the district court's legal error altogether by asserting that the district court "found, as a factual matter, that NASCAR has no competitors as a buyer."  Pls.' Br. 46-47 (emphasis omitted).  However, Plaintiffs' support for this is the district court's conclusion that Plaintiffs have built "unique

cars and highly specialized teams" *post-investment*. JA178. Crucially, the district court never addressed, let alone made factual findings on, the level of competition at the *pre*-investment stage for attracting team owners like Plaintiffs.

Finally, Plaintiffs make an unsuccessful attempt (at 45-46 & n.5) to distinguish just three cases cited by NASCAR. For instance, Plaintiffs say that NASCAR's "investment-market argument" is confined to situations where plaintiffs are "'bound by contract'" to sell their services to the defendant because those were the facts in *Queen City Pizza*. Pls.' Br. 45 (quoting *Queen City Pizza*, 124 F.3d at 441). But *Queen City Pizza* did not hinge on the "contractual" nature of the plaintiff's alleged lock-in to the defendant. Instead, it set forth a broader legal rule: A plaintiff cannot establish a market by claiming it is "locked in" to selling to a defendant—whether due to a contract or otherwise—when that relationship was "subjected to competition" *before* the lock-in occurred. 124 F.3d at 439-40. Regardless, NASCAR cited other cases that did not involve contractual restraints. *See, e.g.*, *Virginia Vermiculite*, 108 F. Supp. 2d 549.

Plaintiffs' efforts (at 56 n.4) to distinguish *Mozart Co. v. Mercedes-Benz of North America, Inc.*, 833 F.2d 1342 (9th Cir. 1987), are also unconvincing. They assert (at 56 n.4) that the relevant market in *Mozart* included all car dealership franchises, not just Mercedes, only because "Mercedes cars [a]re not unique." But that is not what the Ninth Circuit said. It held that jury instructions for determining

Mercedes' power over dealers that centered on the "uniqueness of the Mercedes automobile" were "*improperly focused*" because, "while many individual purchasers of automobiles undoubtedly regard a Mercedes as unique," dealers (or franchisees) simply see it as "an article that is purchased at wholesale and sold at retail." *Id.* at 1346-47 (emphasis added). So, focusing solely on a car's "uniqueness" missed the "critical" market-definition issue: whether Mercedes had the "power" to compel franchisees to choose a Mercedes dealership over another franchise. *Id.* The district court here made the exact same mistake: It considered only Cup Series cars' "uniqueness," ignoring the "critical issue" of NASCAR's power over team owners who prioritize investment returns. *Id.*

Plaintiffs' market-definition argument boils down to this: An investor like Michael Jordan can create an entity for a specific investment, fully aware of the market dynamics and with countless other investment (and reinvestment) opportunities available, and then cry monopoly whenever the offered terms for a new contract are not to his liking. Plaintiffs cannot cite a single case that has endorsed this argument because it defies common sense and basic economic principles. Like the plaintiffs in *Virginia Vermiculite*, Plaintiffs chose to fund NASCAR Cup Series teams with "eyes wide open, fully able to 'assess the potential costs and economic risks at the time.'" 108 F. Supp. 2d at 584 (citation omitted). Indeed, Plaintiffs still do not dispute that, had NASCAR's terms been

anticompetitive, they could have invested elsewhere—and they *still* could sell their Charters. The fact that certain of Plaintiffs' teams' "services" are now "locked in" to being used in Cup Series races, Pls.' Br. 40-43, 45, stems from Plaintiffs' own voluntary choices, says nothing about NASCAR's market power, and thus "cannot establish a relevant ... market." *Virginia Vermiculite*, 108 F. Supp. 2d at 583-84. The district court's contrary conclusion warrants reversal.

### D. At A Minimum, Plaintiffs Have Failed To Meet The Heightened Standard Required For Mandatory Injunctions

At the very least, Plaintiffs' likelihood of success on what would be an unprecedented Section 2 claim is not "indisputably clear," the standard required for mandatory injunctions like those entered here. The injunctions fail for this additional reason.

These injunctions—compelling NASCAR to provide Plaintiffs the full benefits of a contract Plaintiffs rejected and NASCAR subsequently withdrew, while ordering transfers of Charters that disregard specific contractual requirements for such transfers—disrupt the status quo and trigger a heightened standard. *See* NASCAR Br. 29-32. Plaintiffs barely contest this, instead mischaracterizing (at 37) the district court's contrary conclusion on the applicable standard as a "factual finding[]" subject to clear-error review. But the district court made no factual findings that affect the applicable standard. It is undisputed—and indeed, the district court acknowledged—that Plaintiffs' 2016 Charters expired in 2024, and Plaintiffs

never held Charters for the 2025 Cup Series season before these injunctions.  *See, e.g.*, JA171-172.  Determining the standard of review from these undisputed facts is a legal question that this Court must resolve independently, as even the cases Plaintiffs cite confirm.  *See Pierce v. North Carolina State Bd. of Elections*, 97 F.4th 194, 209-210 (4th Cir. 2024) (analyzing whether injunction was mandatory without deference to district court); *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (same).

