No. 24-2245

# United States Court of Appeals for the Fourth Circuit

2311 RACING LLC d/b/a 23XI RACING
and FRONT ROW MOTORSPORTS, INC.,
*Plaintiffs-Appellees*,

*v.*

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC;
and JAMES FRANCE,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of North Carolina
No. 3:24-CV-886-KDR-SCR
Hon. Kenneth D. Bell

## PETITION FOR REHEARING AND REHEARING *EN BANC*

Danielle T. Williams
WINSTON & STRAWN LLP
300 S. Tryon St. 16th Floor
Charlotte, NC 28202
(704) 350-7700
dwilliams@winston.com

Jeanifer Parsigian
WINSTON & STRAWN LLP
101 California St.
San Francisco, CA 94111
(415) 591-1000
jparsigian@winston.com

Jeffrey L. Kessler
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700
jkessler@winston.com

Scott P. Glauberman
Kelly Mannion Ellis
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
(312) 558-5600
sglauber@winston.com
kmannion@winston.com

*Counsel for Plaintiffs-Appellees*
*2311 Racing LLC d/b/a 23XI Racing and Front Row Motorsports, Inc.*

# TABLE OF CONTENTS

Rule 40(b) Statement of Purpose ............................................................. 1

Statement of the Case .......................................................................... 3

   I.    The parties, the charter system, and the Release ......................... 3

   II.   This lawsuit ......................................................................... 5

   III.  The panel's decision ............................................................. 7

Reasons for Granting the Petition ......................................................... 8

   I.    The Release is an anticompetitive act to maintain NASCAR's
monopoly. ............................................................................... 8

      A.   Faced with a question of first impression, the panel did not
consider the Release's anticompetitive effect. ................................. 9

      B.   The panel's opinion will encourage other monopolists to
maintain their monopolies by requiring releases as a condition of
entry..................................................................................... 14

   II.   The panel should have either assessed the Release together with
NASCAR's other anticompetitive acts or left the injunction in place
and remanded for the district court to conduct that assessment. ....... 16

      A.   The panel's opinion ignored *Duke Energy*'s directive to
consider all anticompetitive acts of a monopolist together "as a
whole." ................................................................................. 16

      B.   At a minimum, rehearing is required to keep the injunction in
place so that the district court can apply *Duke Energy* on remand....
................................................................................................ 18

Conclusion .......................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Ashcroft,*
   322 F.3d 240 (3d Cir. 2003) ................................................................ 19

*Ashcroft v. ACLU,*
   535 U.S. 564 (2002) ........................................................................ 3, 19

*Cook Cnty. v. Wolf,*
   962 F.3d 208 (7th Cir. 2020) .............................................................. 17

*Duke Energy Carolinas v. NTE Carolinas II,*
   111 F.4th 337 (4th Cir. 2024) ..................................................... *passim*

*Duke Energy Carolinas v. NTE Carolinas II,*
   122 F.4th 120 (4th Cir. 2024) ............................................................ 13

*E.I. du Pont de Nemours & Co. v. Kolon Indus.,*
   637 F.3d 435 (4th Cir. 2011) .............................................................. 12

*Jordan v. Alternative Res.,*
   467 F.3d 378 (4th Cir. 2006) ................................................................ 8

*Karaha Bodas v. Perusahaan Pertambangan Minyak Dan*
   *Gas Bumi Negara,*
   500 F.3d 111 (2d Cir. 2007) ............................................................... 17

*Lutz v. Case Farms,*
   2020 WL 5111217 (W.D.N.C.) ........................................................... 14

*NCAA v. Alston,*
   594 U.S. 69 (2021) .............................................................................. 15

*Omega World Travel v. Trans World Airlines,*
   111 F.3d 14 (4th Cir. 1997) .......................................................... 13, 14

*P.R. Tel. v. San Juan Cable,*
   874 F.3d 767 (1st Cir. 2017) .............................................................. 15

*Pac. Bell Tel. v. linkLine Commc'ns,*
   555 U.S. 438 (2009) ................................................................ 13

*Pashby v. Delia,*
   709 F.3d 307 (4th Cir. 2013) ...................................... 17, 19