Plaintiffs emphasize (at 34) a suggestion in the district court's first order that Plaintiffs could meet even the mandatory-injunction standard, but this is a red herring.  This Court must independently determine the appropriate standard of review for evaluating these injunctions—and whether it is satisfied.  *See Pashby*, 709 F.3d at 319.  Applying settled law to undisputed facts here leaves no doubt both that these injunctions are mandatory, and that Plaintiffs' chances of success on their novel Sherman Act claim is, at the very least, not "*indisputably* clear," *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (emphasis added)—meaning these "(extra) extraordinary" measures must be reversed, *Pierce*, 97 F.4th at 209-10.

One other point bears mention.  Plaintiffs suggest (at 1, 5, 32, 65) that the fact the 2025 Cup Series season is "well underway" might itself justify affirming these "narrow" injunctions.  But the status quo is obviously determined by the parties'

positions *before* the injunctions, not after.  And there is nothing "narrow" about these injunctions; they force NASCAR to pay Plaintiffs *tens of millions of dollars* in guaranteed revenue, without any bond, while Plaintiffs' counsel makes disparaging statements about NASCAR to the press.  *See* NASCAR Br. 30-32; *see also* JA1164. Regardless, the "narrowness" of the injunctions is not relevant for the issues on appeal.  If this Court concludes that Plaintiffs failed to meet their burden to show a likelihood of success, then these injunctions must be reversed—narrow or not.  *See, e.g.*, *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (likelihood of success is essential for granting an injunction).

## II.  THE DISTRICT COURT'S INJUNCTIONS FAIL FOR THE ADDITIONAL REASON THAT THEY CONTRADICT PLAINTIFFS' ATTEMPT TO HOLD THE CHARTER UNLAWFUL

The district court's injunctions also cannot stand for a separate reason:  they flout this Court's decision in *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997).  *Omega* held that a complaint alleging that a contract "violates the Sherman Act cannot, as a matter of law, support an injunction requiring [the defendant] to remain involuntarily in [the allegedly unlawful] contractual business relationship with [the plaintiff]."  *Id.* at 15-16.  That is because preliminary injunctive relief must advance, not conflict with, the "ultimate legal claim" in the complaint.  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 32 (2008).  These

injunctions—which bind Plaintiffs to a contract they are simultaneously seeking to declare unlawful—contradict *Omega*'s clear rule.

Plaintiffs respond (at 62-65) that this case falls outside of *Omega* because they aim to invalidate just "two provisions" of the Charter at the end of this case, leaving the rest of the Charter and the Charter system intact. But their complaint and the rest of their brief tell a different story. Plaintiffs' complaint seeks sweeping declaratory relief under Section 1 of the Sherman Act, aiming to overhaul the Charter system and renegotiate all Charter terms because they were set by an alleged monopsonist. *See, e.g.*, JA57-60. And throughout their brief, Plaintiffs denounce all Charter terms as tainted by NASCAR's alleged monopsonist status. *See, e.g.*, Pls.' Br. 3, 12, 14, 61 n.8. There is simply no way to reconcile Plaintiffs' argument that "[t]he complaint does not seek to invalidate the entire charter agreement," *id.* at 7, 32, 63, with their request to adjudge the 2025 Charter an "unreasonable restraint of trade," JA58 (¶153), JA60, and their argument that *all* Charter terms have been infected by NASCAR's status as a monopsonist, Pls.' Br. 3, 12, 14, 61 n.8.[3]

---

[3]    For the same reasons, there is no merit to Plaintiffs' claim (at 65) that simply enjoining the noncompete would align the district court's injunctions with the complaint. Their complaint attacks the entire 2025 Charter as tainted by alleged monopsonistic conduct. For instance, Plaintiffs argue that Charter provisions "seiz[ing] control over team intellectual property rights" and limiting the "ability [of team owners] to resist unilateral NASCAR rules" are "one-sided, monopolistic ... terms." JA48-49 (¶110). And they point to Charter terms "that would undermine the relationship between teams and drivers." JA49 (¶110). An injunction that binds

The district court's *Omega* error thus independently warrants reversal.

## CONCLUSION

The district court's injunctions should be reversed.

Dated: April 4, 2025

Respectfully submitted,

/s/ *Gregory G. Garre*

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com

Tricia Wilson Magee
SHUMAKER, LOOP &
  KENDRICK, LLP
101 S. Tryon Street, Suite 2200
Charlotte, NC 28280
(704) 945-2961
tmagee@shumaker.com

Gregory G. Garre
Anna M. Rathbun
Christopher J. Brown
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
lawrence.buterman@lw.com

*Counsel for Defendants-Appellants*
*National Association for Stock Car Auto Racing, LLC and James France*

---

Plaintiffs to any of the Charter's terms contradicts their underlying position that the 2025 Charter violates the Sherman Act.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

Counsel for Appellants National Association for Stock Car Auto Racing, LLC and James France hereby certifies that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(b).  The brief contains 6,480 words (as calculated by the Microsoft Word 365 word processing system used to prepare this brief), excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman style font.


Dated:  April 4, 2025

*s/ Gregory G. Garre*
Gregory G. Garre

*Counsel for Defendants-Appellants*
*National Association for Stock Car*
*Auto Racing, LLC and James France*