*Pub. Serv. Co. v. Patch,*
   202 F.3d 29 (1st Cir. 2000) ................................................ 19

*Seijas v. Argentina,*
   352 F. App'x 519 (2d Cir. 2009) ...................................... 20

*Stinnie v. Holcomb,*
   77 F.4th 200 (4th Cir. 2023) ............................................ 20

*Telecom Int'l Am. v. AT&T,*
   280 F.3d 175 (2d Cir. 2001) ............................................ 16

*Total Vision v. Vision Serv. Plan,*
   717 F. Supp. 3d 922 (C.D. Cal. 2024) ............................ 12

*United States v. Cohen,*
   152 F.3d 321 (4th Cir. 1998) ........................................ 3, 19

*United States v. E. I. du Pont de Nemours & Co.,*
   353 U.S. 586 (1957) ............................................................ 10

*United States v. Grinnell,*
   384 U.S. 563 (1966) ............................................................ 10

*Va. Impression Prods. v. SCM,*
   448 F.2d 262 (4th Cir. 1971) ............................................ 12

## Statutes

15 U.S.C. § 2 ................................................................ *passim*

## Other Authorities

4th Cir. L.R. 40(b) .................................................................. 1

4th Cir. L.R. 40(b)(i) .............................................................. 2

4th Cir. L.R. 40(b)(iii) ............................................................................ 2

Fed. R. App. P. 40(b) ............................................................................. 1

Fed. R. App. P. 40(b)(1)(A) ............................................................... 1, 2

Fed. R. App. P. 40(b)(2)(A) .................................................................... 2

Fed. R. App. P. 40(b)(2)(D) .................................................................... 1

## RULE 40(b) STATEMENT OF PURPOSE

In counsel's judgment, the panel should rehear this appeal, or the full Court should rehear it *en banc*, for two reasons that Federal Rule of Appellate Procedure 40(b) and Local Rule 40(b) authorize.

First, the panel's opinion answers—incorrectly—a question of exceptional importance under Section 2 of the Sherman Act. Section 2 forbids a monopolist from using anticompetitive acts to maintain the monopoly. The question is whether a monopolist may forbid participants from entering the market unless they agree not to challenge the monopoly in court. Fed. R. App. P. 40(b)(1)(A), 40(b)(2)(D); 4th Cir. L.R. 40(b)(iv). The monopolist here, NASCAR, requires premier stock-car-racing teams to sign a release of antitrust claims as a condition of racing with a charter. Racing with a charter is (as the district court found, and the panel's opinion did not dispute) the only economically viable way to race. Thus, NASCAR is using the Release to maintain its monopoly.

The panel's opinion ruled, as a matter of law, that a release of antirust claims cannot be an anticompetitive act because no decision has found a Section 2 violation based on that conduct. But neither does

1

any decision allow it. This is an issue of exceptional importance because if the panel's opinion stands, other monopolists will require releases of antitrust claims to maintain their monopolies.

Second, the panel's opinion overlooked an important legal matter and conflicts with this Court's decision in *Duke Energy Carolinas v. NTE Carolinas II*, 111 F.4th 337 (4th Cir. 2024). Fed. R. App. P. 40(b)(1)(A), 40(b)(2)(A); 4th Cir. L.R. 40(b)(i), 40(b)(iii). *Duke Energy* held that in a Section 2 case, "[i]t is foundational that alleged anticompetitive conduct must be considered as a whole." 111 F.4th at 354. The panel's opinion, however, addressed just one anticompetitive act in isolation (NASCAR insisting on the Release as a condition of entry) rather than considering whether the Release is anticompetitive when combined with NASCAR's other anticompetitive acts. NASCAR's acts included locking up racetracks so that competitors cannot use them, imposing noncompete agreements on racing teams, and acquiring its closest competitor. The panel's opinion declined to consider NASCAR's conduct "as a whole"—contravening *Duke Energy*.

Even if the Panel were correct not to address NASCAR's other anticompetitive acts in the first instance, it compounded its error by

vacating the injunction. The Supreme Court, this Court, and other appellate courts in similar situations have instead left the injunction in place and remanded for a lower court to consider whether other grounds support it. *E.g.*, *Ashcroft v. ACLU*, 535 U.S. 564 (2002); *United States v. Cohen*, 152 F.3d 321 (4th Cir. 1998). That prudent approach is especially warranted here because NASCAR has not challenged the district court's finding that plaintiffs will suffer severe and irreparable harm without the injunction, defendants will suffer little or no harm from the injunction, and the public interest favors the injunction.

## STATEMENT OF THE CASE

### I. The parties, the charter system, and the Release

Plaintiffs—23XI Racing and Front Row Motorsports—are premier stock-car-racing teams. The country's *only* premier stock-car-racing circuit is NASCAR's Cup Series.

The teams make the investments, employ the drivers, and engage in the races—but NASCAR reaps nearly all the economic benefits. In 2016, after years of financial upheaval for the teams, NASCAR began using a charter system. It granted charters for 36 cars, guaranteeing each one a spot in every Cup Series race and a share of pooled revenue. Charters provided the minimum for teams to have a chance to survive.

The district court found that racing as an "open" team, meaning without a charter, is not economically sustainable.[1] JA0182-0184. Defendants did not challenge this finding on appeal.

New charter agreements for 2025 continued to impose below-competitive-market terms. But with livelihoods on the line, every other team besides plaintiffs surrendered and signed to keep their charters.

The 2025 charter agreements force the teams to agree to the following Release, which defendants contend shields NASCAR's monopoly from antitrust liability:

> Team Owner … hereby releases and forever discharges [NASCAR] … from all [claims] … arising out of or relating to the criteria used by [NASCAR] to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner or any other Person….

JA0836-0837 (§ 10.3). The Release is "hardly a model of clarity, but Defendants' view that the Release bars plaintiffs' antitrust claims *in this action* is crystal clear." JA0194; *accord* JA0180 (citing JA0252).

---

[1] Open agreements also included the Release, underscoring its anticompetitive purpose, until defendants removed it after plaintiff's first preliminary-injunction motion. JA0172.

## II.    This lawsuit

Plaintiffs sued to challenge the monopoly, claiming that NASCAR unlawfully maintained it through a series of anticompetitive acts in violation of Section 2. 15 U.S.C. § 2.

Plaintiffs requested a preliminary injunction to allow them to continue racing, under 2025 charters, without the Release. They submitted fact and expert evidence that NASCAR used an interrelated series of anticompetitive acts, with the Release, to maintain its monopoly. Those acts included:

(1) acquiring premier racetracks and refusing to grant access to this needed resource to any other stock car races;

(2) contractually forbidding other Cup Series racetracks, which NASCAR does not own, from hosting other stock car races;

(3) acquiring its closest rival to prevent the rival from growing into a competitor to the Cup Series;

(4) forbidding chartered teams from competing in other stock car races or investing in a competitor to the Cup Series; *and*

(5) requiring chartered teams to use and pay for "Next Gen" cars that cannot be used in races competing with the Cup Series.

*E.g.*, JA1059-1086. Those acts—as a whole—unlawfully maintained NASCAR's monopoly power. JA0945-0985; JA1016-1053.

The district court granted plaintiffs' motion for a preliminary injunction to "maintain the status quo of Plaintiffs participating in

NASCAR Cup Series races as chartered teams while being permitted to pursue their legal claims in this action." JA0169; JA0177.

Before granting that injunction, the court found that plaintiffs satisfied each requirement for preliminary relief. First, losing their charters would irreparably harm them. JA0181-1084. Second, the balance of equities favored plaintiffs because defendants "will not be significantly harmed (and perhaps not harmed at all) by plaintiffs being allowed to race as chartered cars." JA0184. Third, the public interest favored an injunction to allow fans to cheer for their favorite teams and plaintiffs to pursue antitrust claims while competing. JA0185. Defendants challenged *none* of those findings on appeal.

Defendants challenged only the court's finding that plaintiffs are likely to succeed on the merits. The court held that the Release is likely an anticompetitive act to maintain NASCAR's monopoly. "Market aspirants should not be forced to choose between participation in a market and the later assertion of their ongoing/future antitrust rights, ***nor should a monopolist be permitted to include in the market only those who consent to the monopolist's alleged wrongdoing***."

JA0181 (emphasis added). The court did not rule on the other anticompetitive acts.

The preliminary injunction barred NASCAR from enforcing the Release against plaintiffs, allowed each plaintiff to race under charters in the 2025 season, and prohibited NASCAR from blocking the teams' preapproved acquisition of charters from other teams. JA0186; JA0209-0210. The Cup Series season ends in November and will be followed by a trial on December 1.

## III.    The panel's decision

The panel vacated the injunction on the ground that the Release cannot, as a matter of law, be an anticompetitive act that supports a Section 2 claim. Op. 2-3. The panel said the injunction was "not supported by any case of which we are aware" and asserted that the district court "supplied no case law" to the contrary. *Id.* 2, 7. According to the panel, the cases the district court cited showed only that public policy does not allow an agreement to prospectively waive antitrust claims, but "here there is *no agreement*," and the release "is *not prospective.*" *Id.* 2. The panel said the Release itself "did not address competition," and there is no general bar on releasing antitrust claims.

*Id.* 8. The panel did not address whether the Release could be an anticompetitive act to maintain NASCAR's monopoly when considered as a whole with NASCAR's other anticompetitive acts.

## REASONS FOR GRANTING THE PETITION

### I. The Release is an anticompetitive act to maintain NASCAR's monopoly.

The panel's decision addresses a question of exceptional importance deserving rehearing: May a monopolist maintain its power by barring participants from the market unless they agree not to challenge the monopoly in court? *Cf. Jordan v. Alternative Res.*, 467 F.3d 378, 382 (4th Cir. 2006) (King, J., dissenting) (recommending *en banc* review, which was denied on a tie vote, because a panel "forc[ed] employees to choose between hostile work environment claims and the protection authorized under Title VII's anti-retaliation provision").

The panel answered "Yes." The panel did not consider whether the Release had the anticompetitive effect of helping to maintain NASCAR's monopoly without any offsetting procompetitive justification. Instead, the panel noted the absence of prior caselaw and ruled, as a matter of law, that antitrust releases can never be an anticompetitive act for maintaining a monopoly. Op. 8. If left in place,

that decision will lead to other monopolists insisting on releases as the price of market entry.

### A. Faced with a question of first impression, the panel did not consider the Release's anticompetitive effect.

The parties and panel found no case in which a monopolist insisted on a release of antitrust claims as a condition of market entry. But that was not a legitimate reason to vacate the injunction. NASCAR may be the first monopoly brazen enough to force market participants to waive antitrust claims on pain of going out of business. But the issue is not whether the Release is unprecedented. The issue is whether insisting on it is an anticompetitive act that helps maintain NASCAR's monopoly.

The panel held that "[t]he effect of such a release is to eliminate antitrust suits and others between parties doing business with each other, not to eliminate or injure *competition*." Op. 8. But the Release here had both effects. The panel left in place the district court's finding that NASCAR is a monopolist. But the panel did not consider the anticompetitive effect of NASCAR's insisting on the Release as a prerequisite to market entry. Op. 9.

Section 2 prohibits the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Duke Energy*, 111 F.4th at 353. A monopolist cannot maintain its monopoly power through anticompetitive acts, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell*, 384 U.S. 563, 570-71 (1966).

NASCAR's share of the premier stock-car-racing market is 100 percent; there is no market entry except through NASCAR. JA0178-0179; *see United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 595-96 (1957). To compete as chartered racing teams, NASCAR requires a release of antitrust claims. JA0180. As the district court found, a premier stock-car-racing team has only two choices: agree not to challenge the monopoly, or give up the ability to compete. JA0180.

Given NASCAR has used other anticompetitive acts to suppress any competing premier stock-car-racing circuit, racing teams are the most likely plaintiffs with an incentive to sue to challenge NASCAR's monopoly. The panel's decision permits NASCAR to impose the Release

to block such lawsuits. Because the Release helps NASCAR maintain its monopoly without any procompetitive justification, the Release is, to use the panel's phrase, "anticompetitive conduct in the service of monopoly power." Op. 9.

The panel's opinion, however, addressed none of this simply because there was no case on point. The opinion focused instead on a series of inconsequential, peripheral issues.

***First***, the opinion relied on its notion that the Release is only "a release for past conduct." Op. 2. The panel then distinguished the cases the district court cited because "the release … is *not prospective*." *Id.* 7. None of this is relevant to whether the Release was an anticompetitive act to help maintain NASCAR's monopoly. On this point, there should be no doubt. Defendants themselves have asserted that the Release would preclude plaintiffs' claims here. JA0180; JA0194; JA0252. Requiring the release of such claims, by the victims of NASCAR's monopoly, obviously helps maintain NASCAR's monopoly. And neither the panel nor NASCAR identified a procompetitive reason for requiring the Release as a condition for entry.

**Second**, the panel emphasized that the teams' release of NASCAR is accompanied by NASCAR's release of the teams. Op. 3, 8-9. But that has nothing to do with whether the Release is anticompetitive when NASCAR uses it to protect its monopoly. Unrebutted expert evidence showed there is an "obvious asymmetry" to the releases because the teams, unlike NASCAR, "do not have market power." JA1048 (¶ 79). The Release of claims *against* NASCAR—the monopolist—as a condition to market entry is anticompetitive. *Id.*; *Total Vision v. Vision Serv. Plan*, 717 F. Supp. 3d 922, 933 (C.D. Cal. 2024) (finding a release invalid because it was part of an antitrust conspiracy).

**Third**, the panel quoted a case, which allowed a release in a settlement, as holding there is "no prohibition … [on] the disclaimer of antitrust claims by a general release." Op. 8 (quoting *Va. Impression Prods. v. SCM*, 448 F.2d 262, 266 (4th Cir. 1971)). The defendant there, however, was *not* a monopolist and did *not* use a release to maintain a monopoly. *Va. Impression*, 448 F.2d at 263-65.

A monopolist "is not free to take certain actions that a company in a competitive … market may take, because there is no market constraint on a monopolist's behavior." *E.I. du Pont de Nemours & Co.*

*v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2011). The panel should have considered whether the expert and fact evidence showed that NASCAR was likely using the Release as an anticompetitive act. The panel did not even mention the evidence on this point.

**Fourth**, the panel relied on *Pacific Bell Telephone v. linkLine Commc'ns*, 555 U.S. 438 (2009), for the proposition that parties may choose their counterparties and terms of dealing. Op. 9. But *linkLine* "addressed a unique claim in which the 'independent competitive harm' from *price squeezes* could not be identified." *Duke Energy Carolinas v. NTE Carolinas II*, 122 F.4th 120, 124 (4th Cir. 2024) (Niemeyer, J., in support of denying rehearing *en banc*). *linkLine* had nothing to do with a monopolist using a release to maintain its monopoly.

**Fifth**, the panel's opinion states that the injunction improperly "required two parties to engage in a business that one party claims to be illegal." Op. 10. The sole support was a "*Cf.*" cite to *Omega World Travel v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997). But *Omega* does not apply here.

In *Omega*, an agent sued to "dissolve" its relationship with the defendant. 111 F.3d at 15-16. The defendant "threatened to terminate"

the relationship, and the plaintiff won an injunction to *prevent* the defendant from terminating. *Id.* at 15. This Court reversed because the plaintiff "literally [sought] through its antitrust claim to dissolve the very contractual relationship which it [sought] to have preserved through preliminary injunction." *Id.* at 16.

Unlike *Omega*, plaintiffs here do *not seek to dissolve* the parties' entire contractual relationship (the charter agreements). In fact, the opposite is true. Plaintiffs seek to keep the charter agreements "but only to the extent that they do not violate the [Sherman Act]." *Lutz v. Case Farms*, 2020 WL 5111217, at *4 (W.D.N.C.) (distinguishing *Omega*). Plaintiffs' challenge to NASCAR's imposing the Release as an entry condition does not seek to invalidate the charter agreements, which plaintiffs fully complied with, pursuant to the injunction, so *Omega* is not applicable.

## B. The panel's opinion will encourage other monopolists to maintain their monopolies by requiring releases as a condition of entry.

This may be the first time a monopolist has insisted on a release of antitrust claims as a condition of entry, but if the panel decision stands, it will not be the last. A dominant company like Apple may rely

on the opinion to demand that app developers release antitrust claims as a condition for entry to the App Store. A company like Google may read the decision and then require companies to sign antitrust releases as a condition of advertising on its dominant search engine.

If the panel's opinion had arrived a few years earlier, recent successful antitrust challenges might have been blocked by an anticompetitive release. The NCAA could have required all college athletes to release their antitrust claims as a condition of entry into the monopsony markets for Division 1 sports—and then asserted those releases as a defense to what became the Supreme Court's unanimous decision striking down compensation restraints in *NCAA v. Alston*, 594 U.S. 69 (2021). Similarly, Duke Energy could have demanded an antitrust release as an entry condition for power providers to connect with its network. Under the panel's decision, such a release would not be anticompetitive, and the Section 2 claims against Duke Energy, which this Court found to be actionable, would have been blocked.

The panel's decision is far-reaching and dangerous. By announcing a blanket rule that requiring an antitrust release cannot be anticompetitive, the panel ignored the fact that Section 2 is intended to

broadly "prevent creative monopolists from escaping liability by adopting ever new forms of … anticompetitive conduct." *P.R. Tel. v. San Juan Cable*, 874 F.3d 767, 773 (1st Cir. 2017) (Barron, J., concurring); *see also Telecom Int'l Am. v. AT&T*, 280 F.3d 175, 197 (2d Cir. 2001) ("The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use."). The panel's ruling contradicted this principle and, because of the grave implications for antitrust policy on an issue of first impression, calls out for rehearing.

## II. The panel should have either assessed the Release together with NASCAR's other anticompetitive acts or left the injunction in place and remanded for the district court to conduct that assessment.

### A. The panel's opinion ignored *Duke Energy*'s directive to consider all anticompetitive acts of a monopolist together "as a whole."

The panel's opinion acknowledged that "the plaintiffs' complaint alleged years of conduct and contract provisions that they claimed were anticompetitive." Op. 6. The record contained expert and fact evidence of these anticompetitive acts and their effects. The acts included locking up racetracks, acquiring NASCAR's closest rival, restricting teams from

racing or investing in a Cup Series competitor, and requiring teams to invest in cars but prohibiting them from using those cars in competing races. *E.g.*, JA0945-0985; JA1016-1053; JA1059-1086. The panel failed to consider these other anticompetitive acts when holding that the Release, in isolation, could not be a Section 2 violation. This ruling cannot be reconciled with *Duke Energy*.

In a Section 2 case, "[i]t is foundational that alleged anticompetitive conduct must be considered as a whole." *Duke Energy*, 111 F.4th at 354. "Section 2 focuses on anticompetitive conduct, not on court-made subcategories of that conduct." *Id.* Where, as here, plaintiffs alleged interrelated acts as "part of a singular, coordinated anticompetitive effort," the allegations "must be … considered as part of a single campaign to foreclose competition." *Id.* at 356.

The panel violated this rule by focusing on the Release in isolation because the district court did not rule on the other anticompetitive acts. In doing so, the panel ignored plaintiffs' request, commonly granted in this Circuit and elsewhere, that the injunction be upheld "based on an[other] ground that appears in the record." *Pashby v. Delia*, 709 F.3d 307, 330 (4th Cir. 2013); *see also Cook Cnty. v. Wolf*, 962 F.3d 208, 226

(7th Cir. 2020) (affirming a preliminary injunction on an alternative ground of likely success); *Karaha Bodas v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 120 (2d Cir. 2007) (upholding a preliminary injunction "[b]ased on the extensive record"). In declining to consider all anticompetitive acts together, the panel created an inter-circuit conflict with *Duke Energy* that warrants a rehearing *en banc*.

**B.    At a minimum, rehearing is required to keep the injunction in place so that the district court can apply *Duke Energy* on remand.**

Even if the panel correctly declined to consider NASCAR's other anticompetitive acts in the first instance, it should have kept the injunction in place and remanded for the district court to conduct that assessment. It is undisputed on appeal that if the injunction is vacated, plaintiffs will suffer severe and irreparable harm. JA0181-0184. The district court found that racing without a charter is not an economically viable option, depriving the teams of the "incalculable opportunity to achieve success on the track." JA0183; *see also* JA0171; JA0181-0184. Withdrawing the preliminary injunction in the middle of the Cup Series

season heightens the irreparable harm that the district court identified and throws plaintiffs' teams into chaos.

Rather than vacate the injunction in the middle of the season, the panel should have remanded. Prior cases demonstrate that prudence favors remanding without vacating in a case like this. For example, in *Ashcroft v. ACLU*, 535 U.S. 564 (2002), the district court granted a preliminary injunction, and the Third Circuit found that the plaintiffs were likely to succeed on the merits. *Id.* at 572. The Supreme Court reversed, holding that the merits finding was wrong, but it left the injunction in place and remanded for consideration of alternative merits theories, as "prudence dictates." *Id.* at 586. On remand, the Third Circuit affirmed the injunction again, "on a ground neither decided nor discussed by the District Court." *ACLU v. Ashcroft*, 322 F.3d 240, 243 (3d Cir. 2003).

This Circuit acted similarly in *United States v. Cohen*, 152 F.3d 321 (4th Cir. 1998). There, the district court enjoined a defendant from dissipating assets. This Court reversed, given the lack of required findings of fact. *Id.* at 326. But this Court left the injunction in place and gave the district court 60 days to consider those facts. *Id.*

Other appellate cases are in accord. *E.g.*, *Pashby*, 709 F.3d at 330 (remanding without vacating injunction); *Pub. Serv. Co. v. Patch*, 202 F.3d 29, 34 (1st Cir. 2000) ("[W]e have determined not to vacate the district court's injunction … but instead to remand this aspect of the case to the district court for further proceedings" within 90 days.); *Seijas v. Argentina*, 352 F. App'x 519, 522 (2d Cir. 2009) (reversing district court but leaving injunction in place to avoid "undue hardship on plaintiffs" while the district court considered additional facts). The conflict between those decisions and the panel's decision calls for rehearing. *Stinnie v. Holcomb*, 77 F.4th 200, 203 (4th Cir. 2023).

At a minimum, under the precedents of the Supreme Court and this Circuit, the Court should grant rehearing to maintain the injunction against NASCAR for a fixed period to allow the district court to consider all anticompetitive acts together "as a whole." Any other result unfairly subjects plaintiffs to irreparable harm before any court has applied *Duke Energy*.

## CONCLUSION

This Court should grant rehearing or rehearing *en banc*.

June 20, 2025                   Respectfully submitted,

                               By:  /s/ *Jeffrey L. Kessler*
                                    Jeffrey L. Kessler
                                    WINSTON & STRAWN LLP
                                    200 Park Avenue
                                    New York, NY 10166
                                    (212) 294-6700
                                    jkessler@winston.com

                                    Danielle T. Williams
                                    WINSTON & STRAWN LLP
                                    300 S. Tryon St.
                                    Charlotte, NC 28202
                                    (704) 350-7700
                                    dwilliams@winston.com

                                    Jeanifer Parsigian
                                    WINSTON & STRAWN LLP
                                    101 California St.
                                    San Francisco, CA 94111
                                    (415) 591-1000
                                    jparsigian@winston.com

                                    Scott P. Glauberman
                                    Kelly Mannion Ellis
                                    WINSTON & STRAWN LLP
                                    35 W. Wacker Dr.
                                    Chicago, IL 60601
                                    (312) 558-5600
                                    sglauberman@winston.com
                                    kmannion@winston.com

                                    *Counsel for Plaintiffs-Appellees*
                                    *2311 Racing LLC Racing and*
                                    *Front Row Motorsports, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A), because it contains 3,864 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook, 14-point font.

/s/ *Jeffrey L. Kessler*
JEFFREY L. KESSLER